Pages 1 - 171

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VIRGINIA K. DeMARCHI, MAGISTRATE JUDGE

| | | |
|---|---|---|
| RAJA KANNAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 5:17-cv-07305-EJD (VKD) |
| | ) | |
| APPLE, INC., | ) | |
| | ) | |
| Defendant. | ) | San Jose, California |
| _____ | ) | Tuesday, September 24, 2019 |

**TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING
OF PROCEEDINGS**

FTR 10:00 a.m. - 1:23 p.m. =  203 minutes

**APPEARANCES**:

For Plaintiff:              Ford & Associates, LLC
                           The Warren
                           Ocean Avenue, Suite 208
                           Carmel-By-The-Sea, California  93921
                    BY:  **KAREN E. FORD, ESQ.**


For Defendant:             Baker & McKenzie
                           Two Embarcadero Center, 11th floor
                           San Francisco, California  94111
                    BY:  **TODD K. BOYER, ESQ.**



Transcribed by:            Leo T. Mankiewicz, Transcriber
                           leomank@gmail.com
                           (415) 722-7045

1   <u>Tuesday, September 24, 2019</u>

2                                           10:00 a.m.

3                    P R O C E E D I N G S

4        **THE CLERK:**  All rise.  This court is now in session,

5   the Honorable Virginia K. DeMarchi presiding.

6        **THE COURT:**  Good morning.  You may be seated.

7        **THE CLERK:**  Calling the matter of Kannan versus

8   Apple, case number 17-CV-07305.

9        **THE COURT:**  When you're ready, I'll have your

10   appearances, please, starting with the plaintiff.

11        **MS. FORD:**  And looks like the mike is on.

12        **THE COURT:**  Yes.

13        **MS. FORD:**  Good morning, your Honor.  Karen Ford for

14   the plaintiff Roger Kannan.

15        **THE COURT:**  Good morning.

16        **MR. BOYER:**  Good morning, your Honor.  Todd Boyer on

17   behalf of defendant Apple, Inc.

18        **THE COURT:**  Good morning to you, as well.  You may

19   both be seated, and during the argument today, we're doing an

20   audio recording, so it's probably best if you argue from a

21   seated position, so that we can record you.  Thank you.

22        All right, so I have five discovery disputes before me

23   today, and some other things that I think are disputes I'm

24   going to put in the miscellaneous category, but we have a lot

25   to get through this morning, and I plan to just go through them

1    essentially in the order in which they were submitted to me;

2    and I have questions for each of you about each dispute, and

3    for the ones where the parties did not make a joint submission,

4    I'll give Mr. Kannan's side an opportunity to address anything

5    in Apple's part of the submission that you weren't able to

6    address, or you feel needs addressing.

7        So let me start with the one that's the question of

8    compliance with my July 11th order.  So this is docket

9    number 108, Exhibit 1, and docket number 114.

10       So let me start with you, Ms. Ford, and some questions for

11   your side of the case.

12       First of all, can you tell me how many employees of Apple

13   are within the scope of my July 11th order?  My recollection

14   from the hearing last time was there were about nine.

15       **MS. FORD:**  Um, I think it depends a bit on what time

16   it is, because they changed a little bit over time, I think,

17   over the years.

18       **THE COURT:**  I mean total.  So my order said

19   employees who reported to Mr. Kotni during the relevant time

20   period, which was July 1st, 2011 through December 31st, 2018.

21   So how many employees are we talking about?

22       **MS. FORD:**  There were five that were the ones that

23   we said had essentially the same job, and then there were two

24   others, I believe, and then there's a third that pops in later

25   on.  So that would be five, six, seven, eight.  So that would

1    be eight.

2              **THE COURT:**  So there's a total of eight employees,

3    okay.  Now, I understand that Apple made a further production

4    of documents last week, and so I'd like to understand from your

5    perspective what remains in dispute, and it would be helpful if

6    you could answer that question by reference to the document

7    categories that you put at the end of your submission.

8              **MS. FORD:**  Okay.

9              **THE COURT:**  So I think there were 10 different

10   categories of documents, so I'm interested in knowing what is

11   still in issue.

12             **MS. FORD:**  Okay.  With respect to the compensation

13   documents --

14             **THE COURT:**  All right, let's go in order, please.

15   It would just be helpful.

16             **MS. FORD:**  Oh.

17             **THE COURT:**  The first one is e-mails from the stock

18   plan administration to the employees in question reflecting

19   awards and vesting, including "confirmation of approval"

20   e-mails.

21             **MS. FORD:**  We received some of those.  We are not

22   certain that we received all of them.  You have to match them

23   up with other documents that show what stock awards people got.

24   So I believe we don't have all of them, but we did receive some

25   of them last week, yes.

1    **THE COURT:**  Okay, Apple says it's already produced

2    information reflecting the RSUs each employee received, both

3    their award -- their certificates and their agreements, as well

4    as the e-mails that you refer to.

5    So is the answer to my question that you're not sure if

6    there's something missing because you haven't had a chance to

7    match it all up yet, or are you sure there is something missing

8    and if there is, what is it?

9    **MS. FORD:**  Okay.  In part, it's what you just said,

10   that I haven't had time to sit down and match them all up

11   because there's quite a few of them, but just in terms of sheer

12   numbers, it doesn't appear like there would be enough of the

13   e-mails, because the e-mails come out -- the stock awards vest

14   over four years.  So if somebody gets a stock award, there

15   should be four e-mails for each stock award, and so if you

16   have, you know, that many employees and you multiply out how

17   many awards that seemed to be, it doesn't seem like we have all

18   of them.

19   Another major issue that is floating around here is the

20   following, that Apple places a dollar amount, a dollar value --

21   **THE COURT:**  Okay, we're going to get to that one.

22   I think that's a little bit later.

23   **MS. FORD:**  Okay.

24   **THE COURT:**  I'm sorry to cut you off, but I'm really

25   just trying to go through this very deliberately, to make sure

1    I understand what's still at stake.

2         **MS. FORD:**  Okay.

3         **THE COURT:**  So I'm not sure that expressly falls

4    into one of your categories.  Okay, so let's just put a pin in

5    that, I'll make a note.  I will come back to that issue about

6    the dollar amount, but with respect to this first category

7    about the stock plan administration, you think you don't have

8    all the e-mails.

9         **MS. FORD:**  Right.

10        **THE COURT:**  Okay, but you do have all the RSU

11   agreements and all of the RSU awards, the certificates.

12        **MS. FORD:**  I think so.

13        **THE COURT:**  Okay.

14        **MS. FORD:**  But again -- can I put a footnote on

15   that?  All of these documents tie together, and you can't

16   exactly tell, if they send you 20 RSU certificates, I can't

17   know that's all of them unless I see secondary records from the

18   company that's, like, a summary of how many RSU awards that

19   person got, and right now I don't have that kind of a summary

20   to match it up to.

21        **THE COURT:**  Okay, so let's go on to the next

22   category, compensation summaries given to employees.  Now, I'm

23   not sure, and maybe Mr. Boyer can answer this question, whether

24   Apple's reference to the myPage records, all right, is the same

25   thing as these compensation summaries.

1      **MS. FORD:**  Different.

2      **THE COURT:**  Okay.  So what are compensation

3  summaries?

4      **MS. FORD:**  Each year, when the employees got their

5  performance review -- and Mr. Kotni, their witness, testified

6  to this, and we actually sent them exemplars of ones that were

7  given to Mr. Kannan -- the manager would give the employee a

8  printed-out compensation summary, which included RSUs that were

9  awarded, I suspect for people that had moved up a job level,

10  that would be in there.  It would include all the bonuses, and

11  it would include what their base pay was going to be for the

12  coming year.

13      **THE COURT:**  Do you have any of those?

14      **MS. FORD:**  Didn't get any of those.

15      **THE COURT:**  Okay, all right.  So now, let's go on to

16  the next category, all pay statements to the employees in

17  question.  Now, Apple says it's produced every bi-weekly pay

18  stub for each employee that falls into the category we're

19  talking about.  So what is missing?

20      **MS. FORD:**  Two things.  Number one, I do not believe

21  that they have given -- Apple gives out these pay stub -- like,

22  it's a pay stub, but it's a statement, because they're paid

23  electronically, but a statement that shows exactly what they're

24  being paid and all the deductions and everything, and they have

25  given me those.

1    I believe -- again, that's a lot of pages, and I haven't

2    totally gone through them, but it looks like everything is

3    there for every pay period.  And those, again, were stuff I got

4    just very recently.

5    The problem that I have with it, it's been redacted to

6    reduce, er -- to leave out RSU and dividend information.

7    **THE COURT:**  Okay, Apple says it hasn't.  It's only

8    redacted --

9    **MS. FORD:**  And I have a copy of --

10   **THE COURT:**  -- the health benefits and all that --

11   **MS. FORD:**  I have a copy of one I can show you.  If

12   I could be allowed....

13   **THE COURT:**  Yeah, go ahead and hand it up.  Okay, so

14   there's something that says, "RSU tax offset," "stock purchase"

15   and "post-tax sep life" (phonetic) in the bottom left, or the

16   left column, is that what you're referring to?

17   **MS. FORD:**  Actually, that one I'm not certain, but

18   yes, that is redacted, and probably shouldn't be, so that we

19   can figure this document out.

20   But then on the right-hand side, it says, "Other benefits

21   and information," and says, "ESPP rollover, RSU vesting, RSU

22   dividends," and some other categories that I'm not certain

23   exactly what they are, but that's all under Benefits, and it

24   again shows this period year-to-date, and has -- clearly there

25   are numbers in there, and that's income.  Those are forms of

1   income that are not reflected on the left-hand side of this

2   statement, and every single one of these statements has been

3   redacted in this fashion.

4             THE COURT:  Okay.  All right, I understand that

5   point now.  Okay.  So apart from the redactions, though, you

6   have all the statements.

7             MS. FORD:  The other one that we don't have is,

8   there is a year-end summary statement that they have produced

9   with respect to Mr. Kannan, but with respect to the other

10  people, for some reason, that year-end statement doesn't appear

11  to be there.

12            THE COURT:  Okay.  The next one is all documents

13  reflecting dividends paid, and Apple says it's produced all of

14  those.  So what's missing?

15            MS. FORD:  I don't know that we've received anything

16  that shows dividends other than what I just showed you, but the

17  number's redacted.

18            THE COURT:  Okay, so let's look at the example you

19  shared with me of the bi-weekly pay statement.  What line item

20  would show dividends?

21            MS. FORD:  I don't know, and when I tried to ask an

22  Apple witness, they couldn't exactly tell me what these line

23  items meant, but I'm presuming that "RSU Dividend" refers to

24  the dividends.  I know they do pay dividends, but I --

25            THE COURT:  So "RSU Dividend" on the right column --

1          **MS. FORD:**  Right.

2          **THE COURT:**  -- it says, "RSU Dividend EQU."  That

3     one?

4          **MS. FORD:**  But again, it's sort of cut off there, so

5     I don't --

6          **THE COURT:**  Okay.

7          **MS. FORD:**  -- I don't know, but --

8          **THE COURT:**  Okay.

9          **MS. FORD:**  We haven't received anything that I know

10    of that has just dividends listed there.

11         **THE COURT:**  Okay.  Then the next category is

12    Compensation Calibration Sheets for relevant employees.  Again,

13    this is the eight employees.  Apple says it has produced all of

14    these and points out that Mr. Kotni had no employees in 2011

15    that reported to him and had only one in 2012.  So what is

16    missing?

17         **MS. FORD:**  I think we kind of laid it out in our

18    moving papers.  They have not produced any more of those since

19    I submitted our moving papers.  So that situation remains

20    exactly the same, and that's another one where --

21         **THE COURT:**  So you're missing later years.  You're

22    not talking about 2011 and 2012.  You're talking about the

23    later years.

24         **MS. FORD:**  Yeah, I don't think we got any from 2011

25    and 2012, and even if there was only one or two employees, that

1   should be -- you know, should exist, but also, the -- we kind

2   of describe how, for some years, there's a whole lot of this

3   information and then for other years there's not, and it

4   includes both these....

5       The way this document worked, it's like a big spreadsheet,

6   and they --

7           **THE COURT:**  What, the Compensation Calibration

8   Sheet?

9           **MS. FORD:**  Yeah.

10          **THE COURT:**  Okay.

11          **MS. FORD:**  A big spreadsheet, have a list of names

12  of employees.  It is circulated back and forth between the

13  manager and his immediate manager.

14          **THE COURT:**  Um-hum.

15          **MS. FORD:**  And they put in there, you know, the

16  ratings that people are getting, anybody that's getting a

17  raise, the bonuses, all that kind of information is put in, and

18  it's a kind of an evolving document, it seems.  It gets

19  changed.  So it's not an absolute.  So if you don't get kind of

20  all of them, it's hard to tell whether you're looking at the

21  last one, which was the real one that went into effect, or not.

22          **THE COURT:**  And it's done on an annual basis is your

23  understanding?

24          **MS. FORD:**  Well, once a year they go through this

25  process of compensation planning, which involves the

circulation back and forth of this calibration worksheet, and

we have some of those worksheets, and we have quite a lot of

them for a couple of years, but not hardly any for other years.

        **THE COURT:**  Okay.

        **MS. FORD:**  And so I'm just not confident -- well,

I'm quite confident that we don't have everything, because it

just doesn't make any sense that for 2014 there would be very,

very little and then 2016 there would be a lot.  It doesn't

make a lot of sense.

        **THE COURT:**  Okay.  The next item is the Compensation

Planning Guidelines for each employee.  Apple makes the point

that these are really outside the scope of document requests

that were issued in my order, but nevertheless, says that it

has produced these.

   So first of all, let me ask you, is there anything

missing?

        **MS. FORD:**  I believe that we have Compensation

Planning Guidelines for -- again, for some years.  I'm not

confident that we have all of them, but we do have some of

them, and again, they -- the way we get them is that they are

attached to these e-mails that are getting circulated amongst

management, along with the calibration worksheet, you're going

to have these guidelines.

   Sometimes it's just a written note from managers, and

sometimes it's a very formal-looking document.  I believe that

1    for only one or two of the years do we have the actual kind of

2    formal-looking document, and part of this was part of the

3    questions that I was going to ask in a 30(b)(6) deposition and

4    what should be there, but it looks to me like less than

5    everything is there.

6              **THE COURT:**  So let me ask you, what document request

7    that was at issue in my July 11th order do these fall under?

8              **MS. FORD:**  Okay.  If you go back to Request number

9    17, which is the basic one that's set out all the stuff, it

10   says, all records, documents and information that reflect,

11   relate or show job performance evaluations and compensation of

12   APS employees reporting to Kotni from 2011 to present, and

13   then, including, without limitation, personnel file, employment

14   history, pay check history, date of hire, job level,

15   compensation, cash bonuses, regards and stock grants, peer

16   feedback ratings, which is part of the performance review

17   process, performance reviews, self-assessment text and ratings,

18   manager's feedback text and ratings.

19        So it's really quite a broad request concerning the

20   compensation process, and --

21             **THE COURT:**  Okay, wait.  Here, let's just be

22   precise.

23             **MS. FORD:**  Yes.

24             **THE COURT:**  Because you asked for the compensation

25   of the employees, not the back-end planning that leads up to

1    it.  So I want to be real precise about understanding what you

2    think is the hook for you to get these planning documents, as

3    opposed to the actual compensation they received.

4              **MS. FORD:**  Because I believe that it is fairly

5    within the scope of the request.  When I wrote that request,

6    I had not yet done a deposition or any discovery that allowed

7    me to figure out the calibration worksheets existed or they

8    would have been in there, but --

9              **THE COURT:**  No, no, we were talking the Compensation

10   Planning Guidelines, not the Compensation Calibration Sheets.

11             **MS. FORD:**  Well, the stuff that talks about

12   performance evaluations, the performance review each year and

13   the compensation review are enmeshed.  They are the same

14   process.

15             **THE COURT:**  Okay, I'm still skeptical that this is

16   really within the scope of what I ordered.  Document number,

17   er -- Request number 17 is the one that you're relying on.  But

18   I appreciate your point, so let's move on to the next.

19        "All communications showing the compensation planning

20   process for relevant employees," that's really the same thing,

21   but you want communications about it.  Again, would your answer

22   be the same, that it's -- you're relying on Request For

23   Production 17?

24             **MS. FORD:**  Yes.

25             **THE COURT:**  Okay.

| | |
|---|---|
| 1 | **MS. FORD:**  And also, the other Request For |
| 2 | Production that related to specific named individuals, if you |
| 3 | look, like, at Request number 19, it talks about personnel |
| 4 | records -- |
| 5 | **THE COURT:**  Yes? |
| 6 | **MS. FORD:**  -- and personnel records is defined |
| 7 | within the requests for production also, and again, I won't -- |
| 8 | **THE COURT:**  Was it defined -- |
| 9 | **MS. FORD:**  -- read it into the record -- |
| 10 | **THE COURT:**  I don't think I have it. |
| 11 | **MS. FORD:**  -- because it's very long, but it's quite |
| 12 | broad. |
| 13 | **THE COURT:**  I don't think I have that definition. |
| 14 | **MS. FORD:**  It's part of the request itself, and |
| 15 | I believe -- |
| 16 | **THE COURT:**  I know, but nobody attached it in their |
| 17 | most recent submission, so it would be helpful if you have it |
| 18 | handy.  If not, we can come back to it.  But you think the |
| 19 | definition of personnel records includes e-mails about or |
| 20 | communications about compensation planning? |
| 21 | **MS. FORD:**  Yes. |
| 22 | **THE COURT:**  I'm just going to make a note about |
| 23 | that.  All right, the next category is records and spreadsheets |
| 24 | showing compensation, stock bonus, dividends for each employee. |
| 25 | **MS. FORD:**  Um-hum. |

1          **THE COURT:**  My first question is, what document

2     request requires the production of that information?

3          **MS. FORD:**  Again, I --

4          **THE COURT:**  And specifically, it's the form of.

5     It's sounds like you're asking for, in particular form, some

6     kind of summary form of this information.  So what request does

7     that fall under?

8          **MS. FORD:**  Again, I believe it would both be under

9     17 and under -- I know 19 is one of them.  I don't know off the

10    top of my head the other numbers that ask for personnel records

11    for these individuals, but again, can I show you a sort of an

12    example here of what I'm talking about in that request?

13         **THE COURT:**  Something that's already been produced,

14    you mean?

15         **MS. FORD:**  Something that's been produced by Apple,

16    uh-huh --

17         **THE COURT:**  Okay, sure.

18         **MS. FORD:**  -- with respect to Mr. Kannan.

19         **THE COURT:**  Okay, this is a document called "Options

20    and Awards Summary."

21         **MS. FORD:**  Um-hum.

22         **THE COURT:**  And this is for Mr. Kannan, okay.  All

23    right, so what is the significance?

24         **MS. FORD:**  And you can see it's got the Bates stamp

25    number in the lower right-hand corner --

1      **THE COURT:**  Right, and --

2      **MS. FORD:**  -- that was produced by Apple.

3      **THE COURT:**  And it's Bates number 384.

4      **MS. FORD:**  Yeah.

5      **THE COURT:**  So what is the significance of this

6   document for your argument?

7      **MS. FORD:**  This is an example of what would be a

8   record or spreadsheet showing and listing compensation of the

9   employees over the years, including base pay, bonuses, stock

10  grants and dividends.

11     **THE COURT:**  This one looks like it's only having to

12  do with options and stock.

13     **MS. FORD:**  Um-hum.

14     **THE COURT:**  So it doesn't look like it's all

15  compensation.  So you're suggesting that there's -- there's

16  separate spreadsheets showing the different categories of

17  compensation?  Is that what you're -- or are you looking for

18  something that has everything all in one bucket?

19     **MS. FORD:**  I would love it if I had everything all

20  in one.  I know that the way these get produced is that they

21  have a computerized system called Merlin that they can just run

22  reports from, and I believe this is a report they ran from

23  Merlin with respect to Mr. Kannan.  Whether they can change the

24  variables on that, I honestly don't know.

25     **THE COURT:**  Okay.

1    **MS. FORD:**  But if they can generate this kind of

2    thing for Mr. Kannan, they should be able to generate it for

3    the others, and then we could cross- -- for example, I was

4    saying, I can't tell whether we got all the stock awards.  If

5    we had this for those employees, we could look and see if we

6    got something that matches up with every stock award that's

7    listed in these charts.

8            **THE COURT:**  Okay, and you're saying you only have

9    this kind of Options and Awards Summary document for

10   Mr. Kannan, and not --

11           **MS. FORD:**  That's right.

12           **THE COURT:**  Okay.

13           **MS. FORD:**  And that's intended as just an example,

14   but you can see the kind of thing we're trying to find.

15           **THE COURT:**  All right.  The last -- sorry, two more

16   categories.  You asked for budget and organization documents

17   showing the groups and numbers of employees reporting to

18   each -- to Mr. -- sorry, to Mr. Kotni.  So for each employee,

19   who reported to that employee.

20           **MS. FORD:**  Correct.

21           **THE COURT:**  And you want both regular employees

22   reporting and contractor employees.

23           **MS. FORD:**  Yes.

24           **THE COURT:**  So Apple says it's already produced the

25   personnel file, job performance records for each of Mr. Kotni's

1    employees, which is, they feel, within the scope of Request For

2    Production number 17; budget documents and org charts, not

3    within the scope.

4        So let me understand why you think that the budget and

5    organization documents that you are asking for in your motion

6    are within the scope of what I previously ordered.

7            **MS. FORD:**  Okay.  The -- well, first, of all, to

8    kind of put it into context, they haven't produced personnel

9    files by any means.  They've produced performance reviews, and

10   the performance reviews unfortunately do not indicate that

11   information about who reported -- what groups reported or what

12   the people's specific responsibilities were, and --

13           **THE COURT:**  Well, those are two different things,

14   I can imagine.  So let me just make sure I understand.  You're

15   specifically asking for reporting relationships.

16           **MS. FORD:**  Correct.

17           **THE COURT:**  Okay, now, why is that?

18           **MS. FORD:**  Okay, the reason that we're asking for

19   that is that one of the major reasons given by Apple in this

20   case why Mr. Kannan was paid less than the other people is that

21   they claim his responsibilities and the groups -- groups

22   reporting to him was less than the other people.

23       That's their, you know, basis for making this distinction,

24   and my client says that really that isn't true, but we need to

25   have evidence concerning -- discovery concerning what were the

1   responsibilities and what -- you know, who did they evaluate,

2   who did they -- who were they responsible for, who were these

3   groups they were responsible for.

4       Basically, these people were all supervising groups of

5   independent contractors that worked in various places around

6   the world.  That's what they all did, but there were some

7   distinct groups within that, and each person would be

8   responsible for certain groups; and so, you know, I've tried to

9   ask the question in deposition, didn't really get much of an

10  answer, looking for documents that would show what the -- you

11  know, who is it, the groups that report -- you know, if you're

12  performing so great and you're getting paid so much --

13          **THE COURT:**  Okay.

14          **MS. FORD:**  -- for this reason, then who is it that

15  reports to you?  What are these groups that they're saying

16  reported to them?

17          **THE COURT:**  Okay, so I can see why you're --

18          **MS. FORD:**  And I haven't really gotten that for even

19  Mr. Kannan.

20          **THE COURT:**  I can see why you're -- well,

21  presumably, Mr. Kannan knows who reported to him.  You don't

22  need to get that discovery from Apple.

23          **MS. FORD:**  Yeah.

24          **THE COURT:**  But with respect to the other employees,

25  I can see why you might want it.  I just don't see how you've

1   asked for it.  At least if the question before me is your

2   allegation that apple failed to comply with my order, I don't

3   see that in any of the document requests.

4           **MS. FORD:**  Okay.

5           **THE COURT:**  So is there a document request that

6   you're relying on, that...?  I assume that's number 17.

7           **MS. FORD:**  Again, I would feel that it either falls

8   within personnel records or number 17.  Again, if you looked at

9   what falls within personnel records, it's very broad and

10  detailed.

11          **THE COURT:**  Okay, yes, I don't have that in front of

12  me right now, so I can't look at it.

13          **MS. FORD:**  By the way, I believe we did attach a

14  copy of the RFP in question.

15          **THE COURT:**  Your submission to me in the

16  administrative motion referred to a number of attachments that

17  were not included.

18          **MS. FORD:**  Huh.

19          **THE COURT:**  I'm sure it was included in the prior

20  order, the prior submission that led to my July 11th order, so

21  I'm sure I have it.  I can go back and look at it.  At least

22  I'm assuming I have it, but I don't have it in front of me

23  right now --

24          **MS. FORD:**  Okay.

25          **THE COURT:**  -- is all I'm saying.

1          **MS. FORD:**  Would you like me to send you one,

2    somehow?

3          **THE COURT:**  I will ask you all if I need it.

4          **MS. FORD:**  Okay.

5          **THE COURT:**  But first let me just get through this

6    list and then I want to hear from Mr. Boyer.

7        The last category is records showing job levels and

8    promotions through job levels of Mr. Kotni's employees.  Apple

9    says it's already produced this material.  What's missing?

10          **MS. FORD:**  Could you -- could you say --

11          **THE COURT:**  The last category in your list is

12    records showing job levels and promotions through job levels of

13    Mr. Kotni's employees, and Apple says it has already produced

14    this material.  So what's missing?

15          **MS. FORD:**  Okay, what's missing concerning the job

16    levels is -- the only things we got on job levels were fairly

17    recent, okay?  And those are reports of some kind out of Merlin

18    that were produced, which, by the way, Ms. Ramirez, who's one

19    of their witnesses, testified this is not an official Apple

20    document that she had ever seen before, but they show a

21    snapshot in time, a given day of the year -- I think it's

22    June 1 of each year -- this was the person's job level, which

23    does show, you know, like, one particular employee and they

24    have one job level June 1st of one year and then a different

25    job level the next year.

1    Nothing about when exactly did they get these job level

2    increases, what was the reason for it, what -- you know, was

3    there some kind of a change in the reporting or anything that

4    had to do with job levels.

5    And again, that's an important part of the case, for two

6    reasons:  Number one, because my client claims that he was

7    denied movement up the job level ladder, which he should have

8    had, and second of all, because the job levels are directly

9    tied to compensation issues.

10   So it's an important question for us, and what we have so

11   far, which we just got very recently, were these snapshot

12   documents that say, on a given day of each year, here's what

13   the people's job levels were, but presumably there's going to

14   be documentation, e-mails, records of some kind, that show when

15   each person progressed up the job levels and why, what was the

16   reason.

17           **THE COURT:**  Okay, so I understand your point, but

18   I still don't see where that's requested.

19           **MS. FORD:**  Oh, in 17.

20           **THE COURT:**  Seventeen just asks for job level.  It

21   doesn't say, show me the progression through job levels and the

22   particular date and the reason why.

23           **MS. FORD:**  Well, I guess by saying from 2011 to the

24   present, showing their job levels --

25           **THE COURT:**  Right.

1    **MS. FORD:**  -- would indicate to me that you'd want

2    to see the progression over time, during that time frame.

3    I don't see how else one would word it.

4              **THE COURT:**  Maybe just as you've done here in court.

5    So you have lumped a lot of things together into this one

6    Request For Production number 17.  In retrospect, you might

7    have chosen to do it differently.

8         You know, you've asked me to effectively sanction Apple

9    for failing to comply with my court order.  So it is important

10   to me whether that's a sanctionable issue, but I'm also trying

11   to solve problem of, you all are close to the end of your

12   discovery.  If there's information that must be produced, you

13   know, I'd like to -- I'd like to engage with you on that point.

14        So if I can paraphrase what your issue is with the last

15   category is that you have received information saying what job

16   levels people had, maybe at the same time of every year on an

17   annual basis, but not how they got there and when they got

18   there.

19             **MS. FORD:**  Correct.

20             **THE COURT:**  All right.  I'm going to now invite you

21   to tell me anything else that you'd like to tell me about this

22   dispute that you didn't include in your opening motion and

23   that, you know, you might need to respond to by virtue of

24   Apple's subsequent submission.

25        And I don't know if that includes -- I see that this

1    summary that you gave me includes this current market value,

2    dollar value, for the stock options and awards.  Is that an

3    issue that you want to address at this time?

4          **MS. FORD:**  Um-hum.  Well, it is one of the problems

5    that have plagued us in terms of this discovery, which is that

6    Apple takes the position, which they argued in their response,

7    that, gee, we gave you these certificates, these certificates

8    that say -- and at that time the initial certificates they gave

9    us had no dollar value.  They just said, X number of shares,

10   okay?  And they did not have any information about the dollar

11   amount.

12         First of all, Apple absolutely assigns dollar values to

13   each of these RSU awards, and also, with respect to at least

14   some, and it could be all of them, that's looking at it

15   backwards.  Apple says, well, you could take the number of

16   shares and then you can go in the stock market listings for

17   that day and you can kind of look up what the Apple stock was

18   selling for that day and you can figure out the value.

19         If you look at the way the awards were, in fact, made --

20   and I can show you one if you're interested -- that it's the

21   other way around.  They want to give out a dollar amount and

22   they take that dollar and then compute -- that dollar amount

23   they want to give out and they compute the number of shares

24   based on the value of the stock terms and conditions,.

25         **THE COURT:**  So are you only interested in the dollar

1    value of a particular RSU grant when it was made?

2            **MS. FORD:** Well, I want to know when it was made and

3    then, of course, when it vests. Okay?

4            **THE COURT:** Okay, so when it was made and when it

5    vests, what's the dollar amount?

6            **MS. FORD:** Right.

7            **THE COURT:** And why is that relevant to your case,

8    the dollar amount as opposed to the number of RSUs, or the...?

9            **MS. FORD:** Because that's how you compare

10   compensation levels.

11           **THE COURT:** Okay.

12           **MS. FORD:** Okay, what are you earning, right? So

13   for example, right -- and again, I've got additional copies of

14   this, but --

15           **THE COURT:** And let me just -- so I understand the

16   metrics here, I mean, Apple doesn't control the value of a

17   particular RSU when it vests. That's whatever the market says

18   it is. So really, the only --

19           **MS. FORD:** But -- but --

20           **THE COURT:** -- the only relevant metric, from your

21   perspective, I would assume, is what's the value of the RSU

22   when it's awarded.

23           **MS. FORD:** Um-hum. Well, there's two things, and

24   yes, it is important what it is when it's awarded. Apple

25   tracks both, and I've seen documents with respect to Mr. Kannan

1    and a couple with respect to others that do that, okay?

2         The problem with the Apple "you can just look it up

3    yourself" argument is whatever our expert chooses to use for

4    that market value of the stock, I guarantee you Apple will

5    attack it and say they should have used some other value;

6    there's not just one value.

7         Second of all, like I said, if you look at the RSU awards,

8    they say the number of RSUs was determined by dividing your

9    grant value, which is a dollar amount, by the NASDAQ closing

10   price share of Apple, okay?  So this is, in fact, a, like, cash

11   bonus or cash distribution more than it is an award of stock.

12            **THE COURT:**  So that's at the time of the award.

13            **MS. FORD:**  And at the time of the vesting.

14   I believe they get the same e-mail --

15            **THE COURT:**  Okay, so what --

16            **MS. FORD:**  -- but --

17            **THE COURT:**  What is your understanding of what Apple

18   does with the value of the RSUs or the stock at time of

19   vesting?

20            **MS. FORD:**  I think they compute a dollar amount for

21   it and they tell the employee what it was.  I also believe that

22   it's present in this first thing that we looked at that is the

23   pay stub, because I believe that the employee -- the employer

24   is required to report that dollar amount to the IRS for income

25   tax purposes, and that the employee is required to pay tax on

1      it.

2                    THE COURT:  Okay, I get all that stuff --

3                    MS. FORD:  That's just part of their tax records.

4                    THE COURT:  -- but I'm trying to figure out how it

5      relates to your claim, and it seems like once the RSUs are

6      awarded, whatever the value is, it could be up or down, right?

7      The employee is sort of taking that risk.  That's how those

8      things work.

9           Okay, so what I'm trying to understand is, if the actual

10     vesting value, value at time of vesting, is taken into account

11     in the overall compensation process, either in these

12     Compensation Calibration Sheets or the compensation planning --

13     for example, if an RSU vests at a certain point and it's way

14     higher than what it was at the time it was awarded, does that

15     mean the employee gets less of a bonus the next summer?

16          Is it a factor in how compensation is awarded going

17     forward?  That's my question, because otherwise, it doesn't

18     seem like it matters.  It's just, great, you win or you lose.

19                   MS. FORD:  Well, it matters because it is crucial to

20     calculating the damages, the losses of my client.  He says,

21     I should have received an RSU award --

22                   THE COURT:  Okay.

23                   MS. FORD:  -- and here's what I think the value of

24     that award should be.

25                   THE COURT:  But you can make -- so if he says,

1    I should have received an RSU and this and that on this day,

2    you know, or these many RSUs on this day, and by the time I,

3    you know, reached this date, they would have been X value,

4    that's a calculation you can totally make, and it doesn't

5    matter what anyone else did, what anyone else's value is.

6         I mean, you could have a dispute about what the market was

7    or was not at a time, but that's not a discovery problem for

8    purposes of this dispute.  That may be something that's an

9    expert issue, but Apple doesn't have any better information

10   than anyone else about what the value is, unless I'm

11   misunderstanding your argument.

12             MS. FORD:  You are, in a way.  Here it says --

13             THE COURT:  Where is "here?"

14             MS. FORD:  I'm....

15             THE COURT:  Okay, so the Court's been handed

16   something that has a Bates number that's cut off, but it looks

17   like it's an e-mail from the Stock Plan Administration,

18   Subject:  RSU Grant Confirmation of Approval, dated

19   October 14th, 2015.  Okay.

20             MS. FORD:  And you can see that it says, "Grant

21   Date," "Grant Value," and then number of RSUs.

22             THE COURT:  Got it.

23             MS. FORD:  Right?  And then it says the number of

24   RSUs was determined by dividing your Grant Value by the NASDAQ

25   price per share.  So --

1      **THE COURT:**  Yeah, I got that part about the grants.

2  I'm talking about vesting.

3      **MS. FORD:**  The same kind of e-mail comes out --

4      **THE COURT:**  Okay, all right.  I think I --

5      **MS. FORD:**  -- with each of the vesting things, and

6  I think if Apple has documents which assign dollar amounts to

7  these RSU shares, then that's quite relevant to our discovery

8  in this case, and I don't see any legitimate reason why Apple

9  should be able to refuse to produce those documents on the

10  theory that somehow we could look it up through some other

11  source, which, like I said, they no doubt --

12      **THE COURT:**  Have you asked for those documents

13  specifically --

14      **MS. FORD:**  -- can challenge.  Yeah.

15      **THE COURT:**  -- in a document request?

16      **MS. FORD:**  Sure.

17      **THE COURT:**  Not number 17, which I don't consider a

18  specific document request for these.  Have you asked for that

19  specifically?

20      **MS. FORD:**  You don't consider 17 --

21      **THE COURT:**  I don't consider 17 a specific request

22  for the dollar value of RSUs upon grant and upon vesting, no,

23  I don't.  So let me just ask you, is there a specific request,

24  other than 17, that you've asked?

25      **MS. FORD:**  I don't think there's any request that

has the words "dollar value" in it.

**THE COURT:**  Okay, something more specific that says you don't want to just know how many RSUs someone got, but you want to know what the dollar value was at different points in time.

**MS. FORD:**  Like I said, I don't think that --

**THE COURT:**  Okay.

**MS. FORD:**  I don't think we even would have thought to draw that distinction --

**THE COURT:**  That's fine.  I just want to know.

**MS. FORD:**  -- between the number of shares -- I mean, it also doesn't say we want to know the number of shares.  It says we want to know the stock awards.  We want all the documents that relate to the stock awards.

**THE COURT:**  Yeah, I mean, I get that you've tried to draft this broadly, all records, documents, information which reflect, relate to or show, and then you have a big, long list.

**MS. FORD:**  Um-hum.

**THE COURT:**  The danger of this kind of request, especially in the context where counsel are not cooperating with each other, is that you get into fights about where to draw the line about, you know, does it reflect, relate to or show.

Usually this is not a problem because people figure out what's actually relevant to the case, and they don't want to be

1    in front of me fighting about it all the time, and they just

2    work it out.

3        You all haven't done that.  So let me just put a pin in

4    that, because we're going to talk about that at the end, but

5    I'm just trying to understand, if we're fighting over a request

6    for production of documents that is actually covered someplace

7    else in your requests for production, I don't want spend any

8    more time on it, but if I have to -- if I have to parse whether

9    these kind of documents that you share with me fall into the

10   category of "reflect or show" awards, and whether that includes

11   the dollar value of such awards, I'll do that, I'll make that

12   judgment, but I don't want to spend more time on it if it's

13   already covered.

14       So let me just pause there.  Sounds like it's not already

15   covered specifically.  At least you can't identify another one,

16   another document request that covers that, so we can move on to

17   anything else that you needed to respond to we haven't already

18   covered from what Apple submitted with respect to this dispute.

19            **MS. FORD:**  I think we've -- I'm trying to remember

20   all the things we said here, but yeah, I think that pretty much

21   covers it, yeah.

22            **THE COURT:**  Okay.  So let me turn to Mr. Boyer.

23   I want to go through the same process.  I want to find out --

24   you've heard now what Ms. Ford has said about what she feels is

25   missing.  She's given me examples of documents that she says

1    your client has that she thinks are relevant and within the

2    scope of the production.  Whether or not they were ordered or

3    not, you now understand why she wants them.  So I'd like to go

4    through each one and understand what Apple's position is.

5         So we're talking about the first category -- first of all,

6    are there eight employees, total?

7              **MR. BOYER:**  That's correct, your Honor.

8              **THE COURT:**  Okay, does that include Mr. Kannan or

9    are those in addition to Mr. --

10             **MR. BOYER:**  In addition to.

11             **THE COURT:**  In addition.  So Mr. Kannan plus eight

12   employees, okay.  So we have e-mails from the Stock Plan

13   Administration to the employees in question reflecting awards,

14   and vesting, including these Confirmation of Approval e-mails,

15   and it sounds like from what Ms. Ford is describing, it's the

16   Confirmation of Approval e-mails that she thinks are

17   principally missing.

18        So are they missing?  Are there still more?

19             **MR. BOYER:**  It's my understanding, your Honor, that

20   we have produced all of them, and I think there is a

21   miscommunication between the initial grant e-mail, which is

22   what she provided the Court already, and which I also have some

23   examples of if the Court would like to see, and then another

24   e-mail every year when the stock vests, and I have not seen

25   something like that, so I'm not sure.  That's new to me.

1          So initially, when we had the Court's order, we produced

2     the actual Stock Notice of Grant Award Agreements, and I have a

3     copy of that here, if the Court would like to see.

4     Specifically, it shows the number of units subject to the

5     award, the date and the vesting schedule.

6          And so what I, through the meet-and-confer process,

7     stating with Mrs. Ford that, look, the actual value on that

8     given date is calculated based on the market.  And so once an

9     employee gets a number of shares, you know, over four years,

10    you divide the number of shares that were issued as part of the

11    award, and the value on any given day is subject to, as the

12    Court has noted, the market price.

13              **THE COURT:**  So I'm looking at this Options and

14    Awards Summary, which is the document number 384 that Ms. Ford

15    handed to me.  This is for Mr. Kannan.  Has Apple produced

16    documents like this for each of the eight employees?

17              **MR. BOYER:**  No, we have not, your Honor.

18              **THE COURT:**  Okay, why not?

19              **MR. BOYER:**  Frankly, I wasn't aware this was an

20    issue, but it does show the vesting schedule.  One of the

21    issues that has come up in a number of the meet-and-confer

22    efforts is that additional documents got produced by Mr. Kannan

23    saying, oh, we would like it in this form or this form, and

24    we've produced it in the forms that are available.

25          In fact, these Stock Administration e-mails we had to go

1   back and essentially recreate, because they go out to the

2   employees at the time but are --

3           **THE COURT:**  No, I got that point.  I'm talking about

4   this Options and Awards Summary.  This doesn't look like

5   something -- it's either something that you can print out of a

6   system, according to Ms. Ford, or it's something that was

7   created contemporaneously with the time that was shared with

8   the employee.  I'm not sure which, and it kind of doesn't

9   matter.

10          But here's my point to you, Mr. Boyer:

11          **MR. BOYER:**  Yes, your Honor.

12          **THE COURT:**  So if you take a request like number 17,

13  and I'm sure Apple is very familiar with these kinds of

14  requests, "Please produce all records, documents and

15  information which reflect, relate to or show," and then the big

16  long list.  So it's not a "sufficient to show."  It's "all

17  records that relate to, reflect or show."

18          So, you know, I can see Ms. Ford's point that a document

19  like this Options and Awards Summary is within the scope of RFP

20  number 17.  Even if it -- the request didn't require you to

21  produce something that said, okay, and these -- the current

22  market value of these RSUs is A, which I agree it does not,

23  nevertheless, this is a document within the scope of RFP

24  number 17, I think we would all agree.

25          So you're the only one who knows what documents you have.

1   Ms. Ford says that she's been handing you examples of the kinds

2   of documents that she's seen or knows about, and is asking for

3   them for the eight employees.

4       This is a small number of employees to have to do this

5   for.  So, you know, I continue to believe that part of the

6   problem here is that you are not talking to each other, or if

7   you are, you are not listening to each other.  I shouldn't have

8   to have this conversation about whether -- if this document is

9   available for each of the eight employees, why isn't it

10  produced?  This is something you can do in five minutes.

11      Unless there's something I'm not understanding, these

12  documents aren't generated for each employee, they're never

13  generated, they just happened to be generated for Mr. Kannan

14  specially, and it's really hard to do, I mean, I'm not hearing

15  any of those things.

16      And perhaps this is the first time you've seen this

17  document, which again would cause me some concern, that you all

18  are not talking to each other.

19              **MR. BOYER:**  One point, if I may, your Honor --

20              **THE COURT:**  Yes, please.

21              **MR. BOYER:**  I apologize, and I understand the

22  Court's frustration.  I note that there are different systems

23  between what an employee may or may not get, depending on what

24  country they're in.  He's in India right now.  This is a form

25  that was -- looks like it was given to him in India.  If Apple

1    can create these for the other employees, then I would agree

2    with the Court, then yes, we will absolutely produce it.

3               **THE COURT:**  Okay.  Now, the Confirmation of Approval

4    e-mails, you represent that you have produced, recreated all of

5    these.  Have you?

6               **MR. BOYER:**  That's my understanding, your Honor,

7    yes.

8               **THE COURT:**  Okay, because one of the things I was

9    thinking of doing today -- I'll just preview this for you, so

10   you can think about how to conduct yourself -- is I can't tell

11   from your submission, and I don't give you enough space to do

12   this, whether someone's not being candid with me, someone

13   doesn't actually -- hasn't really looked at the production that

14   they've received or provided to know what's in there, or maybe

15   you really haven't conferred and you're talking past each

16   other, or maybe all of those things are true.

17       So one thing I was thinking of is asking Apple to prepare

18   a log of all the documents that it has produced that fall into

19   these categories, and file it with the Court and serve it on

20   Mr. Kannan, and if it turns out that what you say in your

21   submission is accurate and you have, in fact, produced all

22   these things for all the employees for all the relevant years,

23   then Mr. Kannan will pay your fees for having to do that.  If

24   it turns out that you haven't done it and you're like, oops,

25   I missed, maybe we have some things we have to produce, then

1     you'll pay Mr. Kannan's fees for having to bring the motion.

2         Now, I'd rather not have that happen.  I'd rather have us

3     all, like, figure it out here, get it done, and have you go on

4     your way.  But I am concerned that because of the late date and

5     the fact that you don't really seem to be talking to each

6     other, that we have an ambiguity here that's going to take time

7     to resolve, because I can't tell who's right and who's wrong.

8     Okay?

9         So we're going to do some examples.  So sorry for the

10    digression there, but that was what I was thinking when I got

11    your papers, is that this is the only way to resolve this, if

12    you really want to resolve it that way.

13        I want to understand, though, Apple's position, because

14    I've spent a lot of time with Ms. Ford going through

15    Mr. Kannan's position.  So let's go on to the second category,

16    which is compensation summaries.

17        Okay, now, I don't think I have one of the compensation

18    summaries, but I know you've seen it, Mr. Boyer.

19              **MR. BOYER:**  Yes, your Honor, I have.

20              **THE COURT:**  All right.  Are these the same thing as

21    the myPage records you refer to?

22              **MR. BOYER:**  They are not, your Honor.

23              **THE COURT:**  Okay.

24              **MR. BOYER:**  So compensation summaries are documents

25    that exist in a limited period of time.  So what happens is

1    that during the compensation and review process, which happens

2    around September and October of each year, once that is finally

3    set, each manager has access to essentially print out these

4    summaries.

5        Once the compensation discussion happens with the

6    employee, and that certain period of time passes, which

7    I understand is about 30 days or so, that essentially that

8    document goes away.  The raw data is available, as of course,

9    within the pay stubs and the HR documents that we produced, but

10   they do not exist in that particular form, unless the employee

11   has retained it, which I believe Mr. Kannan has.

12       Now, the myPage summaries are a little different, and

13   this, again, highlights the difference between the, say, Indian

14   employee access and the US employee access.  He using an alert

15   system right now to obtain --

16           **THE COURT:**  Mr. Kannan is?

17           **MR. BOYER:**  Yes, correct, to obtain this data, which

18   we do not have, or the employees do not have access to.  So

19   there's this summary they can print out, and that's an older

20   system in India that they're using, but here it's just in the

21   data form that we've produced it in.

22       And I understand that counsel wants it in a spreadsheet

23   form.  I mean, internally, we have compiled all these

24   documents, put it in a spreadsheet, because we do not have some

25   master spreadsheet that came from Apple that we're looking at.

1   We had to do it from the documents as well.

2           **THE COURT:**  You mean the lawyers did it?

3           **MR. BOYER:**  Correct.

4           **THE COURT:**  Okay.  All right, so -- and let me just

5   make sure I understand.  The Apple affiliate that Mr. Kannan

6   currently works for, which is not a party to this case, you're

7   saying that Apple, Inc. here doesn't have access to whatever

8   Apple India has.

9           **MR. BOYER:**  The form in which an employee would see

10  it is different.  The data is the data.

11          **THE COURT:**  Okay.

12          **MR. BOYER:**  And yes, we have the access to it, and

13  it's been produced, in various forms, but the way it looks to

14  someone in India when an employee actually accesses their own

15  personal data is different than it is in the United States.

16          **THE COURT:**  Okay.  So let me just ask a question,

17  and I'm not suggesting that this is something you were required

18  to do in order to satisfy my prior order or the request, but

19  how hard would it be for each of the eight employees to

20  produce, in summary form, the information that Ms. Ford is

21  asking about?  Is it a manual recreation of data, or is it a

22  spreadsheet query -- you know, a database query that can be

23  outputted in a spreadsheet?

24          **MR. BOYER:**  There -- well, so, could it be put in a

25  spreadsheet?  Yes, but there would be some manual work involved

1    in it.

2              THE COURT:  Okay.

3              MR. BOYER:  It would not be an automatic download

4    into a spreadsheet.

5              THE COURT:  All right.  What do the myPage records

6    include?

7              MR. BOYER:  So they would generally include

8    compensation and bonuses.  I think -- I think that's generally

9    it, and the dates of the -- of any pay increase.

10             THE COURT:  RSU grants, as well?

11             MR. BOYER:  I don't know if that's in the myPage.

12             THE COURT:  Okay.  Let me ask you about the -- so

13   the next item is the -- all pay statements to the employees in

14   question.  Apple says it produced ever single pay statement on

15   a bi-weekly basis.  I now have an example that shows redactions

16   for things that look like they're within the scope.

17        I get that you don't want to include people's health

18   benefits or things like that which aren't relevant to the case.

19   I get that, but RSUs are very relevant to the case.

20        So why are there the redactions that are reflected in

21   this -- this particular document from Mr. Kandakar (phonetic)?

22             MR. BOYER:  That's -- so actually, your Honor, we

23   have produced the year-end summaries with these unredacted, and

24   I have an example of that, but of course, again, we're trying

25   to preserve the employee's privacy.  If the Court feels -- if

1   the Court feels that the redactions are inappropriate, we're

2   certainly willing to unredact it and produce it under the AEO,

3   but I have another example just to show that information --

4              **THE COURT:**  Okay --

5              **MR. BOYER:**  -- is available.

6              **THE COURT:**  -- let me see, is it the year-end

7   summary?

8              **MR. BOYER:**  Yes.

9              **THE COURT:**  If I can see a copy of that, that would

10  be great.  All right, so I've been handed a year-end summary,

11  which is labeled 4010.  Okay.

12      So let me just briefly ask Ms. Ford, it seems like the

13  redactions are consistent with, or rather, they are not matters

14  redacted in this year-end summary that would cause you concern.

15  Is that -- do you agree?

16             **MS. FORD:**  I can't agree with that formally at this

17  point, because I don't know what some of them refer to, but

18  this particular document does have the redaction taken away for

19  the RSU vesting line item and the RSU dividend item.

20      I would take the position all of those are income or

21  compensation items.  Those are all income items, and so they

22  should all -- there's no reason to redact any of them.

23             **THE COURT:**  Okay.  But the dispute that you have

24  with Apple on Mr. Kannan's behalf is not about whether he got

25  more or less health insurance, dental, vision coverage.  It's

1    about whether he got bonuses, RSUs and compensation awards that

2    were less than what he felt he would deserve, right?

3           **MS. FORD:**  Correct, and the insurance and everything

4    is on the left-hand side, and I don't have problems with that.

5    What I do have a problem with is the -- the items on the

6    right-hand side, which is other benefits and information, which

7    those are, I believe, actual, you know, things of dollar value

8    that were forms of compensation that those people received,

9    okay?  And I notice that they did also unredact the RSU tax

10   offset, which is something I will need to find out what that

11   means.  I'm not sure what that means.

12          **THE COURT:**  All right, well, presumably, you have

13   deposition testimony about these things, or can obtain it.

14          **MS. FORD:**  No, I have not been able to get it,

15   because of the 30(b)(6).

16          **THE COURT:**  Okay, I know it's another issue, but it

17   is possible to obtain deposition testimony about what these

18   things are, right?

19          **MS. FORD:**  Yes, it is.

20          **THE COURT:**  All right.  So why is it important --

21   what does the year-end summary not show that would make it

22   necessary to show bi-weekly statements?

23       Mr. Boyer, is there -- it looks like the actual

24   information is the same, and perhaps even more comprehensive,

25   on the year-end summary.

1    **MR. BOYER:**  That's right, your Honor.  So bi-weekly

2    statements wouldn't show particular forms of compensation to

3    the extent they were given in a particular pay period.  So one

4    might be given, you know, on June 12th, 2015 and that would

5    show up in the year-end statement.

6              **THE COURT:**  Okay.

7              **MS. FORD:**  And, can I...?

8              **THE COURT:**  Why do you need bi-weekly statements?

9              **MS. FORD:**  Because the year-end does not -- it

10   doesn't divide out the RSU vesting in any way, and there's

11   several different kinds of RSUs and they vest at different

12   times, and also, when the awards are made, it's like somebody

13   gets a promotion and they get a bunch of RSUs affiliated with

14   that promotion, you wouldn't be able to pull that out of this

15   RSU vesting amount.  I'm not saying that this is irrelevant or

16   useless.  It's not irrelevant or useless.  It's just not the

17   entire picture.  And so by --

18             **THE COURT:**  But presumably, you --

19             **MS. FORD:**  -- the bi-weeklies get you a step closer

20   to figuring out whether or not you're getting the accurate

21   picture on the RSUs.

22             **THE COURT:**  Presumably, you could get that

23   information from -- the RSU award from this Options and Awards

24   Summary that we just talked about, the one that Mr. Kannan has

25   that Mr. Boyer represented could be provided for the other

1    eight employees.

2              **MS. FORD:**  You're talking about the --

3              **THE COURT:**  384?

4              **MS. FORD:**  Yes, the spreadsheet that's 384.

5              **THE COURT:**  All right, okay.

6              **MS. FORD:**  That would presumably have, you know,

7    some of that information in it, yeah.

8              **THE COURT:**  Okay.  So now going on to the next one,

9    Mr. Boyer, all documents reflecting dividends paid, now,

10   Ms. Ford says that she has no information about what dividends

11   were paid.  You say it's been produced.  So how am I to resolve

12   that?

13             **MR. BOYER:**  It is -- it should be reflected on that

14   year-end statement, your Honor.

15             **THE COURT:**  Okay, so where would I find it on the

16   year-end?

17             **MR. BOYER:**  Should be --

18             **THE COURT:**  RSU Dividend EQU, right column?

19             **MR. BOYER:**  I believe so, your Honor.  Yes.

20             **THE COURT:**  Okay.  All right, now, going on to these

21   Compensation Calibration Sheets, for the relevant employees, so

22   again, this is a situation where Ms. Ford says she doesn't have

23   them, or most of them are missing.  You say they've all been

24   produced.  Have they all been produced?

25             **MR. BOYER:**  With the exception of 2011, there may be

1    one or two e-mails that I understand that we're in the process

2    of getting together, but we've checked all of the relevant

3    sources.  We've checked Mr. Kotni, who was obviously performing

4    in the evaluation of his own employees, and his manager, Rahul

5    Rastogi, we've produced those as well.

6         So some of them were produced just recently, and I'd also

7    argue that those were not necessarily within the scope of the

8    Request For Production and the Court's order, but we wanted to

9    obviously do what we could to show that we were trying to

10   comply in good faith.

11        So what we've done is provide everything -- we have

12   asked -- I specifically sat down with Mr. Kotni to go through

13   these e-mails and get the ones that are related to compensation

14   for his team and produce them.

15             **THE COURT:**  Mr. Kotni's still an employee of the

16   company?

17             **MR. BOYER:**  That's correct.

18             **THE COURT:**  Okay, and are these not kept in some

19   central place, or are they -- each manager has the calibration

20   sheets?

21             **MR. BOYER:**  That's correct, your Honor.

22             **THE COURT:**  Okay.  So your representation is that

23   apart from some e-mails about them, or that attach them, you

24   have searched for and have not found any additional

25   Compensation Calibration Sheets.

1              **MR. BOYER:**  That's correct, your Honor.  With the

2     exception of 2011 and '12, I don't actually think they're

3     Compensation Calibration Sheets, but what I think they are is

4     the guidelines for those particular years that they're looking

5     for.

6              **THE COURT:**  So the Compensation Planning Guidelines?

7              **MR. BOYER:**  Correct.

8              **THE COURT:**  Okay, and it sounds like the parties

9     talk about these things in sort of overlapping ways.  So I'm

10    not sure if these are discrete documents or they're kind of

11    related documents.

12         With respect to the Compensation Planning Guidelines,

13    Ms. Ford says she has these documents for some years but not

14    for others.  So are there still more to be produced?  You're

15    still looking?

16              **MR. BOYER:**  For 2011 and '12, your Honor.

17              **THE COURT:**  Only 2011.  Okay, now, she's noted a

18    disparity that there are some, like, a lot of them for 2016,

19    not very many for 2014.  How do you account for that?

20              **MR. BOYER:**  There may have just not been as many

21    communications, but the guidelines were produced for those

22    years, so they were --

23              **THE COURT:**  Are the guidelines a discrete -- like,

24    is it a discrete document on an annual basis, and then there

25    are e-mails about them?

1          **MR. BOYER:**  That's correct, your Honor.

2          **THE COURT:**  So has Apple produced the guidelines

3   document, not the e-mails, but the guidelines document, for

4   every single year, 2011 through 2018?

5          **MR. BOYER:**  So not 2011 and 2012, your Honor.  We

6   are in the process of doing that now.

7          **THE COURT:**  Okay, and why weren't those produced

8   earlier?

9          **MR. BOYER:**  Probably an oversight on my part,

10  frankly.  I didn't -- because, one, he was -- well, a number of

11  reasons.  One, we had a dispute as to whether or not they were

12  actually requested, but secondly, I do not believe we went over

13  those specifics, because Mr. Kannan did not report to Mr. Kotni

14  at that time.

15         **THE COURT:**  I see.

16         **MR. BOYER:**  So again, pursuant to counsel's request,

17  we did go back and we did find those, and we'll be producing

18  those in the next day or two.

19         **THE COURT:**  Okay.  I'm going to skip over, because

20  we've already talked about it, the communications showing

21  compensation planning, because that's been encompassed in our

22  discussion.

23      There's a request for records and spreadsheets showing

24  compensation, stock bonus, dividends for each employee.  My

25  sense is from Ms. Ford is that she's looking for something that

1    allows easy comparison between and among the eight employees

2    plus Mr. Kannan that worked for Mr. Kotni.

3         Is there such a document that exists or can be output from

4    a query to a database?

5              **MR. BOYER:**  Not that I'm aware of, not that includes

6    all of those various compensation --

7              **THE COURT:**  Some subset of them?

8              **MR. BOYER:**  -- levels.  Yes, and we have produced

9    some of that in the form of the payroll records and in the --

10   the HR documents, but -- as I said, we manually did this

11   internally to create our own spreadsheet, but I will check with

12   Apple to see if there's some way that a -- an automated system

13   that would download everything into the spreadsheet that would

14   be easier for everyone.  It's my understanding that there's a

15   lot of manual processing there.

16             **THE COURT:**  So I'm not going to ask you to do

17   anything that's not, you know....  So if you have a database

18   and it can be queried and you can have an output, that's a

19   document kept in the ordinary course of business.  If you have

20   to do manipulation of it, you have to do manual entry, not a

21   document kept in the ordinary course of business.

22        I mean, in some cases the question comes up, should

23   I give, you know, your adversary access to the database.  I'm

24   not going to do that here, because there's lots of other

25   things, I'm sure, in the database that are not at all relevant

1    here, but if you can query a database and get some subset of

2    the information, do another query and get another subset of the

3    information that allows both parties to see it in summary form,

4    I think you should do that.

5        Let's say it's not specifically called out for in the

6    Requests For Production.  I think it's going to make

7    everybody's life easier, and certainly if it's something that

8    you're going to rely on -- I don't mean your own work product,

9    but it's something you're going to rely on in the case, you

10   should produce it.  You should just do it.

11       **MR. BOYER:**  Okay.

12       **THE COURT:**  So that's my suggestion to you about

13   that.  It sounds like that's possible.  At least you're going

14   to inquire and see if it's possible.

15       **MR. BOYER:**  Yes, your Honor.

16       **THE COURT:**  All right.  Now there comes the issue

17   about documents essentially showing who reported to the

18   employees in Mr. Kotni's group.

19       So again, I can see how you might think the performance

20   reviews, I produced those, the peer evaluation, I've produced

21   those, if these things are silent about who reported to whom

22   and a key issue in the case is Mr. Kotni had fewer employees

23   reporting to him, these other people that we think are not

24   similarly situated had way more or more important employees

25   that are reporting to them, that's a key issue in the case,

1    you're going to need to make that showing.

2        That's going to be part of your defense.  So why not show

3    that information?  If you're going to need to rely on it, why

4    not show that information with Mr. Kannan?

5        **MR. BOYER:**  That's correct, your Honor, we are

6    actually going to do that.  We're in the process of getting --

7    gathering that right now.

8        **THE COURT:**  Okay.  I would urge you to do that,

9    because I just think that there's -- there's no way you're

10   going to get to use it unless you provide it, so....

11       **MR. BOYER:**  I totally understand, your Honor, and

12   I agree with you.  This just came up a few weeks ago and we

13   inquired as to whether we could get this.  So again, this is

14   not something that's -- we have to actually run a program

15   internally to pull the number of contractors that reported to

16   each employee, and it's going to be in a snapshot in time.

17   We're going to do it on a quarterly basis.

18       And so, again, not a document that exists, but we have to

19   run a query to get it, and we are doing that, and we've agreed

20   to do it.

21       **THE COURT:**  Okay, that's great.  So I'm not going to

22   worry about the definition of personnel records, because it

23   sounds like you've agreed to do it anyway.  Okay.

24       **MR. BOYER:**  And if I could adjust one more thing,

25   your Honor?

1          **THE COURT:**  Sure.

2          **MR. BOYER:**  Sorry to turn it up.

3          **THE COURT:**  Yeah.

4          **MR. BOYER:**  The thing is, we're going to produce

5     this, but I don't want another request saying, okay, now, we

6     want the budgetary numbers, we want this.

7          **THE COURT:**  I don't see how budget numbers matter.

8     I really don't.

9          **MR. BOYER:**  I agree, your Honor.

10         **THE COURT:**  I mean, I get that the number of -- if

11    it's a key issue in the case, this is one of the

12    differentiations, like, Mr. Kannan only had a few and other

13    people had more and that's why these other people were

14    compensated more, given more bonuses or whatever, that seems

15    like it's a legitimate issue.

16         I don't understand why the budget has any relevance here.

17    It's not part of the request, it's not supported in the

18    submission that Mr. Kannan made.  So I'm going to move past the

19    budget.

20         All right.  So now, the last information is, some

21    information showing how people moved up and what -- when people

22    moved up, to these job levels.  So this one, again, Ms. Kannan,

23    er -- Mr. Kannan suggests that Merlin would reflect -- you

24    could, you know, query this Merlin system to identify at what

25    point in time these different job level classifications were

1   changed.

2       Is that something that's readily accessible?

3       **MR. BOYER:**  It is, and we have produced it in

4   another form.  Again, the dates of the particular promotion are

5   available on a particular document that -- it's somewhat

6   difficult to read.  I'll again inquire, since we're going to go

7   back and look at the entire package together, as to whether or

8   not that can be added to the entire --

9       **THE COURT:**  So what is the document you're referring

10  to?  Because you're saying you already produced the job level

11  classifications, and I -- I don't think Ms. Ford is disagreeing

12  with you.  She's just saying, well, that's a snapshot at a

13  particular point in time.  I can't tell if that person just got

14  that job level promotion, or whether they got it 11 months

15  before the snapshot.

16      **MR. BOYER:**  Yes, your Honor.  It's these work

17  information documents that I think -- and I actually have a

18  particular cite to one where it actually shows it.

19      **THE COURT:**  Okay.

20      **MR. BOYER:**  It's Bates 4933.  I actually don't have

21  it with me --

22      **THE COURT:**  Okay.

23      **MR. BOYER:**  -- but I can show it electronically.  It

24  shows the particular position, and current as of the new

25  position, and -- I'm sorry -- the old position, and the

1    "effective as of" date is the new position, and --

2              THE COURT:  And what's that document called, what

3    kind?

4              MR. BOYER:  So it's called the Work Information.

5    I have an example here.  It's just --

6              THE COURT:  Work Information document?

7              MR. BOYER:  Yes.

8              THE COURT:  And have you produced all of those for

9    each of the eight employees plus Mr. Kannan?

10             MR. BOYER:  The eight employees, yes, your Honor.

11   Mr. Kannan, I don't know if we produced it for him.

12             THE COURT:  Okay, but basically you're saying you've

13   produced this kind of document which shows the change and when

14   it happened for each of the eight employees.

15             MR. BOYER:  That's correct.

16             THE COURT:  Okay, that seems good enough.

17        Ms. Ford, what's the problem with that document?

18             MS. FORD:  That's -- at least from what I could see

19   looking at those documents, that's not what they are at all.

20   They are just a snapshot in time, like I said, a random date,

21   maybe it's 6/1 of a given date, and all the employees, it seems

22   to be the same date in a given year, and generally is June 1.

23             THE COURT:  Have you all talked about the meeting --

24   the job level classifications are made at the same -- the

25   changes are made at the same time of year.  That wouldn't be

1    too surprising.

2              **MS. FORD:**  But that wouldn't really make sense,

3    because the performance evaluations all take place as of

4    October 1.  So having a June or May date really doesn't

5    correspond to that --

6              **THE COURT:**  Have you all talked about this?

7              **MS. FORD:**  -- particularly.  Yes, in a way, yes.

8              **THE COURT:**  Okay.  You need to talk about this one,

9    because it sounds to me like Mr. Boyer is representing that the

10   documents show the effective date of the job level

11   classification, which is exactly what you want, and if that's

12   not true --

13             **MS. FORD:**  I don't believe it is.

14             **THE COURT:**  -- then he'll need to find the

15   information for you, but it sounds like you already have it,

16   and it may just be a question of interpreting a document,

17   right?  So --

18             **MS. FORD:**  I --

19             **THE COURT:**  -- if you haven't talked about it, you

20   can't possibly know, right?  If you have an example of it, I'm

21   happy to look at it.  Do you have an example of one of these?

22             **MS. FORD:**  I don't have a paper example to hand you.

23             **THE COURT:**  Okay.

24             **MS. FORD:**  No.  One could be provided, but like

25   I said, the reason why I'm thinking this is not -- it says --

1    it will have a whole lot of information, a person's name, their

2    base salary, their job title, which includes their job level,

3    and then it will say, effective date is June 1, two thousand --

4    that means, this is accurate information as of that effective

5    date.  It doesn't mean that that's reflecting that some change

6    in their job level took place on that effective date.

7              **THE COURT:**  Well, here's what -- if you continue to

8    disagree about this point, this is a question you get to ask a

9    30(b)(6) witness in a deposition, and if it's not true, then

10   Apple has to fix it.

11             **MS. FORD:**  Okay.

12             **THE COURT:**  Okay?  All right.  Okay, so I think

13   we're at the end of the categories.

14       Mr. Boyer, is there anything else that you'd like to add

15   to your part of the argument?

16             **MR. BOYER:**  No, your Honor.

17             **THE COURT:**  Okay, so here's my take on this, is that

18   there's still some things missing.  There's some things that

19   weren't clear that needed to be produced that arguably are

20   relevant to the case and should be produced.  Again, I come

21   back to my same point, which is, I think you all have not

22   talked carefully through these issues.

23       I think we have agreement about what's going to happen

24   with respect to these categories, or rather, I'm going to order

25   it to happen, but I also am mindful of the fact that you all

1    are here and is a good opportunity for you to talk.

2         So there may be other things to talk about, but at the end

3    of the hearing, I'm going to invite you to use my jury room and

4    sort out any details that need to be sorted out about who's

5    going to produce what to whom, but let me just go through what

6    I think needs to happen.

7         All right, so I'm going through all the list of document

8    categories.

9         So with respect to the first category, the e-mails from

10   the Stock Plan Administration, for this one, Apple is going to

11   see if it can -- Apple is going to, unless it's not available

12   for employees not in India, provide the Options and Awards

13   Summary for each of the eight employees that reflect their RSU

14   grants; and if there are any Confirmation of Approval e-mails

15   that haven't been produced, they can be produced at that time.

16        With respect to the compensation summaries for the given

17   employees, I'm not going to order any further production based

18   on Apple's representation that all of the ones that are

19   available have been provided.  If there are any other

20   discovered, they should be produced immediately.

21        With respect to the pay statements for the employees in

22   question, it looks to me that the year-end summaries have

23   appropriate redactions and non-redactions.

24        Taking Ms. Ford at her word that she needs the bi-weekly

25   versions of these with the RSU information redacted as well, so

1   she can track the exact times, I'll order you to produce it

2   with those items unredacted on a bi-weekly basis, unless there

3   is a summary spreadsheet that can be provided that has all that

4   information, in which case you don't have to do it.  Okay?

5       All right, with respect to dividends, it's my

6   understanding, based on looking at the year-end summary, that

7   the dividends information paid is -- is available in that

8   document.  So I think that nothing further needs to be done on

9   that one, subject to my comment on the pay statements

10  generally.

11      On the Compensation Calibration Sheets and the

12  Compensation Planning Guidelines and e-mails relating to those,

13  Apple has represented that it has not completed its production

14  as to 2011 and 2012, at least as to the Compensation Planning

15  Guidelines and -- sorry -- Compensation Planning Guidelines and

16  e-mails about those.  I think I have that right.  Those will be

17  produced no later than -- how long do you need?

18          MR. BOYER:  Seven days is fine, your Honor.

19          THE COURT:  Let's just say, all of these things

20  should be produced by the end of the week.  We'll talk about

21  schedule, but let's put a pin in that.  But everything I'm

22  saying needs to be produced should be done by the end of the

23  week, subject to further discussion about timing.  Okay.

24      With respect to the category of records and spreadsheets

25  showing compensation, stock bonus and dividends for each

1    employee, Apple -- Mr. Boyer is going to check whether Apple

2    can generate a spreadsheet or spreadsheets that shows in

3    summary form across all of the employees at issue here what

4    their compensation, stock bonus, dividends show, and so on, on

5    a comparative basis.

6        Apple is not required to create information that's not

7    maintained in the ordinary course of business, but if a

8    database can be queried to output information, whether that

9    takes multiple spreadsheets or a single spreadsheet, then I'm

10   going to require Apple to do that.

11       All right.  Apple is also going to provide information

12   that shows, over time, during the relevant period, how many

13   employees and contractors reported to each of the eight

14   employees that worked for Mr. Kotni, as well as Mr. Kannan if

15   that information has not already been produced.  It's not

16   required to produce any budget-related information on that

17   point.

18       And then finally, with respect to job levels and

19   promotions through job levels, this is one where you guys need

20   to talk further, probably, but Apple has represented it has

21   already produced that information, and Ms. Ford may ask on

22   behalf of Mr. Kannan -- explore that question in deposition.

23   If it turns out that's not the case, then Apple is going to

24   need to provide that information, and the information is what

25   job level classification each employee had and when that

1    classification changed, the date that classification changed.

2         Okay.  That's that issue.  Any questions?  Timing?

3              **MS. FORD:**  I was wondering, on the job levels, the

4    why of the job level changes is a very important issue for us,

5    and we suspect that there's communications and records that

6    would show why somebody was promoted when Mr. Kannan was not.

7              **THE COURT:**  I'm not sure if that's encompassed in

8    the personnel records categories, but those are only for

9    certain employees.  Those weren't for all eight.  So I think

10   you have a little bit of a problem with the "why," because I'm

11   not sure that's encompassed by my prior order, and that's what

12   we're talking about.  That's probably a deposition question, as

13   well.

14        You've had Mr. Kotni's deposition, right?

15             **MS. FORD:**  Yes, and he --

16             **THE COURT:**  Okay.

17             **MS. FORD:**  -- didn't know, or couldn't remember a

18   whole lot of things, but yes.  Also, a lot of the documents

19   that we're talking about were not produced until after his

20   deposition was taken.

21             **THE COURT:**  All right, well, we're going to get to

22   that issue, so hold tight on that.

23        In terms of the timing for this production, I'd like --

24   given the -- you all have a deadline of completion of discovery

25   of the 30th, which is Monday, and you are going to need some

1   relief from Judge Davila on that point.

2        So let me ask Mr. Boyer, based on the things that I've

3   asked that need to be produced, can you get it done by Friday?

4             **MR. BOYER:**  The 2011 and 2012 compensation e-mails,

5   yes, I could definitely do that.  The Options and Awards

6   Summary and to the extent that we can come up with some sort of

7   summary for the eight employees, it may take a little bit more

8   time, because our database needs to be queried, there may be

9   multiple queries, it needs to be done properly and checked, and

10  I don't think we could do that by Friday.

11            **THE COURT:**  Okay.  How about, you said a week

12  initially, October 1st?  That's a week from today.

13            **MR. BOYER:**  I -- yeah, I think --

14            **THE COURT:**  Why don't you -- I realize you have to

15  ask.

16            **MR. BOYER:**  Yes.

17            **THE COURT:**  So I'm going to expect you to produce

18  everything that you possibly can as quickly as you can to

19  Ms. Ford.  If you find out that it's going to take longer,

20  you'll need to let her know.  For those particular items, those

21  spreadsheets, or queries of the database, you're going to need

22  to let her know, and report to the Court as well, about what

23  the status is.

24        Ms. Ford, I know you want the information, and so if the

25  information is not accurate, it doesn't do you any good.  So

1    I think it's in everyone's interest to be expeditious about it

2    but also to communicate about, practically, what's needed.  I'm

3    sure you'll let Apple know that they need to devote attention

4    to this.

5            **MR. BOYER:**  Yes, your Honor.

6            **THE COURT:**  Okay.  I'd like to leave this topic and

7    go to the next discovery dispute, and that's at document

8    number 108, Exhibit 2, and document number 115.  This is Apple

9    designation of Rule 30(b)(6) designees.

10       All right.  So let me just kind of share with you some

11   thoughts about this dispute, and I would like to hear from the

12   parties about what really happened, because I can't tell

13   exactly from the papers.

14       So Mr. Kannan is entitled to have Apple designate specific

15   people for specific topics.  Could be more than one per topic,

16   as you all know, and Apple's obligation is to not only

17   designate those people but prepare them, and to provide dates

18   on which they're going to be available.

19       Usually this is something that people cooperate about,

20   right?  You talk to each other, that kind of thing.  If there

21   are objections to a particular category, it's ambiguous, too

22   broad, don't understand, you talk about it.  The objections are

23   often a vehicle for talking about it and reaching some

24   resolution, or crystallizing a dispute.

25       My sense is that none of that happened.  Apple searched

1    objections, indicated people that it expected to designate

2    subject to the objections.  The objections never got discussed

3    between the parties, and nobody ever came to the Court until

4    months later.  Meanwhile, 17 topics were added.  So it puts the

5    Court in a difficult position to try to help you with this.

6        So let me just start with a question:  Have the parties

7    discussed Apple's -- has Apple objected to all 27, or only the

8    first 10 topics?

9            **MS. FORD:**  Only the first 10.

10           **MR. BOYER:**  Well, that's not accurate.  We have

11   objected to all of them because of the -- well, in some regard,

12   because of the scope of them, and Apple's not objecting to not

13   produce anybody, but yeah.

14           **THE COURT:**  Yeah.  Yeah, but I mean, did you provide

15   objections, written objections, to Ms. Ford on all 27 topics

16   before your written submission to the Court?

17           **MR. BOYER:**  Yes, and in fact, we discussed them,

18   what, about a week before, I believe?  I think that's right.

19           **THE COURT:**  So right now, there are written

20   objections -- you should each know what your position is on the

21   scope and all those kinds of things.

22       Is that not the case, Ms. Ford?

23           **MS. FORD:**  I don't believe there was ever a written

24   objection other than the one that we got which only covered the

25   10 topics.  I don't believe we've ever received anything on the

other topics in the form of a written objection.

Now, I might have gotten an e-mail from him --

**THE COURT:**  That counts.

**MS. FORD:**  -- mentioning something, but no formal
written objections other than the first 10.

**THE COURT:**  Okay.  Maybe it's my fault for using the
word "formal."  You're quite correct that you don't get to get
out of a deposition notice by simply serving objections.  It
doesn't work like that, like it does for document requests or
interrogatories.

However, it's appropriate to communicate with each other
by e-mail about concerns you have about the other side's
discovery requests, when we're talking about the deposition
topics.  Many people serve them in, you know, formal notices or
formal objections.  E-mail is fine.

So I'm just trying to understand whether Apple has shared
with you and you have heard the objections that they have to
your 27 topics.

**MS. FORD:**  Um, in any kind of --

**THE COURT:**  In any way.

**MS. FORD:**  Not really, okay?  Like I was saying,
I would think that there may well be an objection, or an e-mail
from Mr. Boyer that might say something to the effect of, we
think your topics are too broad and vague.  I don't believe
I've received anything that goes topic by topic and talks about

1    the specifics of what is a problem with any one of them.

2          We did have a conversation following a deposition which

3    took place on September 10th, I believe it was, or it might

4    have been the one that was on the 8th -- no I think it was the

5    one on the 10th.

6          **THE COURT:**  About the 27 topics?

7          **MS. FORD:**  About the topics, and Mr. Boyer's

8    response, and we sort of went through the list of topics, and

9    in response to most of them, he went, "Uh, yeah, well, that --

10   you know, that could be...," and then he'd drop a name, and,

11   "You know, well, that could be so-and-so."

12         **THE COURT:**  All right.

13         **MS. FORD:**  What I've been looking for is a

14   definitive name so we then can proceed to the scheduling part,

15   and I'm perfectly happy to talk about scope, but I was pretty

16   careful on the scope to limit it to 2011 and forward, to limit

17   it to things that relate to or impact the employees that

18   reported to Mr. Kotni.

19         So I'm not asking about, you know, preparation on all of

20   these overall company issues like how the compensation process

21   works for every employee in the company, the ones that work at

22   the stores and so on.

23         **THE COURT:**  Okay, we can --

24         **MS. FORD:**  I tried to be quite specific, and I never

25   got anything specific from him other than just the generalized,

1    "Oh, this is over-broad," you know, the "We don't know how to

2    do this."

3            THE COURT:  Okay, so let me ask you.  Mr. Kotni,

4    Mr. Carr and Ms. Ramirez were identified at least with respect

5    to the first 10 topics --

6            MS. FORD:  No.

7            THE COURT:  -- in the e-mail as people who may have

8    information responsive, and then in that e-mail, Mr. Boyer or

9    Ms. Pham, I can't remember which, asked --

10           MS. FORD:  Can I...?

11           THE COURT:  -- which -- I have it, I have a copy of

12   it -- asked which -- asked me to propose dates.  Okay, fine.

13       Did you actually question Mr. Kotni about any of the

14   topics for which that e-mail said he may have information?

15           MS. FORD:  Okay, first of all, Ms. Ramirez's name is

16   not in that e-mail.

17           THE COURT:  Okay, Mr. Carr.

18           MS. FORD:  Okay, Mr. Carr and Mr. Kotni's names are

19   in that e-mail but, you know, did I -- first of all, did I ask

20   Mr. Kotni questions about decisions not to award or pay stock?

21   Sure, I asked him questions on that.

22           THE COURT:  I don't -- I mean, as a designee.

23           MS. FORD:  No.

24           THE COURT:  So the way -- the way this works, right,

25   is you go to a deposition, someone's testifying as a personal

1   witness, and also testifying as a designee of the corporation.

2   Usually that's recited on the record.

3         So when Apple had Mr. Kotni come for a deposition, did

4   Apple say, Mr. Kotni is here to testify on behalf of the

5   company about X, Y and Z topics, and otherwise, he's appearing

6   and testifying personally?

7         **MR. BOYER:**  I did not do that, your Honor, and the

8   reason for that was because he was noticed individually.  We

9   had not finished the meet-and-confer process, and we've also

10  offered to bring him back.  That's not really --

11        **THE COURT:**  Okay.  Good.

12        **MR. BOYER:**  -- an issue, so....

13        **THE COURT:**  All right.  I don't want to belabor it.

14  If you all -- if you said, you know what, Mr. Kotni's coming

15  back as a 30(b)(6) designee for certain topics, but from your

16  submission, it sounds like you're relying on, Mr. Kotni

17  testified about X, Mr. Carr testified about Y.  That doesn't

18  cut it, right?  Somebody has to be a designee, has to be

19  prepared to testify, and actually has to answer on behalf of

20  the company.

21        If you're telling me that hasn't happened yet, then we

22  have to totally deal with the 30(b)(6) notice kind of *sui*

23  *generis*, right?  If none of that has happened, no testimony on

24  any 30(b)(6) topics, then we're just going to pretend that --

25  I'm just going to ignore all those statements, because you have

1     to actually do it.

2          So tell me if I'm misunderstanding Apple's position.

3               **MR. BOYER:**  Well, I think it's -- and I don't want

4     to waste the Court's time, but because we never came to an

5     agreement as to who was going to testify to what, because

6     plaintiff's counsel wanted us to -- because we had two

7     witnesses, given the great amount of time that's involved here,

8     seven years, a little bit over that, we had two witnesses that

9     would be able to testify to various topics.

10         Plaintiff's counsel did not accept it, saying we needed to

11    tell her exactly what each one of these witnesses is going to

12    testify to, and that's not what within, one, the requirements

13    of 30(b)(6), and so we never came to any agreement as to

14    whether there would be somebody designated as a 30(b)(6) on

15    various topics, but again, however, we have agreed to bring

16    Mr. Kotni back.  He's probably going to be able to testify

17    about 80 percent of what's sought in terms of the compensation

18    and promotion process.

19         Mr. Rastogi is also being deposed on October 1st --

20              **THE COURT:**  And what is his, or -- what is his

21    position?

22              **MR. BOYER:**  He is Mr. Kotni's manager, direct

23    supervisor.

24              **THE COURT:**  All right.

25              **MR. BOYER:**  So in terms of all the decision makers

1    during this time period, plaintiff has access to them, and

2    that's Mr. Kotni and Mr. Rastogi.  They've also had access to

3    the HR individual who testified about the compensation process

4    in general during that time period, and so what I'm trying to

5    do is avoid bringing people back two or three times.

6         Now, I understand that we have an obligation to designate

7    someone, but we cannot, you know, specify the lists of

8    questions or topics that each individual is going to testify

9    to.

10             THE COURT:  Right, we'll get to that point.

11             MR. BOYER:  Okay.

12             THE COURT:  I think the parties may be disputing

13   something that I can give you guidance on, so it won't be a

14   dispute anymore, but it sounds like, to state it bluntly, there

15   has been no 30(b)(6) testimony on behalf of Apple at this

16   point.

17             MR. BOYER:  That's accurate, your Honor.

18             THE COURT:  Okay.  Now, is there testimony that has

19   already been given that Apple would stipulate is binding on the

20   company and is 30(b)(6) testimony, if Ms. Ford were to choose

21   that option?  And I'm thinking of it only as a time-saving

22   measure.

23        So I'm sure Ms. Ford doesn't want to ask the same five

24   questions again of X witness if she's already done it and has

25   already gotten satisfactory answers, but that would mean, if

1   that were to work, that Apple would have to stipulate that

2   those questions and answers were binding on the company.

3       Is that something you'd be willing to do, or does it

4   depend on the question and answer?

5           **MR. BOYER:**  I think certainly it would depend on the

6   question and answer, but yeah --

7           **THE COURT:**  Okay.

8           **MR. BOYER:**  -- I mean, ultimately, if we come to

9   agreement, that would be fine.

10          **THE COURT:**  Okay, all right.  So let me -- let me go

11  through the topics.  I'm going to tell you what my concern is

12  kind of overall about -- and this doesn't apply to every single

13  topic, some of which seem totally fine and unobjectionable, and

14  I don't understand there is any objection, but there are a

15  couple repeated things that I think might -- we might need to

16  discuss.

17      So one is this time period.  In my July 11th order, we

18  talked about the relevant time period for the eight employees

19  being January 1st of 2011 through December 31st of 2018, solely

20  because for the kind of comparison-type information that was

21  being sought, that broader time period, beyond what

22  Mr. Kannan's employment was, mattered, was relevant.  Okay.

23      For some of these topics, that same rule seems to apply,

24  but for others it doesn't, because the other topics are just

25  about Mr. Kannan and his employment, his work, his activity.

1    So it seems that you all have a dispute about the date

2    that is not really discussed in your papers, but that I see

3    when I line up representations about what Mr. Rastogi will

4    testify about and what the depo topic asks for, that seems like

5    they have already been resolved, or could be resolved or really

6    shouldn't be disputed.

7    So let me understand what the problem is regarding the

8    dates, and I'm just looking at the first topic, which talks

9    about any decision or decisions not to award compensation,

10   salary increases, stock awards, RSUs, bonuses or other

11   potential compensation to Kannan in the years 2011 through

12   2017, et cetera.

13   He didn't work for Mr. Kotni except November 4, 2013

14   through April 17th, 2017.  So I would assume there's no need to

15   go back to 2011.

16   **MS. FORD:**  Um, well, there's two reasons to go back

17   to 2011.  First reason is that the distinction or comparison

18   between how he was treated by prior supervisors and then how he

19   was treated by Mr. Kotni I think is relevant to whether what

20   was happening was appropriate.

21   The second reason is that there was a cancellation of his

22   bonus and RSUs that had already been awarded to him, or he

23   hadn't been told about it, but they'd already been -- the

24   decision had been made to award them to him, right at the time

25   that he transferred into Mr. Kotni's team, and that is also

1    relevant because that is RSUs and bonuses that he would have

2    gotten, should have gotten, and the reasons why that didn't

3    happen are highly relevant to this action.

4              THE COURT:  Okay.

5              MS. FORD:  So those are two reasons why I think

6    going back before the absolute date, which was sometime in the

7    Fall of 2013 when he started to report to Kotni, would be

8    relevant.

9              THE COURT:  Fall 2013.

10             MS. FORD:  2013, sorry, I beg your pardon.

11             THE COURT:  Okay.  Mr. Boyer, what's your view?

12             MR. BOYER:  Right.  So the time before the time he

13   reported to Mr. Kotni is irrelevant because he alleges that no

14   other manager discriminated against him other than Mr. Kotni.

15   So by the time he reported to Mr. Kotni, that's the only thing

16   that really matters.

17        With regard to the bonus being canceled, I have not seen

18   any evidence, in document form, other than plaintiff's

19   testimony, that that ever occurred.

20             THE COURT:  That the bonus was canceled?

21             MR. BOYER:  Right, bonus and RSU were canceled.

22             MS. FORD:  They've produced e-mails showing that

23   they were canceled that we've gone over with both Kotni and

24   Ramirez in their depositions.

25             THE COURT:  Okay.  So here's what I'm going to do on

1    this one.  You can ask, and you should designate someone who

2    can talk about these e-mails, but if you don't know what these

3    e-mails are and you've never seen the information, tell him

4    which e-mails you want to have his witness prepared about,

5    okay?

6        So Ms. Ford, you tell Mr. Boyer, I want a witness who's

7    prepared to talk about this event, this cancellation of RSUs or

8    bonuses, or whatever it is you're concerned about, right at the

9    transition, but really, your deposition testimony needs to

10   focus on the discriminatory conduct that you're attributing to

11   Mr. Kotni, and not beyond.  Okay?

12       **MS. FORD:**  We did not limit our Complaint in this

13   action to Mr. Kotni only.

14       **THE COURT:**  But I understand there's been testimony

15   in the case from your own client that says that that's what's

16   happened.

17       **MS. FORD:**  No, actually, he said that he re-thought

18   and began to wonder about the reason why his bonuses were

19   canceled and his RSU was canceled in 2013, which happened,

20   coincidentally, to be almost right after his son was diagnosed

21   and right after he took his son to India to see his -- his

22   grandfather, Mr. Kannan's father, who happens to be a

23   physician.

24       **THE COURT:**  Okay, the allegations in your Complaint

25   about are -- are about Mr. Kotni's interactions with

1   Mr. Kannan.  So I'm going to at this point limit you to that

2   kind of inquiry.

3       I've already said you can ask about what happened at the

4   cusp, this cancellation that happened on the cusp of his

5   transfer to Mr. Kotni's supervision, but the purpose of the

6   broader range of discovery, 2011 to 2018, was to capture

7   basically comparator evidence, okay?

8           **MS. FORD:**  Yes.

9           **THE COURT:**  So not prior employment by Mr. Kannan

10  with other -- you know, supervised by other people at the

11  company.  That was -- and that's how I've understood the

12  dispute going from our prior interaction, and that's what

13  I understand your claims to be in this case.

14      So, you know, if you discover something that you think

15  expands the scope of your discrimination allegation beyond

16  Mr. Kotni's activity or interaction with your client, you can

17  certainly bring it to the Court's attention, but I'm going to

18  limit the obligation that Apple has to prepare a witness to

19  testify.

20      Certainly if you're taking someone's personal deposition,

21  you can ask him whatever you want related to the case, but for

22  a 30(b)(6) deposition, this is what they're required to prepare

23  a witness about.

24      So what I'm not clear about -- and I don't need to

25  micromanage it, you all can work it out -- is who's going to do

it, Mr. Kotni or Mr. Rastogi.  And let me just give you some

guidance on how this happens.

It is totally appropriate for a corporate entity to say,

"The category is this big, I have two people who together can

cover it."  Unless you're prepared to give Mr. Boyer a list of

all of the questions that you ask -- that you're going to ask,

so he can tell on a question-by-question basis which witness is

going to take which question, you can't expect him to parse it

so fine to tell you exactly what the witness is going to say.

Sometimes it's possible to say, this witness can cover

this time period, from point A to point B, and this witness can

cover the remainder, but sometimes, especially when you have

people in a hierarchy in an organization, one witness can

handle, you know, detail-level questions and other witnesses

can handle the sort of higher-management-level questions.

So I'm not going to require Apple to slice it that fine

unless your topics are so particularized, which they aren't.

So you all can talk about it, because nobody wants to waste

time.

**MS. FORD:**  Right.

**THE COURT:**  And if Mr. Boyer can tell you this

witness doesn't know anything about this, but he knows about

this, great, I encourage you to do that.  But other -- so

I just wanted to say, it's appropriate to designate two

witnesses for a topic.

1          **MS. FORD:**  Okay, but can I just, please, add a

2    little bit to that?

3          **THE COURT:**  What's your concern?

4          **MS. FORD:**  Because I'm perfectly familiar with the

5    fact that it commonly comes up that, you know, within a given

6    topic, there will be two people.  I am not familiar with a

7    corporation that refuses to tell you, like you just said, this

8    guy knows about that and that guys knows about that.

9        The problem that I end up with, as the person who's taking

10   the deposition, is that testimony is supposed to bind the

11   company.

12         **THE COURT:**  Um-hum.

13         **MS. FORD:**  I have to take one person's deposition

14   first and the next person's deposition next.  I can't tell how

15   to divide up my questions, first of all; and second of all, if

16   I get an answer, the company's supposed to be bound by that,

17   except they can totally change it, that testimony, to that same

18   question, when they call in their second witness that's also

19   speaking for the company.

20       The company should have to produce enough information so

21   that I can tell what questions to ask which person and where

22   Apple is stuck.

23         **THE COURT:**  I'm not unsympathetic to your view, but

24   it's sort of like a chicken-and-egg problem that we have.  So

25   you're going to talk about this when we're done here.  You're

1   going to go in my jury room and you're going to talk about this

2   issue, okay?

3        And I hope that you don't need my help to sort it out, but

4   you're going to share with each other what kinds of things you

5   want to explore and what the witness' scope of knowledge is,

6   whether it's by date or by kind of information.

7        Okay, number 2.  Any response or action taken with respect

8   to any request by Kannan for awards of RSUs or bonuses other

9   than compensation.

10       All I have from Apple is, Carr testified on this topic.

11  Are you going to re-produce Mr. Carr to testify as a 30(b)(6)

12  witness on this topic?

13            **MR. BOYER:**  If that's what the Court orders, yes,

14  your Honor, we would.

15            **THE COURT:**  Well, you've got to produce somebody.

16  I am not going to tell you who to pick, I don't know any of

17  your witnesses, but somebody has to testify on that topic.

18            **MR. BOYER:**  Yes, your Honor, we'd bring him back for

19  that.

20            **THE COURT:**  And I otherwise don't see that there's

21  any objection that you have to the scope of the topic.  Maybe

22  it's not clear exactly what the scope is, but there's nothing

23  in your papers for me to rule on.

24            **MR. BOYER:**  Right.  So we didn't find the topic

25  objectionable.

1             **THE COURT:**  Great.

2             **MR. BOYER:**  We said Mr. Carr would be produced as a

3     30(b)(6), and counsel said that she did not want to take him as

4     a 30(b)(6), and so if the Court orders it, we will produce him

5     again.  We just don't want to, you know, obviously have --

6             **THE COURT:**  Okay.

7             **MR. BOYER:**  -- the same sort of discussion --

8             **THE COURT:**  Right.

9             **MR. BOYER:**  Yeah.

10            **THE COURT:**  So you'll need to produce a witness for

11    this topic, a corporate designee.

12        Same thing for number 3, Mr. Kotni and Mr. Carr, again,

13    you need to designate a witness or witnesses for this topic as

14    a 30(b)(6).  Basically, I don't see that there's any objection

15    on this point.

16        Number 4, also appears to be no objection, and you'll need

17    to designate a witness to testify on behalf of the company on

18    that topic.

19        Number 5, okay, I didn't understand this one.  Maybe you

20    all do.  "All peer information and communications concerning

21    Kannan and others."  That's really broad, and I'm not really

22    sure what "peer information" is, and so unless you all have

23    talked about that and you all know what the scope of that one

24    is, I think we should address that one.

25            **MS. FORD:**  The peer review is actually a formalized

1   process that goes on as part of the compensation review process

2   every year, and the peer review comments are all in writing.

3   I think they're all in writing.

4           **THE COURT:**  So you're going to be talking about

5   documents that have already been produced to you --

6           **MS. FORD:**  Yes, in part, and --

7           **THE COURT:**  -- and asking a witness knowledgeable

8   about those documents?

9           **MS. FORD:**  Yeah, and then whether there's anything

10  that isn't in the -- you know, contained in those documents,

11  but yes, we've been provided with that, and this peer review

12  process is something that is -- it's part of the formalized

13  system.  I guess I could have put a capital P, capital R on

14  "peer review," but --

15          **THE COURT:**  No, I just want to make sure, so -- and

16  so you understand what Ms. Ford is asking for on this topic, no

17  ambiguity about it, and you're prepared to designate Mr. Kotni

18  to testify on behalf of Apple?

19          **MR. BOYER:**  I am.  I get a little nervous by the

20  word "communications," just given how broadly counsel tends to

21  interpret their communications, and I'm not sure what exactly

22  that means, but yes, Mr. Kotni will testify to this topic in

23  terms of the peer review information that he received and --

24  I mean, that's really -- it seems like all that it's asking

25  for.

1              **THE COURT:**  Okay.  So here's another bit of guidance

2     on expectations about questioning a witness and preparing a

3     witness for topics like this.  A witness cannot possibly know

4     everything about every communication, especially ones that he

5     or she didn't participate in.

6              So if it's the kind of situation where you say, this

7     witness needs to investigate and be prepared to answer on

8     behalf of the company about a particular communication, you

9     need to identify those, in advance, sufficiently in advance of

10    the deposition so that Mr. Boyer can prepare the witness to

11    testify about that.

12             Because otherwise, if you get "I don't know," "I don't

13    know what so-and-so meant when they wrote that," you can't come

14    back and say, you didn't prepare your witness.

15             I mean, some communications are formal communications that

16    are part of a process.  He's going to be the one who made it,

17    it's within the scope, it's going to be, like, the critical

18    communication, okay.  But random e-mails, unless you've

19    identified them in advance, there's no way somebody can

20    possibly figure out they need to prepare a witness about that.

21             **MS. FORD:**  The problem that I have is that I need to

22    ask a more general question.  For example, Mr. Rastogi, did

23    anybody communicate with you and tell you things about

24    Mr. Kannan that influenced your decision --

25             **THE COURT:**  That's fine.

1        **MS. FORD:**  -- whether or not to -- well, that's a

2   generalized question, and it's not identified --

3        **THE COURT:**  They're not -- I'm not talking about a

4   generalized question.

5        **MS. FORD:**  -- to a particular --

6        **THE COURT:**  I'm talking about particular e-mails.

7   That's the problem I'm trying to identify.

8        **MS. FORD:**  Okay.

9        **THE COURT:**  If there is -- there are probably a

10  bunch of e-mails produced in this case, and it's not -- it's

11  not reasonable to expect a single witness, particularly a

12  witness who didn't author an e-mail, and it's not within the

13  scope of that witness' job, but is nevertheless being

14  designated to talk about a particular category that's been

15  described very broadly, to be able to answer a question about

16  the meaning of a particular e-mail.  Sometimes it's not

17  appropriate ever to ask that question.

18      But what I'm saying is if there is some e-mail that you

19  consider critical to this issue, you should identify it in

20  advance, so that Apple has an opportunity to prepare the

21  witness about it, okay?

22        **MS. FORD:**  In the context of this litigation, I will

23  tell you there have been almost no questions about, what is the

24  meaning of this --

25        **THE COURT:**  Okay.

1     **MS. FORD:**  -- e-mail.  It's --

2     **THE COURT:**  It may not be an issue.

3     **MS. FORD:**  -- whatever happened, happened.

4     **THE COURT:**  But I just saw this percolating, and

5  I just wanted to --

6     **MS. FORD:**  Okay, thank you.

7     **THE COURT:**  -- survey this.

8     Okay, number 6, any communications between members of

9  management concerning Kannan.  Okay, I understand the issue

10  here is, what are members of management.  We still have a

11  dispute about that?

12     Who -- I'm not really sure what you're getting at here,

13  Ms. Ford.  I think you -- there's the sort of the broader

14  question that was asked before about Mr. Kannan's awards and

15  compensation, and now you want specifically communications

16  between members of management.  Who are you envisioning

17  comprise members of management?

18     **MS. FORD:**  Well, that's the problem, is that -- you

19  know, in part, that's the problem is that I don't know.  I know

20  that Mr. Kannan and Mr. Rastogi communicated to a certain

21  extent concerning his compensation.

22     I know that Ms. Ramirez, for some of the years -- although

23  not all of them, she left Apple years ago -- but that for some

24  of the years, she was an HR person who seemed to sort of

25  collect information and data.  She didn't really have any input

1   into it.

2        I don't know whether there's anybody else involved.  Even

3   as I sit here, I don't know whether there was anybody else

4   involved.

5              THE COURT:  But by "members of management," you mean

6   people who are Mr. Kotni or his supervisors, his direct

7   reporting supervisors?

8              MS. FORD:  I would hate to make it that narrow in

9   case there's, in fact, input into the decision-making processes

10  concerning things like cancellation of his bonuses that maybe

11  came from his former manager, or maybe came from some other

12  manager that he worked with.

13             THE COURT:  Okay, let me ask it --

14             MS. FORD:  And that's why it's --

15             THE COURT:  Yeah, okay, let me ask the question this

16  way.

17             MS. FORD:  It is the way it is.

18             THE COURT:  Do you have documents that suggest that

19  there are people in management involved in these kinds of

20  decisions, that is, compensation, his stock awards, et cetera,

21  beyond Mr. Kotni and Mr. Rastogi and this HR person, who maybe

22  you wouldn't even consider management, I'm not sure, but do you

23  have documents that reflect other people were involved?

24             MS. FORD:  Um, no, but then --

25             THE COURT:  Okay.

1          **MS. FORD:**  -- Apple's been very careful about they

2     disclose to us.

3          **THE COURT:**  All right.  So Mr. Boyer, what's your

4     concern about this topic?

5          **MS. FORD:**  Oh, take that back.  With respect to the

6     cancellation of the RSUs and the bonus that happened

7     contemporaneous with his transfer, from that we have e-mails

8     from his former manager, Mr. Raja, who we also hope to depose

9     but we don't have a date for him yet, and he just said, "Cancel

10    his bonuses and his RSUs," and it doesn't say why.

11        And when I asked Ms. Ramirez, who is the only party to

12    that communication I've been able to depose yet, she said,

13    "I don't know."

14         **THE COURT:**  Okay, I don't have Mr. Raja -- this is

15    this reference to other depositions that you need --

16         **MS. FORD:**  Um-hum.

17         **THE COURT:**  -- in your papers.  I forget which

18    filing it is.

19         **MS. FORD:**  Yes.

20         **THE COURT:**  Maybe it's the administrative motion.

21    Mr. Roger (sic) is not on the list.  The list I had was --

22    I don't know if these people are male or female -- Kundar,

23    Raja, Rastogi, and then a further deposition of Mr. Kotni.

24        So is Mr. Roger somebody in --

25         **MS. FORD:**  Raja, R-A-J-A.

1          **THE COURT:**  Oh, oh, excuse me, I'm sorry.

2          **MS. FORD:**  Mr. Moazam Raja.

3          **THE COURT:**  Raja, okay.  I thought you said Roger.

4     Sorry, okay, I got it.  Got that one on the list.  Okay, so

5     that one's a to-be-deposed person anyway.

6          **MS. FORD:**  But when you asked me what do I mean by

7     communications, that's what I'm talking about.

8          **THE COURT:**  Okay.

9          **MS. FORD:**  And I don't know enough and I don't have

10    the e-mails and, you know, if there are some, there may be, but

11    I don't -- I don't have them.

12         **THE COURT:**  Let me let Mr. Boyer respond here.  You

13    were concerned about the scope of this topic and trying to

14    understand what she meant.  You've now heard what she meant.

15    Are you able to prepare a witness or do you have objections on

16    this topic?

17         **MR. BOYER:**  So really, I'm looking at, like, three

18    different people on one topic.  See, the issue with -- and the

19    objections that we've served is because these are so vague and

20    they are so over-broad in terms of what they could encompass

21    and could involve so many people, and there's some guesswork

22    involved too, because there's no information that comes from

23    the other side saying, I want somebody to specifically talk

24    about X, Y and Z, which makes it very challenging, because if

25    we get into a deposition and, you know, did you look through

1    everyone's e-mail in 2012 to find, you know, a communication

2    with, that's the problem.

3          **THE COURT:**  I understand the problem, but just to

4    try to simplify, here's the issue:  I think what Ms. Ford is

5    after is who made the decisions about what compensation, stock

6    awards, et cetera, Mr. Kannan was going to get.  So who were

7    the people who were involved, who took direction from him, that

8    kind of stuff.

9      So we know Mr. Kotni was involved.  She believes

10   Mr. Rastogi was involved.  If they consulted with other people

11   in making their decision about what his compensation and awards

12   should be, those are the people that -- you need to talk to

13   them first, figure out who they talked to, and figure out what

14   those communications were.  I think that's what the scope of

15   the prep is.

16        **MR. BOYER:**  And I agree, your Honor.

17        **THE COURT:**  And then there's this prior manager

18   Raja.  I mean, it seems like the simplest way to handle that

19   is, he's been identified as a witness for a personal

20   deposition.  You know, maybe in the -- maybe as part of his

21   personal deposition you can just have a little 30(b)(6) snippet

22   that takes care of this one issue.  That's my suggestion.

23        **MR. BOYER:**  All right, your Honor.

24        **THE COURT:**  I think you guys are going to talk about

25   this afterwards.

1           **MR. BOYER:**  Thank you.

2           **THE COURT:**  That's my thought.

3       Okay, any replacement for Kannan after he left, it sounds

4   like there's no objection on this.  Mr. Kotni will be

5   re-designated -- designated to testify about this topic, is

6   that right?

7           **MR. BOYER:**  That's correct, your Honor.

8           **THE COURT:**  All right.  Number 8.  So we have three

9   in a row that are about this system at Apple, job level system,

10  bonus system and compensation system, and I have the same

11  questions about all of these.

12      First of all, the date limitation.  These all go back to

13  2010.  I don't see any reason why they should go back to 2010.

14  It seems like January 1st, 2011 is the earliest date that is at

15  all relevant for any purpose here.

16          **MS. FORD:**  I can live with that, no problem.

17          **THE COURT:**  Okay, Mr. Boyer, do you agree?

18          **MR. BOYER:**  I'm sorry, the date again, your Honor?

19          **THE COURT:**  January 1st, 2011, the same date we used

20  for the documents in my July 11th order.  That would encompass

21  people who worked for Mr. Kotni before -- slightly before

22  Mr. Kannan joined and continued after.

23      So instead of going out way back to 2010 about eight --

24  this is topics 8, 9 and 10.  Each of them go back to 2010.  I'm

25  saying that's too broad.  The relevant time period should be

1    January 1st, 2011 to December 31st, 2018.

2         Do you agree?

3         **MR. BOYER:**  I would argue it's still a bit broad.

4    The issue with the job level, bonus and compensation, again,

5    does not arise until 2013.  I would request that it be limited

6    to 2013 to '18.

7         **THE COURT:**  But see, this is the same problem we had

8    when we talked about the comparator employees.  I mean, this is

9    a question that relates to the system generally as it applied.

10        And so I think -- I can see merit in understanding how the

11   system worked.  So this is a description of the system.  It's

12   not particular decisions.  It's a description of the system.

13        **MR. BOYER:**  Right.  No, I do understand, your Honor,

14   and the only other caution that I have is it may be very

15   difficult to find people who would know something so long ago.

16   It's almost 10 years.

17        **THE COURT:**  That's a problem that happens.  So you

18   have an obligation to investigate and inquire.  If the

19   information is not available, it's not available.  So your

20   designee will do the best job he or she can on that topic.

21        The other question I have that relates to all three of

22   these is the department in which Kannan was employed in

23   California.  I'm not really sure what that means.  I have been

24   assuming that the relevant realm of people we're talking about

25   are the eight employees -- Mr. Kannan and eight employees who

1    worked in the APS Department for Mr. Kotni.

2         Do we mean something different here or do we all agree

3    that's what this means?

4              **MS. FORD:**  That's what that --

5              **THE COURT:**  Okay, great.

6              **MS. FORD:**  Reference to the department is the APS

7    Department.

8              **THE COURT:**  Okay.  So then it sounds like, for each

9    of these, it will either be -- okay, number 8 -- you'll have to

10   decide who to designate.  I'm not going to micromanage who to

11   designate, but there will need to be a designee or designees

12   for 8, 9 and 10, with the date limitation I described and the

13   department limitation I described, the APS Department and the

14   eight employees.

15        On number 9, there's a limitation that talks about

16   Contributor Level 4 and Contributor Level 5, which I didn't

17   understand.  But that's totally acceptable and fine, but

18   I didn't understand why Apple was making that specific

19   limitation on what Mr. Rastogi would testify about.

20             **MR. BOYER:**  Oh, with regard to the bonus system,

21   your Honor?  Yes.

22             **THE COURT:**  Yes.

23             **MR. BOYER:**  So the bonuses -- the amount of bonus

24   the individual can get depends on the level that they're at.

25   So each year, these compensation guidelines, you know, to the

1    extent that they're published, have certain -- each position

2    has a level of bonus that could be awarded.  And so the -- you

3    know, for a 3 or a 2, IC 2 or 3, not really relevant to this

4    particular issue.

5              **THE COURT:**  I see.

6              **MR. BOYER:**  Really what we'd be looking at is the

7    IC 4 and 5 level, and that's why we wanted to limit it to this

8    particular --

9              **THE COURT:**  Okay, that seems reasonable, because

10   I don't think that the lower-level contributors are really --

11   you don't really care about them.  They're not going to be

12   similarly situated, is that right?

13             **MS. FORD:**  No, we'd be more concerned with the --

14   well, I'll have to put a footnote on that one.  Unless Apple is

15   going to point to the lower-level people as being, see, there's

16   lots of other folks who didn't get bonuses, when the answer is,

17   well, you didn't get bonuses because you're not, you know,

18   doing the same kind of job or whatever.

19             **THE COURT:**  Okay.

20             **MS. FORD:**  So if Apple is not going to point to

21   them, then I don't see any reason that I would need to know

22   about their bonus and comp system, but I think Apple is saying

23   something different.  They are saying the people up above

24   the -- there's this individual contributor level and then

25   there's the manager levels, okay, and they've always wanted to

1    shave off those manager levels and take them out of the case,

2    make them irrelevant somehow.

3         That's not true, because my client is saying, I should

4    have gone to Individual Contributor 5, I should have gone up

5    into the management levels.  These other people I'm pointing at

6    in my same department got hired at my level, at Individual

7    Contributor 4 --

8              **THE COURT:**  And got promoted to manager?

9              **MS. FORD:**  -- and they wound up as a Manager 5.

10             **THE COURT:**  Okay.

11             **MS. FORD:**  Well, then, if they did, how that bonus

12   system works is directly relevant.

13             **THE COURT:**  So I think it is fair to exclude the

14   lower-level contributor positions, but how do you respond to

15   Ms. Ford's remark that part of the case is that he should have

16   been promoted to these other positions?

17             **MR. BOYER:**  It's my understanding that, reading the

18   Complaint, the allegation is that he should have been promoted

19   from IC 4 to 5, not necessarily the manager level.  So that is

20   different -- however, there are different levels of managers,

21   as well as Manager Level 1, 2 and 3.  If the Court were to say,

22   well, okay, we were going to go ahead and require Apple to

23   designate someone on the manager level as well, it should be

24   limited to just Manager 1.

25        So each of these promotions are based on, obviously, level

1    of responsibility and performance and things like that.  People

2    don't go from, like, an IC 5 to Management 3.  They usually

3    step up through the process.

4              THE COURT:  So of the eight -- the group of eight

5    folks that we're talking about who are -- I'm going to, for

6    lack of a better word -- a comparison to Mr. Kannan, by the end

7    of 2018, what level, job level, did each of -- what is the

8    maximum job level any one of them achieved?

9              MR. BOYER:  I know for a fact that at least one of

10   them was a manager, so Manager Level 1.

11             THE COURT:  Okay.

12             MR. BOYER:  But I believe he started as an IC 5.

13   I have to get my chart out, but --

14             THE COURT:  Yeah, I mean, what I think you should

15   use as your governing principle here is if, in this group of 8,

16   somebody achieved level X, you should talk about a -- have

17   somebody who's designated to talk about the bonus system that

18   encompasses that level.  I think that that's probably within

19   the realm of reasonable scope here.

20             MR. BOYER:  Yes, your Honor.

21             THE COURT:  Okay.  We're on to number 11,

22   Mr. Kannan's internal complaints and Apple's investigation of

23   Mr. Kannan's internal complaints.

24        Sounds like there's not really an objection on this one

25   and you'll make a designation, is that right?

1          **MR. BOYER:**  Yes, your Honor.

2          **THE COURT:**  Okay, same thing for number 12.  The

3    only question I had here was about the dates.  This is

4    Compensation Planning Guidelines for salary, stock and bonuses

5    applicable to Apple's IS&T Department, and the dates are 2011

6    forward.

7          I think the relevant dates ought to be January 1st, 2011

8    through December 31st, 2018, just like we did with the

9    documents before, and that the relevant department is this APS

10   department, with the eight employees.

11         So I'm not sure if there's any difference between what I'm

12   saying and what you're asking about, but it's -- I was

13   surprised to see the broader scope.

14         **MS. FORD:**  Well, first of all, the IST department is

15   the larger group within which APS is included, okay?  And the

16   testimony so far has been that the compensation planning was

17   done for the whole IST group, and the guidelines and everything

18   apply to that whole IST group, not just the APS groups.

19         In other words, there's not going to be planning

20   guidelines probably for Apple's APS department, or if there

21   are, they're so narrow that they're not really responsive or

22   not good enough.  You really need the planning guidelines that

23   were developed for the IST department, of which APS is a part.

24         Then the second thing on the issue of going forward past

25   April of 2017 when he went to India, his damage claim includes

1    the fact that he went to India and earned a lot less in India

2    than he would have earned had he remained in his job in

3    California, but that he was essentially driven out and forced

4    to do that because of the cap on his earning ability.

5         And so the -- what they were doing with the comp system

6    with the people who remained behind, in other words, had he

7    stayed there, what would have happened to him up until the

8    present is pertinent.

9              **THE COURT:**  So my thought on this is that the

10   compensation planning guidelines deposition inquiry should

11   mirror the discussion we had about the request for production

12   of documents.  It should mirror that in scope.

13        So whatever was the relevant scope there, which I think

14   I included the relevant time period being January 1st, 2011

15   through December 31st, 2018, that's the relevant scope for this

16   as well.  I'm not going to revisit that issue.

17        I get your point that compensation planning may be done at

18   a higher level than simply the group in which the eight

19   employees worked.  That's fine, and I would expect that the

20   documents reflect that as well.  So whatever these guideline

21   documents are that you're producing, I understand they're being

22   produced for these eight employees, but they reflect the

23   guidelines that may apply beyond those eight employees, that's

24   fine.

25        You can inquire about the guidelines generally, but

1   I really don't want to get into questions about applying to

2   other employees outside Mr. Kotni's group, and all of that

3   questioning would really be beyond the scope of what's

4   relevant.

5           **MS. FORD:**  But really, in terms of cutting off all

6   of our discovery on the day that he moved to India --

7           **THE COURT:**  It's not the day he moved to India.

8   December 31st, 2018 is at the end of the following year.

9           **MS. FORD:**  Well, at any --

10          **THE COURT:**  This is -- I'm not going to revisit that

11  issue.  Okay?  I'm really not.  So we debated this question, we

12  talked about the documents.  I don't see any reason to change

13  that.

14      Do you all agree otherwise?  Like, if you're going to rely

15  on stuff that happened in 2019, then you better allow someone

16  to talk about it, but otherwise, I don't see that it bears on

17  the dispute.  At least as to these topics.

18          **MS. FORD:**  Only as to the --

19          **THE COURT:**  Compensation planning guidelines.

20          **MS. FORD:**  Yeah, as to damage computation is where

21  it comes in.  It's what would he have earned had he been

22  allowed to remain in his position in California, where he would

23  love to still be working today.

24          **THE COURT:**  If somebody's -- if your expert is going

25  to talk about that, then you're going to need to provide it to

1     her and allow a witness to testify about it.  That's all I can

2     say.  So this is kind of this caveat.  I mean, if you don't

3     have any objection to having it extend through the present,

4     fine, go ahead and do it.  It will solve a lot of problems

5     later.  But if your damages expert is going to project, you

6     know, into the present using these guidelines, then you better

7     allow a 30(b)(6) witness to testify about it.  That's my

8     suggestion.

9          Same thing for all of these -- these ideas.  So I don't

10    want to dictate some rule that is then going to come back and

11    be a problem in the case, okay?  All right.

12         So I think my concern about the scope and the time period

13    applies to 12, 13 and 14.  So I don't think we need to talk

14    anything about those there.  I understand that Apple will

15    designate a witness or witnesses as to all three.

16         With respect to the compensation system, number 15, I'm

17    not sure how that's different from number 10.  I'm going to

18    assume that it's the same, and that Apple is going to designate

19    Mr. Kosti or Mr. Rastogi or someone else to talk about that.

20         And for all of these, where it is goes to other employees

21    in the group, not just Mr. Kannan, I think the broader date

22    period is relevant.  So I made that remark at the beginning and

23    it continues to apply.

24         Okay, number 16, I'm not sure how Apple's compensation

25    planning is any different from an earlier topic we talked

1    about, but I see that Apple proposes to make a designation, so

2    I think we can move on from there.

3         Same thing with number 17, peer evaluation,

4    self-evaluation, I think that that's appropriate.  Apple will

5    make a designation as to those.

6         Okay, organizational structure at Apple, I'm not even sure

7    I know what this includes.  Is this another way of getting at

8    the question of who reported to whom?

9              **MS. FORD:**  Yes, ma'am.

10             **THE COURT:**  Okay, so this, it seems to me that just

11   like we had the discussion before, that the scope is

12   reasonable, but it's not an invitation or it's not appropriate

13   to inquire broadly about the organizational structure.  If what

14   you're going to focus on is how many people reported -- of what

15   type reported to each of the eight people, that seems fine.  So

16   if that's the scope, that seems appropriate.

17        Nineteen, how is this relevant, claims by employees other

18   than Kannan related to discrimination or reasonable

19   accommodation, either by internal investigation or agencies

20   like DFEH or EEOC?  How is that relevant to any dispute in the

21   case?

22             **MS. FORD:**  Well, first of all, there seems to be

23   a -- what -- a kind of a brick wall of, "no, we don't know too

24   much about these things," or "I don't remember" or "I don't

25   know" is --

1          **THE COURT:**  What things?

2          **MS. FORD:**  From -- I'm getting there -- from

3    management, when I ask them questions about their experience in

4    dealing with accommodating disabilities, and so I think if

5    there is a pattern or a problem at Apple in terms of

6    accommodating disabilities and people with disabilities in

7    their families, that that is -- is relevant.

8          **THE COURT:**  All right.  So Mr. Boyer, I didn't see

9    in your papers any specific objection to this topic, just a

10   notation that Mr. Carr had testified about it.  So....

11         **MR. BOYER:**  Actually, we did object to this, your

12   Honor.

13         **THE COURT:**  Oh, did I miss that?

14         **MR. BOYER:**  And we did have a discussion about it.

15         **THE COURT:**  You mean you objected to it before it

16   got to me?

17         **MR. BOYER:**  Correct, your Honor.

18         **THE COURT:**  Okay.

19         **MR. BOYER:**  And we believe that the topic's

20   irrelevant, and what counsel is referring to is she asked

21   Mr. Carr and Ms. Ramirez about specific investigations that

22   happened in 2003, '04 and '05, and at different companies and,

23   you know, or the investigations that they did 10 or 12 years

24   ago at Apple is not relevant at all, nor is the fact that they

25   can't recall a certain investigation that occurred 12 years ago

1    relevant, and it's....

2              THE COURT:  Yeah, and I don't think this is relevant

3    to any issue in the case.

4         I do think that the training question, which is topic 24,

5    about training memos, notices related to prevention of

6    discrimination and reasonable accommodation, that is totally

7    relevant to the issues in the case and would allow you to

8    inquire about Apple's experience in -- again, limited to

9    this -- it's not, like, company-wide, but for this group,

10   about, you know, accommodating people with disabilities.

11        That seems -- but claims by other employees about

12   discrimination, that's way too broad and not relevant to the

13   issues in the case.

14             MS. FORD:  Just one footnote.  The questions

15   that I asked Mr. Carr had to do with his experience -- and

16   remember, he was the supposed neutral investigator of

17   Mr. Kannan's claims internally, and it was exploring just how

18   neutral he really is and how many times that he as an

19   investigator actually found in favor of the employee in terms

20   of a claim of discrimination.

21             THE COURT:  That may be fine by way of talking about

22   someone's background and their experience and credentials, but

23   asking about particular times, by other employees, that's

24   really not --

25             MS. FORD:  No, I was just -- I was trying to --

1          **THE COURT:**  -- appropriate.

2          **MS. FORD:**  -- clarify the question and answer

3    context that he --

4          **THE COURT:**  Okay, that's fine.

5          **MS. FORD:**  -- I was talking about.

6          **THE COURT:**  Number 20 is the facts and circumstances

7    concerning other employees whom Apple takes the position were

8    in a situation comparable to Mr. Kannan's from 2011 to the

9    present.

10         Okay, so this one gave me some pause, because -- and

11   I think this comes up in other places as well.  If Apple is

12   taking the position that there are other employees who were

13   similarly situated to Mr. Kannan whom it treated the same as it

14   treated Mr. Kannan, that seems to me something that should be

15   disclosed, if not in your initial disclosures, if not documents

16   in your initial disclosures that you're relying on, that at

17   least it's something that should be disclosed in the case, but

18   I can't tell from Apple's papers whether that really is the

19   position that you're taking, or whether Ms. Ford is just

20   hypothesizing that you may take such a position that there are

21   other employees out there in the world that are similarly

22   situated that you think are legitimate comparators, beyond the

23   eight.

24         So let me just pose the question:  Are there such

25   employees and that Apple intends to take that position about?

1          **MR. BOYER:**  No, your Honor.

2          **THE COURT:**  Okay.  Then I don't see any need to talk

3      about this.

4          **MS. FORD:**  Well, the reason that I asked the

5      question, and I asked the question in an interrogatory also,

6      and I just get sort of objections and equivocations, I know

7      that Apple has said in general terms in this litigation, he was

8      treated the same as other people like him.  There's plenty of

9      people that didn't get bonuses, plenty of people that didn't

10     get promotions, plenty of people that didn't get RSUs.

11         Okay, so who are these people?  Because I think at some

12     point they're going to be telling us.  Either they're going to

13     be trying to tell a jury, oh, there's lots of people who were

14     just like Kannan, he wasn't treated differently than other

15     people, or they're going to even point to specific people and

16     say, look, here's this person who was just like Kannan, and --

17         **THE COURT:**  So if you've asked an interrogatory that

18     asked Apple to identify the people that he thinks -- people

19     that they think were treated similarly to Mr. Kannan, I mean,

20     the answer might be, it's like thousands of people in the

21     aggregate have this profile and were treated the same, see?

22     I mean, it could be like that, or it could be specific people.

23         An interrogatory is the appropriate vehicle to get that

24     information.

25         **MS. FORD:**  Well, we may have to be in here over the

1    interrogatory.  I sort of hate to do that, and --

2              THE COURT:  I don't think it's -- given Mr. Boyer's

3    representation, what I just asked him about just now, I don't

4    think this is an appropriate deposition topic.

5              MS. FORD:  Okay.

6              THE COURT:  So we're going to leave it at that.

7              MS. FORD:  As long as they're stuck with taking the

8    position that they're not going to be drawing any --

9              THE COURT:  If things change --

10             MS. FORD:  -- drawing any comparisons to other

11   people.

12             THE COURT:  If things change, things change.  I'm

13   not going to -- I'm not going to plan for things to change,

14   based on Mr. Boyer's representation.

15             MR. BOYER:  Right, and to be clear, your Honor, you

16   said outside of the eight people.  I mean, those are the

17   appropriate comparators, and to the extent that any of them

18   are, it would be the same team reporting to the same manager.

19             THE COURT:  Okay, so -- and you're going to get

20   discovery about that, so -- all these deposition topics relate

21   to that group.

22             MS. FORD:  Okay.

23             THE COURT:  Number 21 is promotions, demotions and

24   transfers in or out of the group.  I don't think there's an

25   objection to that.  There will be a designee.

1      Promotions or job level changes for any employee reporting

2    to Kotni, again, no objections to that.

3      And when I say no objections, I'm basing it on what's been

4    presented to me in the submissions.  So somebody needs to stop

5    me if that's not the case, but it looks like, for my decision,

6    there's no objection.

7      Number 23, any other employee reporting to Kotni who

8    requested a promotion, job level increase, and what happened as

9    a result, okay, there will be a designee on that.

10      Number 24, this is the training notices, et cetera topic.

11    There will be a designee on that one.

12      Okay, now we come to the final three, to which there is an

13    objection:  Monitoring or review of Mr. Kannan's use of

14    equipment or systems, monitoring or review of Mr. Kannan's

15    activities, and any alleged violations of law or Apple company

16    policies by Mr. Kannan.  I don't see how any of these topics

17    are relevant to any issue in the case.

18      So Ms. Ford, what's your best shot about why these are

19    relevant?

20      **MS. FORD:**  Because Apple is now raising it in the

21    case, claiming that they did an intense review or search of his

22    computer in 2019, apparently both before and after but mostly

23    after his deposition was taken, and got a long, threatening

24    letter about how this violates the law and this violates Apple

25    company policies, and if they -- if Apple intends -- and

1    I asked Mr. Boyer a couple of times, can you assure me that

2    this issue is not going to be used as some justification for

3    taking adverse employment action against him presently, because

4    he still works for Apple; got no such assurances.  He just

5    said, "Oh, well, you know, we're not going to fire you over a

6    discovery issue," but that's not really the answer.

7         The answer is, you know, if you suddenly decide he gets

8    testimony in a deposition and you suddenly decide that he's,

9    you know, done something that violated a policy, we think this

10   whole thing is another act of retaliation.  The fact that they

11   searched his computer in a way that they don't search anybody's

12   computer -- they never do this, but all of a sudden they

13   targeted him and did this.  The fact that they raised this huge

14   fuss about his private things, like his son's medical records

15   and his personal photos that happened to be on his laptop that

16   he then decided, you know, not to back up anymore --

17            **THE COURT:**  Okay, before we get into the details of

18   that --

19            **MS. FORD:**  But that's all retal- -- that's all

20   additional acts of retaliation.

21            **THE COURT:**  Okay.

22            **MS. FORD:**  If Apple wants to drop all of that out of

23   this lawsuit, I'd love to.

24            **THE COURT:**  Okay.  Let me just ask Mr. Boyer, does

25   Apple plan to use, for any purpose, including impeachment, the

1    monitoring or review of Mr. Kannan's use of his equipment in a

2    way that would violate company policy, any illegal activity by

3    Mr. Kannan using Apple equipment or any of these other things,

4    do you want to -- plan to use that in the litigation?  In this

5    lawsuit, not some other lawsuit or some other action, but in

6    this lawsuit.

7            **MR. BOYER:**  We would use it as a defense, some of

8    that, not worded in that way, but yes.

9            **THE COURT:**  Okay.  Well, then, why -- what's your

10   objection to having somebody testify about it, as a corporate

11   representative?

12           **MR. BOYER:**  Well, so the issue isn't Apple's

13   monitoring or processes.  We are using it as a defense in the

14   case.  She's trying to -- counsel is trying to claim that this

15   is a retaliatory event.  However, Apple has an obligation to

16   ensure that electronic data is retained, and we have an

17   obligation to defend the case, and if plaintiff's counsel -- if

18   plaintiff was doing things that would have gotten him

19   terminated, then we have a defense and it cuts off damages.

20        But also, it goes right to -- and this obviously goes into

21   our request for the deposition, but it also is directly

22   relevant to his claims in that some of the documents that we

23   found on his computer either directly contradict his deposition

24   testimony or contradict his testimony that he -- his manager

25   thought he was unavailable because he was at his son's

1    appointments and that's why he couldn't respond to certain

2    e-mails or requests in a timely manner.  So in that regard, it

3    is relevant.

4              **THE COURT:**  So is the dispute that the topic -- from

5    your perspective, the topic shouldn't be about monitoring or

6    review by Apple, but what are the things that Apple believes

7    violate company policy or things that would otherwise have been

8    terminal offenses had Apple only known about them while they

9    were happening; those are things that you think are fair game,

10   things that you plan to use in the case, things you plan to use

11   a defense or to impeach Mr. Kannan when he testifies?

12        You're prepared to provide a 30(b)(6) witness about those

13   things, but not about how Apple figured it out, what Apple did

14   to discover that information?

15             **MR. BOYER:**  Some of it would be privileged, of

16   course.

17             **THE COURT:**  Okay.

18             **MR. BOYER:**  I mean, that's one of the issues as

19   well.  I mean, to the extent that they want to ask what are the

20   normal processes in terms of backing up computers and things

21   like that --

22             **THE COURT:**  Yes.

23             **MR. BOYER:**  -- you know, if we're going to use it,

24   I suppose it is fair game.

25             **THE COURT:**  So I think what Ms. Ford wants to find

1    out is, okay, Apple's normal process -- Apple has a policy that

2    says X.  Normally, Apple doesn't go and look at every single

3    e-mail or text message a company uses, er -- an employee uses

4    company equipment to send, but we did in this case.  Why?

5        All right, she wants to explore that point with you, with

6    your designee.  So I'm trying to understand what the -- why --

7    if you're going to use this stuff, I'm trying to understand the

8    nature of the objection and why I should rule in your favor on

9    it or not.

10            **MR. BOYER:**  Well, part of it is, of course, I think

11   there's going to be a privilege issue, but I think that the

12   company probably would be able to produce somebody that will go

13   through the normal process and how the data was collected with

14   regard to Mr. Kannan, like it would in any other other

15   litigation matter, so yeah, we can prove to somebody on the

16   jury.

17       But I am concerned that any -- we would have to have

18   somebody do an investigation and make a determination as to

19   whether or not any policies were violated, which almost puts

20   the company in a position of, are we going to have to take

21   disciplinary action if we find something.

22            **THE COURT:**  I don't think that's what she's asking.

23   She says, "any alleged violations of law or Apple company

24   policies by Mr. Kannan."  So if Apple is not presently saying,

25   Mr. Kannan, you violated company policy, or Mr. Kannan, you

1   violated a law and that we would have terminated you had we

2   known it at the time, and how we know, so, you know, your

3   damages are cut off, if that's your theory, I don't see why you

4   can't testify about -- have a witness testify about that.

5       So I don't understand the burden problem that you're

6   identifying.  Like, what would the person have to do that would

7   be....  I mean, the policy is whatever it is.  The person can

8   familiarize themselves with that.  So what is the burden

9   problem?

10      **MR. BOYER:**  Well, I don't think it's necessarily a

11  burden problem.

12      **THE COURT:**  Okay.

13      **MR. BOYER:**  It does put the company in a position of

14  having to make a determination as to whether or not somebody

15  violated a policy and then having to take action on it.

16      **THE COURT:**  Yeah, so this presumes that you have

17  made a determination, that you have found something that you're

18  going to rely on that you're going to use.  I'm not talking

19  about going forward or some other case or whatever.  I'm

20  talking about in this case, do you plan to tell the jury, this

21  is what happened, that's what happened, you know, no way he

22  would have been promoted because of this, right?  You know, if

23  that's what you plan to do, that's what I think she wants to

24  ask about.

25      **MR. BOYER:**  Okay.

1      **THE COURT:**  So without -- so it sounds like there is

2   some "there" there, in the sense of, you plan to use some of

3   this information in the case, in this case.  So I'm not sure

4   quite how to crystallize these topics around that issue.  It

5   sounds like it's still a little bit in flux.

6      Is there a pending interrogatory that seeks this, like,

7   seeks out these defenses that you say these might be relevant

8   to?  Is there a pending interrogatory that asks you to identify

9   your defense?  It may be that amending that, a response to

10   that, will then allow you to focus on what's really relevant to

11   the case, because it's not relevant to just find out what

12   Apple's going to do in the future and terminate his employment

13   or whatever.  That's not really relevant.  What's relevant is

14   what are they going to use in the case.

15      **MS. FORD:**  Okay.  Well, I would think that if

16   they're engaging in ongoing retaliation against him, it is part

17   of the case, but in any event, the other important piece to us

18   is what do they normally do, which it sounds like everybody is

19   kind of in agreement as to what is the normal.

20      **THE COURT:**  Maybe, maybe not, but it sounds like --

21      **MS. FORD:**  What if --

22      **THE COURT:**  -- whatever is normal is something that

23   should be pretty easy for a corporate witness to testify about.

24   There's a policy, there's a practice.  You know, again, not

25   company-wide, but relevant to this group.

1    **MR. BOYER:**  And I agree with that, your Honor.

2    I think that's fine as a topic.  Again, there's concern there

3    that it would reveal some litigation strategy because of

4    discussions that we've had, and this is usually not an issue

5    because generally, if -- employees that sue are not --

6    employees of the company, of course.  This is the company's

7    data.

8                **THE COURT:**  Sure.

9                **MR. BOYER:**  It's the company's computers.

10               **THE COURT:**  Yeah.

11               **MR. BOYER:**  Everything that's on it is the

12    company's.

13               **THE COURT:**  Yeah, and you probably have a policy

14    that says, we have the right to look at whatever we want.

15               **MR. BOYER:**  That's right, and -- but I am concerned

16    that the topic itself is certainly going to intrude in

17    strategy, litigation strategy.

18               **THE COURT:**  Okay, so if the problem is privilege or

19    work product, that's not really teed up for me.  I will give

20    you an opportunity to tee it up for me, but you're going to

21    have to be specific about it.

22        So I think we need a process here for how we get to that

23    point.  So among the agenda items when you go and talk to each

24    other, which I'm going to require you to do -- I hope you

25    brought your lunches -- I'm going to have you talk to each

1   other about these depos, and among them will be trying to

2   figure out whether there is a dispute about the scope of these

3   topics, and if there are, given the scope of the topics, if

4   there were privilege or work product issues that relate to

5   that, I'm going to ask you to brief that jointly, and we can

6   come up with a deadline for doing that, okay?  Because I think

7   that's an important question, and it deserves attention.

8       Those are 27 topics.  There are other issues related to

9   depositions that I think related to this, and these were

10  raised, as I said, in some other part of the briefing, the pile

11  of briefing that I got.

12      There are a number of deponents who I understand need to

13  still be deposed, not necessarily as 30(b)(6) designees, but

14  maybe some of them are.  Kundar, Raja, Rastogi and Kotni; are

15  there any other Apple-related deponents whose deposition you've

16  already asked for, Ms. Ford?

17          **MS. FORD:**  There were some that we asked for early

18  on, but I would think in light of where we are in discovery

19  right now, I'd rather pare that list down and stick with just

20  this group that are on that list.

21          **THE COURT:**  Okay, so these four, we've already

22  talked about Rastogi and Kotni.  What is Apple's position about

23  the depositions of Kundar and Raja?

24          **MR. BOYER:**  So for Kundar, we were considering

25  making her one of the 30(b)(6) designees regarding

1   compensation.  However, we believe -- you know, after

2   discussions internally and given the time line here, those

3   topics may be appropriate -- more appropriately covered by

4   Mr. Kotni and Mr. Rastogi.

5           THE COURT:  Okay, and Ms. Ford, do you also seek her

6   personal deposition?

7           MS. FORD:  Yes.  She was listed as a witness, and

8   I can pull it up here, if you can give me a minute, in their --

9           THE COURT:  That's okay, I don't need proof.

10          MS. FORD:  -- in their disclosures --

11          THE COURT:  Okay.

12          MS. FORD:  -- and they give a description of what

13  she knows about, and my recollection, but forgive me if I make

14  a mistake on this, is that what she knew about was the stock

15  plans --

16          THE COURT:  Okay.

17          MS. FORD:  -- and that kind of compensation, which

18  is something that none of the other witnesses have really, you

19  know, as soon as you hit the point of how does all that work,

20  they knew nothing about it, so....

21          THE COURT:  Okay, and then is Raja going to be

22  potentially a 30(b)(6) designee as well?

23          MR. BOYER:  If they still want to continue with that

24  deposition, possibly, yes.  Just based on the time line, he

25  would have been involved in the pre-Kotni management issues,

1    so --

2              **THE COURT:**  As the prior manager immediate?  And

3    he's also sought on a personal basis.

4              **MS. FORD:**  Yes.

5              **THE COURT:**  Okay, so it sounds like there are four

6    people who need to be deposed.  From Apple's perspective, we're

7    going to get to Apple's motion to compel further deposition of

8    Mr. Kannan.  Let me just get there.

9         Okay, let me just -- I'm going to let you argue this one

10   if you want to, but I'm going to just throw out a thought.

11        Ms. Ford, you may want to say, fine, Mr. Kannan will be

12   available for further deposition, since Apple is making all

13   these other people available for further deposition.  I'm

14   suggesting you may want to do that as a way to avoid another 45

15   minutes of argument on this point.  You don't have to, but it's

16   my suggestion.  I'm just going to put it out there.  It's the

17   last argument in my list, and we will get to it, and I have

18   questions for everybody about whether it's warranted or not

19   warranted or whatever, but I just throw that out there.

20        We don't even have to get to it.  If you all agree that

21   these witnesses are going to be available for deposition, I'm

22   going to have you go in the back room and talk about a

23   schedule.

24        So you tell me:  Do you want to argue about this one?

25             **MS. FORD:**  I want to argue about it in the sense of,

1    you know, number one, I don't think it's fair for him to have

2    to travel for this one.

3               THE COURT:  Okay, okay, so --

4               MS. FORD:  Number two, I think it needs to be

5    limited --

6               THE COURT:  Okay.

7               MS. FORD:  -- anything would need to be limited in

8    duration, and it sure would have to be limited in scope.  He

9    doesn't get to go back over all of the same things --

10              THE COURT:  Okay, all right.

11              MS. FORD:  -- that he asked before --

12              THE COURT:  Okay.  So we can go --

13              MS. FORD:  -- and just get another bite out of the

14   apple, which so far that's what has been suggested to me is

15   that's what they intend to do.

16              THE COURT:  We'll get to that one.  That is my last

17   one.  Let me get to the one that comes before that one.

18        But are there any other witnesses, besides these five,

19   that need to be deposed in the case?  Fact witnesses, not

20   experts, but fact witnesses.  Are those the five, Mr. Kannan

21   and then these other four?

22        Okay, all right.  Okay, so the next one I want to talk

23   about is the one having to do with the protective order about

24   medical records.  Okay, I'm hoping this one's going to be an

25   easy one to solve.  You all have talked about this one.  You've

1   worked out at least some portion of a stipulation having to do

2   with these.

3      Has anyone contacted the third party subpoena recipients,

4   these medical providers, and asked whether they can just

5   re-produce the limited set of information that Apple originally

6   asked for?

7            **MS. FORD:**  I have contacted several of them, and one

8   of them actually contacted me to ask if he could do -- you

9   know, "Can I just take back what I did and redo it" --

10           **THE COURT:**  Yeah.

11           **MS. FORD:**  -- and Apple wouldn't agree to that.

12           **THE COURT:**  Okay.  So have you contacted -- since

13  these were your subpoenas, have you gone back to those folks

14  and said, can you just give me the stuff that has -- I forget

15  what all the issues were, but the dates of the appointments,

16  who attended the appointment, and any notations about the move

17  to India?

18           **MR. BOYER:**  We have not, because counsel has not

19  allowed us to see any of that.  She said without --

20           **THE COURT:**  I don't care about seeing it.  Calling

21  up -- on -- here's the original subpoena that asked for this

22  information.  That's all you wanted in the first place, very

23  narrow, calling up the providers and saying, we understand you

24  produced the whole thing, the whole medical file.  We don't

25  that.  We want a subset.

1     Have you done that?

2               **MR. BOYER:**  We have not, your Honor.

3               **THE COURT:**  You must do that.

4               **MR. BOYER:**  Okay.

5               **THE COURT:**  Because the easiest solution to this

6     problem is having those folks produce it themselves.  You don't

7     have to worry about whether you trust Ms. Ford's redactions or

8     whatever.  You just get the providers to re-produce what you

9     asked for and only what you asked for, and then everybody's

10    happy.  Okay?  That's the solution to this problem.

11        I would like for you to report back to the Court -- let's

12    see -- by Friday about your contacting these folks and what the

13    response is.  Doesn't mean they have to re-produce it by

14    Friday.  Find out how long it will take them, but I want a

15    status report on this dispute from Apple on Friday.  Okay.

16        So anything more we need to talk about on this one?

17              **MR. BOYER:**  No, your Honor.

18              **THE COURT:**  Okay.  Related to that is this dispute

19    about the amendment to the protective order.  That one only

20    came up in Apple's separate submission.

21        So Ms. Ford, do you want to address this question of what

22    an amended protective order should look like?  And this would

23    be an amended protective order that has two tiers of

24    protection, an Outside Counsel or Attorney's Eyes Only tier for

25    information like this, and a Confidential tier.

1      **MS. FORD:**  First of all, I don't think it's

2  appropriate to be discussing that even here, because it wasn't

3  ever part of any prior --

4      **THE COURT:**  You guys are very close to being out of

5  time on discovery, so we are discussing it now.  Here's your

6  opportunity to address this issue.

7      **MS. FORD:**  Please let me finish, your Honor.

8      **THE COURT:**  I am.

9      **MS. FORD:**  Okay.  There's actually been quite a bit

10  of back-and-forth and negotiation, and the last proposal was

11  very specific, detailed, here's what the language should say,

12  was me sending it to them a month ago, and I've heard nothing

13  since.

14      **THE COURT:**  Okay.  Here's what I'm going to do.

15      **MS. FORD:**  They wanted to have a whole bunch of

16  additional language that I would not agree to.

17      **THE COURT:**  This is not helpful, okay?  I need to

18  know your position, not a litany of how the other side has not

19  cooperated.  I don't want to hear that.

20      So here's what I'm going to do, unless someone tells me a

21  real good reason not to.  I'm going to enter a revised

22  protective order that follows the model protective order of the

23  Northern District that addresses highly confidential sensitive

24  information.  I'm going to do it exactly like that, with the

25  modifications that I always impose, based on my discovery

1    dispute resolution procedure.

2        That's what it's going to look like.  Here's the

3    opportunity to argue the merits of that.

4        **MS. FORD:**  Okay.

5        **THE COURT:**  Last opportunity.

6        **MS. FORD:**  I would like to be heard on that --

7        **THE COURT:**  Okay.

8        **MS. FORD:**  -- because there are two model orders,

9    and one of them is the one that Apple wanted to use, and it's

10   inappropriate here because it essentially, among other things,

11   gives them the ability to -- we can't -- essentially, we cannot

12   select an expert without getting their prior approval, so that

13   expert can look at the documents, the AEO documents.  They get

14   to vet our experts, and we can't use them unless they agree to

15   it.

16       **THE COURT:**  It happens in every case where you

17   disclose highly confidential sensitive information to an

18   expert.  If you don't disclose highly confidential sensitive

19   information to an expert, you don't have to tell.

20       **MS. FORD:**  But they designated everything, the

21   performance reviews, how many dollars these guys earned, all of

22   that stuff.  So any economic expert that we would have -- and

23   that particular restriction, I swear, is designed for things

24   like, this is a trade secret software that we don't want our

25   competitors to find out about.

1          **THE COURT:**  You know what, they may have no good

2     basis to make the objection, okay?  So I will hear it.  They

3     have -- you have a vehicle in a protective order for disputing

4     their challenge, and I would definitely expect Apple to not

5     dispute access by an expert unless there was a very good reason

6     to do that.

7          So you all have wasted a ton of time on this issue.

8     There's no reason to waste more time on it.  So I'm going to

9     enter the standard order.

10         Is there another question besides the expert vetting

11    aspect of it, or another issue that you wanted to raise,

12    Ms. Ford, or is that the -- you said there were two issues.

13         **MS. FORD:**  In the one they sent to me, there was

14    also -- we had negotiated a special protective order in this

15    case that had time limits that were different than the

16    standard's orders, you know, how soon did you have to object to

17    things.

18         As a matter of fact, if you just went in and reentered the

19    standard order now, I probably can't even object anymore,

20    because it probably has a time limit that's already passed for

21    objecting to things that they've produced back in June and

22    designated as Attorney's Eyes Only, so --

23         **THE COURT:**  No, you can raise it at any time.

24    That's what the order specifically says.  You can raise

25    objections to designations at any time.

1      **MS. FORD:**  I cannot --

2      **THE COURT:**  Here's -- here, let me just -- I'm going

3      to cut this short, because I don't want to waste any more time

4      on this.  I'm going to give you all until close of business

5      tomorrow to submit a stipulated protective order that you all

6      agree you would like me to submit -- like me to sign.

7      Otherwise, I'm going to use the model protective order that's

8      on the court's website, and I will do that on Thursday.  Okay?

9          All right.  Now we're on to the question of the -- Apple's

10     motion to compel production of documents and a privilege log.

11     Okay.  So this is a question for Apple.  It's not clear from

12     the joint submission whether there are any documents being

13     withheld on grounds of privilege with respect to request

14     numbers 11 and 12, and those are the ones related to the DFEH

15     complaints, et cetera.

16         If I understand Ms. Ford's briefing, she says there aren't

17     any.  She's produced everything.  E-mails, the documents

18     attached to the e-mails, everything's been produced.

19         So let me just start there.  Are there any documents that

20     are being withheld, that you understand are being withheld?

21         **MR. BOYER:**  So these are slightly different issues.

22     The documents are not necessarily being withheld.  They just

23     have not been produced, and what I'm talking about are

24     attachments to e-mails that were produced from the DFEH.

25     I don't believe that they're withholding them on a privilege

1    basis.  I just don't believe that they've been produced along

2    with the e-mails.

3        So I've pointed out a few examples --

4            **THE COURT:**  Oh, I see, okay.

5            **MR. BOYER:**  -- to counsel.  You'll see, like, you

6    know, a PDF attachment, and it's not there, and I've asked for

7    it, and that's the issue with regard to the DFEH file.

8            **THE COURT:**  Okay.  So Ms. Ford, let me get your

9    perspective.  I understand your briefing to say you've produced

10   everything.  So Mr. Boyer is saying, I have sometimes e-mails

11   that say here's an attachment and I don't have the attachment.

12   Okay, so what's your response?

13           **MS. FORD:**  We have produced what we have, in the

14   format that we have it, and if he's got a copy of an e-mail

15   that doesn't have the attachment attached to it, that's just

16   the way that document exists.  That's what he had.

17       Now, Apple already did a FOIA request to the DFEH and got

18   all of these e-mails with all of their attachments as part of

19   the hundreds of pages of response they got from that.

20           **THE COURT:**  Okay, is that the case?

21           **MS. FORD:**  And they've gotten the attachments and

22   the e-mails, and you can tell, you know, it says, "See

23   attached" and then, you know, it's somewhere else.

24           **THE COURT:**  Okay, let me pause you there.

25       Is that the case, you have all the documents from the FOIA

1    request?

2              **MR. BOYER:**  I have the e-mail, er -- have the

3    documents from the FOIA request.  The way the DFEH actually

4    organizes them is that there's this chart with the text of the

5    e-mail and attachment, and you cannot tell where that

6    attachment is or whether that's complete or the dates don't

7    seem to line up.  It's very confusing as to what is actually

8    being produced by the DFEH, and so that's why we've asked it

9    from them, because we want to match up the communications that

10   he provided with the communications that the DFEH has provided

11   us.

12             **THE COURT:**  Okay.

13             **MR. BOYER:**  I don't suspect that the DFEH file was

14   incomplete, but the way they produce it is very confusing in

15   terms of organization.  For them I'm sure it works, but for us,

16   it's -- I can't tell which is which.

17             **THE COURT:**  And is the problem mainly e-mails and

18   their attachments?

19             **MR. BOYER:**  That's correct, your Honor.

20             **THE COURT:**  So with respect to e-mails, was

21   Mr. Kannan using a personal e-mail account or an Apple e-mail

22   account or some other e-mail account in communicating with the

23   DFEH?

24             **MS. FORD:**  I can't remember, but I think he was

25   using a personal e-mail account, but --

1          **THE COURT:**  Okay, so as you know, I don't have to

2     tell you this, but you and your client's obligation in the case

3     is to, you know, go back to the source, and you can't just rely

4     on Mr. Kannan to give you stuff.  You have to make sure that,

5     you know, you're satisfied that everything's been collected and

6     whatever.  Same problem Mr. Boyer has, right?

7          **MS. FORD:**  Yes.

8          **THE COURT:**  So have you done that process, where

9     you've gone back and you've looked at the e-mail?

10         **MS. FORD:**  I have not looked at his computer, and

11    I don't really know, because they haven't ever identified for

12    me, you know, what e-mail are you talking about?  We've

13    produced thousands of pages of e-mails.  Give me a Bates number

14    and, you know, I'll go and see if he can find that particular

15    one, but that hasn't happened so far.

16         But I do know we've given them all the e-mails, all the

17    attachments.  I've asked my client twenty times.  I haven't

18    personally searched his e-mail account, I've just asked him to

19    do it.

20         **THE COURT:**  So can he give you access to -- I mean,

21    he's in India, so can he give you access to his personal e-mail

22    account to do the search yourself?

23         **MS. FORD:**  I have no idea.

24         **THE COURT:**  Okay, this is the challenge, and

25    I appreciate the challenge.  You're here, he's there.  But in

1    any case that involves ESI, the attorney actually has an

2    obligation not to just rely on the client.  So you're going to

3    have to find some way to solve this problem.

4         My suggestion is that, Mr. Boyer, if there are particular

5    e-mails that you believe are missing attachments, you should

6    identify them by Bates number and send them in an e-mail to

7    Ms. Ford, and then she can go back and look for those specific

8    things.

9         This is not a project to go re-produce all e-mails.  It's

10   a -- you need to problem-solve.  If you really think these

11   e-mails are important, in light of what you have already via

12   FOIA, in light of what you've already produced, then send her a

13   list, okay?

14        And then you'll need to follow up on those particular

15   items, okay?

16             **MS. FORD:**  Okay.

17             **THE COURT:**  Now, are there any documents that you're

18   withholding on grounds of privilege relating to the first set

19   of requests for production of documents?

20             **MS. FORD:**  Sure.

21             **THE COURT:**  Okay, and that's your privilege log

22   that's attached as Exhibit A?

23             **MS. FORD:**  Yes.

24             **THE COURT:**  Okay.

25             **MS. FORD:**  And these are, I would say, all of the

1   things that fall within the work product are stuff that was on

2   my client's laptop computer, the Apple laptop that they

3   searched.

4           **THE COURT:**  Okay.  So --

5           **MS. FORD:**  That's why it refers to folders on that

6   computer.

7           **THE COURT:**  All right.  With respect to the

8   privilege issue, is it correct that the privilege log spans not

9   just the document production responsive to the first set of

10  document requests, but also the document production responsive

11  to the second set?

12          **MS. FORD:**  You know, I would have to go back and

13  review exactly which, you know, requests go to what, but yes,

14  there is a single privilege log that would span --

15          **THE COURT:**  Okay.

16          **MS. FORD:**  -- anything that we would claim privilege

17  for that has come up in this lawsuit by way of discovery

18  requests.  So we'll say that.

19          **THE COURT:**  Okay.  So this privilege log is not

20  adequate.

21          **MS. FORD:**  Okay.

22          **THE COURT:**  Okay?  It's really not.  I get the point

23  that there might be some documents that can be described

24  categorically and not listed in line items, but this is a far

25  cry from the reasonable particularity that the Ninth Circuit

1    requires.

2         *Burlington Northern* does not help you.  That case is

3    actually very helpful in that it lays out the list of factors,

4    but if I go through the list of factors and consider the delay

5    in which this privilege claim was made and the descriptions

6    provided to me....

7         *Burlington Northern* says, you know, presumptively, this

8    log ought to allow the Court to make privilege calls based on

9    the description of the documents.  I mean, I sure as heck can't

10   do that, and, you know, the delay in time that was at issue and

11   affirmed by the Ninth Circuit when the District Court said no

12   privilege, you've waived, was five months, okay?  So we're way

13   past that too; so at least as to the first request.

14        So I wanted to go through the log and ask you

15   particularly, because I'm also sensitive to the question, or

16   the issue, that you both have mentioned, and I recall it coming

17   up, that the lawyers don't have an obligation to log their

18   communications with their client post-lawsuit -- I mean, post

19   the initiation of the lawsuit.

20        So I can't tell if that's what you're doing here for some

21   of these, whether you're logging your own documents, like, from

22   your own files, which normally isn't something that we do, or

23   whether what you're doing is you're -- and additionally, there

24   seem to be things on here that aren't even responsive to

25   requests, but I may be misreading it, because they're so high

1    level, the descriptions, that you're only required to log

2    documents that would otherwise be responsive to a request, not,

3    like, everything that your client has, whether it's responsive

4    or not.

5        So you may have created a bigger problem than really is

6    necessary here.  So -- so I'd like to go through it.

7            **MS. FORD:**  Okay.  I would say that a big, big

8    difference in this case, which you haven't mentioned yet, is

9    they already have the individual documents in question.  They

10   already have all of them, except for my stuff on my computer.

11           **THE COURT:**  Okay, that may be --

12           **MS. FORD:**  But all of the work product that --

13           **THE COURT:**  Great.

14           **MS. FORD:**  -- my client is talking about, they've

15   got copies of it.  So they don't need detailed descriptions if

16   they've got it.

17           **THE COURT:**  Then why are we -- then why is there --

18   then there's a privilege waiver, right?  I mean, so I'm not

19   sure what we're talking about.  So let's go through it, because

20   I don't think all of those refer to it.

21           **MS. FORD:**  There may be a privilege waiver, but they

22   already have them.  So it doesn't matter whether there's a

23   waiver or not.  They've already got it.

24           **THE COURT:**  Then fine.  Then I'll find that it's

25   waived, it's not privileged, and it's produced and it can be

1   used in the litigation.  If that's your position, I'm happy to

2   go with that and we don't need to belabor it, but I can't tell

3   from your log --

4           **MS. FORD:**  Okay.

5           **THE COURT:**  -- and you didn't raise it timely.  So

6   this is the dilemma that we have.

7           **MS. FORD:**  Well, we --

8           **THE COURT:**  I do not want to find waiver

9   automatically by virtue of your delay.  I'm giving you the

10  opportunity to address it, okay?

11      So the first item on your list is 2011 to the present --

12          **MS. FORD:**  Hold on, hold on.  Because I need to be

13  able to look at it myself, as well.

14          **THE COURT:**  This is document number 110.

15          **MS. FORD:**  Unfortunately, I don't -- I don't keep

16  them that way, but....

17          **THE COURT:**  It's Exhibit A.

18          **MS. FORD:**  Here it is.  Okay, I believe I have it

19  here.  Yes, okay.  So --

20          **THE COURT:**  The first item, the author is listed as

21  R Kannan, no recipients, "contents of folder marked 'case info'

22  on Raja Kannan's laptop," work product and litigation privilege

23  are claimed.

24          **MS. FORD:**  Um-hum, yes.

25          **THE COURT:**  Is there a dispute about whether that's

1    really work product?  I mean --

2                 **MS. FORD:**  No.

3                 **THE COURT:**  -- Mr. Kannan is a not a lawyer.

4                 **MS. FORD:**  Right.

5                 **THE COURT:**  Right?

6                 **MS. FORD:**  Um-hum.  He -- go ahead.

7                 **THE COURT:**  I can't tell whether this encompasses

8    material he prepared at your direction.

9                 **MS. FORD:**  I would like to just explain it.

10                **THE COURT:**  Okay.

11                **MS. FORD:**  Okay.  As far as I know -- and again,

12   there's a big overlap.  There's descriptions here that say

13   contents of the folder, and that means the folder on his

14   laptop, and that -- those same documents are also going to be

15   described in other categories below.  So there's an overlap.

16   This not a separate and distinct category different from the

17   other things that are listed, okay?

18        As far as I know, that folder includes his work that he

19   did *pro se* for the over-a-year that he represented himself in

20   this case, including the fact that he did research himself and

21   he contacted other attorneys other than myself long before he

22   hired me, and got, you know, advice and consultation from them,

23   and then he put together -- this would be, like, drafts of his

24   earlier motion responses.  There were several motions to

25   dismiss, all of which he had to respond to.  They were doing

1   case planning conferences and all that kind of stuff, and

2   that's the sorts of things, as I understand it, that is in that

3   folder.

4       I do not know the extent to which he put documents he got

5   from me into that folder.  I can ask him that, but I think this

6   is primarily things that he generated while he was representing

7   himself in the litigation.

8           **THE COURT:**  Okay.  Let me do it this way.  Let me go

9   through the privileges that are being asserted.

10          **MS. FORD:**  Um-um.

11          **THE COURT:**  So first of all, how many documents have

12  been withheld from production?  And I don't mean how many

13  documents do you believe that Apple already has, but how many

14  documents have you not produced because there's a claim of

15  privilege that's reflected that this chart?

16          **MS. FORD:**  I don't know.

17          **THE COURT:**  Any estimate?

18          **MS. FORD:**  No.  I don't --

19          **THE COURT:**  Have you seen it --

20          **MS. FORD:**  I don't think there's very many, but

21  I don't know.

22          **THE COURT:**  Have you seen the ones that are being

23  withheld --

24          **MS. FORD:**  No.

25          **THE COURT:**  -- that are encompassed by your chart?

Okay, you have an obligation to look at them.  You also have an obligation to make an adequate privilege log, and let me get to what that would be, because your job may have just gotten smaller when I tell you my view about what privileges are applicable and likely their scope.

So first of all, I assume that you're asserting privilege and work product and all that kind of stuff under federal law, not under California state law, because you have federal claims in this case.

**MS. FORD:**  Yes.

**THE COURT:**  Okay.  All right, so I don't know what a "litigation privilege" is, and there's nothing in your papers that explains to me what litigation privilege is.

**MS. FORD:**  Okay.

**THE COURT:**  As far as I know, litigation privilege is nothing.

Okay, so attorney-client privilege, that covers communications between an attorney and his or her client for purposes of seeking legal advice.  You can communicate with an attorney who's not your attorney and you're not their client and chat about legal advice, and that is not privileged unless there is an attorney-client relationship, and you are going to need to make that showing if you contend that some subset of these documents fall into that category when you were not representing Mr. Kannan.

1          **MS. FORD:**  I believe that the privilege does extend

2     to communications with people that you are exploring --

3          **THE COURT:**  Yes.

4          **MS. FORD:**  -- the possibility that they're going to

5     be --

6          **THE COURT:**  Yes.

7          **MS. FORD:**  -- your attorney, and that's the kind of

8     attorneys that I'm talking about.

9          **THE COURT:**  If that's the case, that's legitimate.

10    If he interviewed attorneys, if he talked to them about his

11    case in anticipation of maybe they would retain him, you're

12    absolutely right.  But if he, you know, had gone onto some

13    website blog and posing questions back and forth --

14         **MS. FORD:**  No.

15         **THE COURT:**  -- that's not, okay?

16         **MS. FORD:**  That's not what we're talking about.

17         **THE COURT:**  But you're going to need to make that

18    showing on a document-by-document basis, okay?  Okay?  So --

19    because I can't tell from the big lump of, you know, files on

20    the computer issue.

21        So the next thing is attorney work product.  So 26 3 B --

22    26(b)(3), excuse me, is what governs our attorney work product

23    doctrine, and that covers the mental processes of the attorney.

24         **MS. FORD:**  Actually, it says anything that's created

25    by a party in anticipation of litigation.

1          **THE COURT:**  No.  No, no, no.  That is a total

2     misreading of that rule.  So you are going to need to make a

3     showing about which documents....  I'm sure that Mr. Boyer is

4     not trying to get your files, and what might also be relevant

5     is if you instructed Mr. Kannan to do something, write

6     something for you, that might be your work product.  That might

7     be an attorney attorney-client communication.  But if

8     Mr. Kannan is doing things on his own and gathering stuff and

9     writing stuff without your direction, without your

10    participation, representing himself *pro se* does not make it

11    work product.  That does not make it -- he is not a lawyer.

12         So I need you to --

13         **MS. FORD:**  May I have the opportunity at some point

14    to submit a brief on that subject?

15         **THE COURT:**  You will absolutely have to.

16         **MS. FORD:**  Okay.

17         **THE COURT:**  Because right now, you have not

18    supported your claim of privilege.  This is what I'm trying to

19    tell you.

20         So if there is some law that you think applies and covers

21    a particular document that falls in this bucket, you are going

22    to need to tell me about it, because it's not in your papers

23    now and it's certainly not in your log.  So I'm sharing with

24    you my view --

25         **MS. FORD:**  Sure.

1      **THE COURT:**  -- about the problem here, so that you

2   can address it.

3      **MS. FORD:**  Okay.

4      **THE COURT:**  And then, you know, I don't know if

5   there's really a dispute about spousal privilege here.  It

6   doesn't sound like there is, but Mr. Boyer, you can tell me if

7   there is a dispute about what's being called "spousal

8   privilege."  These -- I'm not even sure any of these categories

9   at the end are even responsive, but maybe they are.

10      I don't want to create more work than what we have to

11   address in order to resolve this problem, but your dispute is

12   not teed up, and this is a mutual problem that the dispute is

13   not adequately teed up, but you have the burden in the first

14   instance to establish a claim of privilege and you have not

15   done that.  So I'm giving you another shot, as opposed to

16   finding waiver right now.  It's kind of where we stand.

17      **MS. FORD:**  Yeah.

18      **THE COURT:**  Okay.  Spousal privilege, is that an

19   issue?

20      **MR. BOYER:**  I am not sure, because I don't really

21   know what these e-mail communications are exactly.

22      **THE COURT:**  Okay.

23      **MR. BOYER:**  So it's very difficult for me to make

24   any determination based on the complete vague nature of this.

25   I mean, when Apple did it, we did it line-by-line, e-mail by

1    e-mail, date by date, and I don't even know how many, you know,

2    e-mails or documents are even relevant here, whether the

3    privilege is going to apply at all.

4              **THE COURT:**  Okay.

5              **MR. BOYER:**  And that's some of the problem that I've

6    had with this line.

7              **THE COURT:**  Right, okay.  So sounds like you're

8    going to need to justify whatever you're claiming spousal

9    privilege on as well, since we can't tell from the description

10   here what that includes.

11             **MS. FORD:**  What part?

12             **THE COURT:**  Nine, 10, 11 and 12.

13             **MS. FORD:**  Yeah?

14             **THE COURT:**  Sorry, 8, 9, 10, 11 and 12.  So keep in

15   mind, you only need to log things that are responsive.

16             **MS. FORD:**  Yeah.

17             **THE COURT:**  If they're not responsive, if there's

18   photos of someone's vacation, it's not responsive, I don't

19   think.

20             **MS. FORD:**  They expressly asked for all documents

21   that reflect any travel by Kannan or his family to India, and

22   we're saying, if he had an e-mail with his wife about their

23   travel to India, that is a privileged spousal communication --

24             **THE COURT:**  Okay.

25             **MS. FORD:**  -- husband/wife, confidential, they're

1    here by date, there's a description of it --

2              THE COURT:  Okay, then go ahead and log it.

3              MS. FORD:  I don't know how much more you could put

4    in.

5              THE COURT:  Well, like I said, I can't tell how many

6    there are.  Maybe these are discrete documents.

7              MS. FORD:  There's one, two, three, four of them.

8              THE COURT:  So are these just discrete ones?

9              MS. FORD:  They're 9, 10, 11, 12.  Those are

10   individual documents.

11             THE COURT:  Okay, these are just discrete documents?

12             MS. FORD:  Um-hum.

13             THE COURT:  I don't know why you would need those,

14   if those are discrete documents.

15        But here's the other thing.  You all can submit it for *in*

16   *camera* review if there's not hundreds of them, but I need to

17   know how many there are and what the privilege is that's

18   claimed on them, and I don't have that information now.

19        I'm not sure the medical information privilege categories

20   that are at three cells, 5, 6 and 7, that may be resolved by

21   what we're going to do with the subpoenas to the third party

22   recipients.  I don't -- I think that's your objection, but

23   correct me if I'm wrong, is that you don't feel that anything

24   else about Mr. Kannan's medical history should be disclosed

25   apart from the date information and these particular notes, is

1    that right?

2            **MS. FORD:**  Yes.

3            **THE COURT:**  Okay.  So I don't think it should be

4    either.  So if we resolve that, maybe that doesn't need to be

5    logged, but I'll wait to get your status report, Mr. Boyer.

6            **MR. BOYER:**  I think that's fine, your Honor.  We're

7    not asking for, and we've made it clear, we're not asking for

8    the diagnoses and things like that related to his son.  Now,

9    the only thing we want are the dates of treatment and whether

10   his son is in the country or not, if that's noted in a record.

11   That's it.

12           **THE COURT:**  Right.  Okay, I got it.  So otherwise,

13   I don't think we need to spend a lot of time on the privilege

14   log with that kind of stuff, because you're going to get that

15   from the third party recipient -- third party provider and, you

16   know --

17           **MS. FORD:**  Well, there was also a good deal of

18   material on Mr. Kannan's computer about his son.

19           **THE COURT:**  Okay.  Let's just put it this way.

20   I don't think that each of those things needs to get logged if

21   Apple is saying it's not asking for that in discovery.

22           **MS. FORD:**  Yes.

23           **THE COURT:**  Okay, so that helps you there.  All

24   right, so I will need a -- I will need a revised privilege log.

25   How quickly can you get that done?

1          **MS. FORD:**  Given the detail that you've asked for

2    and the time difference between here and India, I would say it

3    would take me at least two weeks to put this together.

4          **THE COURT:**  Okay, and you're going to need to look

5    at these documents as well.  If I didn't make that clear,

6    that's my expectation.

7          **MS. FORD:**  And how do I handle, your Honor,

8    documents for which we may be claiming work product privilege

9    but there may be also other objections to the same discovery

10   request which would also exclude that particular document and

11   cause us to withhold it from production?

12         **THE COURT:**  And is that a dispute that hasn't been

13   resolved?

14         **MS. FORD:**  Yeah, there's been no dispute resolution

15   at all concerning our objection, our written objections, to

16   their requests for production.

17         **THE COURT:**  Okay, but has that been brought to me?

18         **MS. FORD:**  No.

19         **THE COURT:**  Okay.  Well --

20         **MS. FORD:**  No.

21         **THE COURT:**  I don't know what to tell you.  I mean,

22   if you object and Apple's, like, fine with your objection and

23   nobody's arguing, nobody's moved to compel --

24         **MS. FORD:**  Right.

25         **THE COURT:**  -- then you can conform your -- you

1   know, you can conform your privilege log to what is within the

2   non-objected-to scope, but if there's an objection that needs

3   to be resolved, then that potentially is going to change.

4       But normally, I mean, the way this works is if you say,

5   I'm asking for 10 years' worth of material, I object, I'm only

6   going to give you three years' worth of material, and the other

7   party is fine with that, then your privilege log encompasses

8   three years' worth of material.

9           **MS. FORD:**  Okay.

10          **THE COURT:**  But I mean, it boggles my mind that

11  we're a week before the end of discovery and there are still

12  things in dispute that haven't been teed up for resolution.

13  But we'll get to that.  Okay.

14      So two weeks from today would be October 8th.  You will

15  need to provide the privilege log to Apple, and then if there

16  is a dispute still, you look at the log and you say, you know,

17  I don't believe it, then -- or I don't accept those claims,

18  then you're going to need to brief that to me, and I have

19  special rules for you all about how you make your submissions

20  to me, which we will get to in a moment.

21          **MS. FORD:**  That would be good.

22          **THE COURT:**  The other thing is, Apple's motion was

23  kind of part privilege log and part, like, motion to compel

24  other stuff, which kind of threw me a little bit.  I get the

25  privilege log spans two sets of document requests.

1      But Mr. Boyle, let me understand, although I think the

2   crux of your motion is about privilege, you also seem to be

3   complaining that with respect to Requests For Production 14,

4   15, 16, 18, 19 and 21, that Mr. Kannan has delayed more than a

5   month in completing production of those documents.

6          **MR. BOYER:**  That's correct, your Honor.

7          **THE COURT:**  Okay.  Does that strike you as maybe a

8   little bit unreasonable and possibly hypocritical about

9   complaining about more than a month delay in producing

10  documents?

11         **MR. BOYER:**  Well, I think the issue is, I don't have

12  any assurance that it's coming.  That's the problem, I think,

13  and --

14         **THE COURT:**  Have you talked about it, about when

15  Ms. Ford will be able to get you additional documents?  Have

16  you had a conversation about that?

17         **MR. BOYER:**  It's my understanding that they are not.

18  I don't believe that they're going to be producing anything

19  else.  I'm not sure.  The problem is that the way they draft

20  their responses is that they're going to produce things, and

21  then I don't know when it's coming or when it's being produced.

22         **THE COURT:**  All right.  So Ms. Ford, do you have

23  more documents that you plan to produce that are responsive to

24  those document requests?

25         **MS. FORD:**  I need to take a quick look at them, so

1   that I may give you an accurate answer.

2          **THE COURT:**  I think they're in Exhibit C.

3          **MS. FORD:**  Do you remember the date that you sent

4   those?

5          **MR. BOYER:**  Let me just (inaudible) this copy.

6          **MS. FORD:**  Okay, so we're talking about 14, which is

7   all documents and text messages discussing, referring to or

8   supporting your decision to move to India.

9          **THE COURT:**  Right.

10         **MS. FORD:**  And basically, we sent a few e-mails that

11  sort of talked about, gee, we've moved to India.  He doesn't

12  really have any written documents discussing his decision and

13  why he made that decision.  That really is not something

14  there's a document on.

15         **THE COURT:**  So I'm trying to avoid, like, getting

16  into every single one and just kind of asking the bigger

17  question, like, are there more responsive documents that you

18  are in the process of producing but haven't produced yet?

19         **MS. FORD:**  The only thing I'm aware of is that

20  I asked my client to look and see if he could find -- which

21  I think -- I think they're completely irrelevant, but just to

22  solve the problem, you know, to try to work out some kind of a

23  solution, is they want to know for some reason the family's

24  whole travel pattern, you know, how often did you go to India

25  and how long did you stay there, for all the time he was

1    working there.

2         I think it's pretty much irrelevant but, you know, I've

3    asked him to see if he can find anything that would help one

4    determine that -- you know, work out what -- you know, what

5    days they came and went --

6              THE COURT:  Okay.

7              MS. FORD:  -- in terms of e-mails, e-mails and

8    stuff, discussing, "Gee, I'm working out of the country," or

9    "I'm in India right now on a business trip," you know, which he

10   took some business trips to India, too, that --

11             THE COURT:  Okay, so you're planning --

12             MS. FORD:  -- that's all been disclosed.  The only

13   thing I can think of that's still outstanding is the business

14   about the, you know, do you have any travel records of any

15   kind, you know, do you have plane tickets, and I said I'm not

16   sure he's got any plane tickets --

17             THE COURT:  Okay.

18             MS. FORD:  -- but I'll have him look and see if he's

19   got anything that would be responsive that would help somebody

20   to backtrack and figure out when he was in India.

21             THE COURT:  Okay.  Great.  All right, here's the one

22   that I thought was a problem, Request number 19.  So Request

23   number 19 is,

24                  "All documents concerning, reflecting or relating

25                  to your wife's development of any mobile, web or

1          other software application during your employment

2          with Apple."

3     Now, I understand that you've asked the same question with

4     respect to Mr. Kannan particularly, and he's represented that

5     he will produce that stuff or has produced that stuff or

6     whatever.  That seems relevant if the thesis is, you were

7     working on these applications when you were supposed to be

8     doing Apple's work and, you know, to the extent this factored

9     into our decision to pay you less, it was probably because you

10    were doing this other thing on the side.

11    Okay.  What possible relevance does the wife's application

12    development have here?

13          MR. BOYER:  Sure.  I understand your question, your

14    Honor.  The issue is that plaintiff has said that it wasn't him

15    that actually did the development of the apps, it was her,

16    although all of the information related to the apps was on his

17    log-in, on his Apple computer, and he's not -- he may actually

18    not have produced anything related to his development and

19    claiming she did everything.

20          So I believe, just based on review of some of those

21    documents, that they worked on it together, that he did have a

22    very significant part in doing it.  In fact, there's video of

23    him demonstrating the apps, on a publicly available website,

24    and these have not been produced, and he can't hide --

25          THE COURT:  What hasn't been produced?

1          **MR. BOYER:**  Nothing.

2          **THE COURT:**  Well, okay.  So you have video you've

3     seen on publicly available websites.  Okay, so you have that.

4     You have the information he has produced about the application

5     he did work on, right?  There was one software application that

6     he worked on.  That's what you all are telling me.

7          **MS. FORD:**  Yes, but that was for Apple.

8          **THE COURT:**  Okay.

9          **MS. FORD:**  That was for Apple, and we produced

10    documents about it.

11         **THE COURT:**  So, and the reason that you think that

12    there is information, or there is information on his laptop

13    that suggests someone worked on his laptop developing a

14    non-Apple-related software application is because of the access

15    that Apple has to what's on his laptop.

16         **MR. BOYER:**  Correct.

17         **THE COURT:**  Okay.

18         **MR. BOYER:**  And other information that we've seen on

19    the internet, correct.

20         **THE COURT:**  Okay.  So now we get to the point of

21    talking about this laptop and the stuff that Apple has access

22    to on the laptop.

23       Do you have -- does Apple have a backup of the laptop that

24    reflects what was on it before Mr. Kannan's deposition in May?

25         **MR. BOYER:**  No, we don't.

1          **THE COURT:**  Why not?

2          **MR. BOYER:**  So what we have is a targeted backup

3    prior to the deposition.  So that would include various

4    folders, which Mr. Kannan may or may not have selected.  So the

5    way Apple's program works is that employees -- I believe it's

6    called a crash plan -- can select various folders to back up.

7    The entire computer is not actually backed up.

8          And so what happened was we took -- we've taken regular

9    snapshots, as Apple does in all litigation, as part of, you

10   know, its obligation to retain electronic information, took the

11   snapshot on April 227th, and then another snapshot on,

12   I believe, May 7th or 8th, and those were different in that a

13   lot of these folders now, which have been disclosed on the

14   privilege log, are missing.

15         **THE COURT:**  Okay.

16         **MR. BOYER:**  Plaintiff's counsel tells me that he

17   just deselected it from backup.  I don't know the answer to

18   that because I don't physically have his computer, and in any

19   event, the entire backup never included the entire hard drive

20   on the computer.  So there's folders but there's also files,

21   there's also data that would not necessarily be backed up, such

22   as deleted files that you have to actually physically have the

23   hard drive to look at.

24         So there's a lot of different information that I don't

25   really know whether I have and I don't know whether there was

1    some attempt made to not produce it to us.

2              **THE COURT:**  Okay.  So I think this kind of bleeds

3    into the last -- well, partly it bleeds into the last topic as

4    well, but I'm really troubled by this dispute in the sense that

5    Mr. Kannan absolutely has an obligation to preserve

6    electronically stored information relating to the lawsuit,

7    whether it's on an Apple-owned piece of equipment or his own

8    personal computer, and what really bothers me is that it sounds

9    like you as his lawyer have never examined these devices or

10   seen them.  They've constantly been in his possession, and

11   there hasn't been, unless you told me I'm mistaken, any effort

12   to preserve.  There hasn't been any effort by Mr. Kannan to

13   preserve it.

14        Apple is telling me that while they have the ability to

15   capture and did capture copies of what was on the computer, it

16   depends on not only their program but the files that Mr. Kannan

17   has chosen to select, or has not deselected, for backup.

18        So, you know, ESI is something you all are supposed to

19   talk about at the beginning of the case.  Your obligation

20   doesn't depend on that conversation, but that's why we have

21   that obligation that you talk about it.

22        So now we're in the situation where Apple is telling me

23   that there is information that they don't have that they think

24   got changed, moved, deleted, whatever, and you're telling me

25   that you don't have access or copies or whatever to this

1    information yourself.  So I'm not sure how the Court is

2    supposed to resolve this for you.

3        So let me hear from Ms. Ford first about this dilemma.

4            MS. FORD:  The first issue is what he just said.

5    Gee, before his deposition in May of 2019, we did these backups

6    and here was the list of folders.  After that date, some of

7    those that were backed up before aren't there anymore.

8        So first of all, that means they've got those backup

9    copies.  That's how he could determine that something wasn't

10   there later, is because he's got the copy from before.

11       Now, my client also said he backed up everything.  No, not

12   the program files.  You know, the Word program doesn't get

13   backed up, or what pages are --

14           THE COURT:  Wait, Mr. Kannan did his own backup of

15   what was on his computer?

16           MS. FORD:  No, he did it on -- Apple, yeah,

17   requires, once a week or something, employees all have to back

18   up their computers, and he did them.

19           THE COURT:  Is that different from what you're

20   describing?  I don't understand what the difference is between

21   an employee backing up all of his files and the program that

22   Apple runs.

23           MS. FORD:  I don't know what he's describing, but

24   I'm describing what my client said that he does, and that he

25   backed it up, at least once a week, sometimes once a day --

1    **THE COURT:**  Does he have access to that?

2    **MS. FORD:**  -- everything.  No, he doesn't -- unless

3    he's backed it up, he can't go look in the archives.  Only

4    Apple can go and look in the archives.

5    But back up a little bit.  So what is it that he

6    supposedly did?  It doesn't -- just because there is not a

7    backup after his deposition of a given file doesn't necessarily

8    mean that it was deleted even from the computer --

9    **THE COURT:**  No, I'm not talking about that.  That's

10   not really -- I'm not really worried about, Mr. Kannan did or

11   did not do something nefarious.  What I'm trying to figure out

12   is whether there exists a universe of documents that can be --

13   that contains responsive information for purposes of discovery

14   that has not been adequately reviewed and produced.  That's

15   kind of the bottom line.

16   **MS. FORD:**  Yeah.

17   **THE COURT:**  So you say Apple has it already.  They

18   say no, we don't, because they only have access to certain

19   folders and they only had access to certain folders at one

20   period of time, and now there is a smaller subset of folders

21   at, you know, time two.

22   So that's what I'm trying to understand, is what actually

23   exists, who has it, and whether you object.  It sounds like you

24   do object to them accessing it.  So this is the problem.

25   **MS. FORD:**  Yeah, according to my client, he has

1    backed up all of his files, or all of his, you know,

2    information files, data files I guess they call those, not the

3    programs but the data files, at least once a week the whole

4    time he's been there.  If Apple does some additional backup,

5    that's fine too, but that he's backed up absolutely everything.

6         But at some point -- and he does this, he also says,

7    regularly, probably weekly -- he deletes a bunch of stuff, just

8    because it's old or because it's a family photograph, or maybe

9    he'll take off one photograph of his kid and put on a different

10   one, and that that's -- there's nothing wrong with that.  That

11   happens all the time.

12             **THE COURT:**  Okay.

13             **MS. FORD:**  But here, nothing was destroyed, and

14   Apple doesn't have anything to suggest that anything was

15   destroyed.  Even if he took it and put it on a CD, that's

16   preserving it.

17             **THE COURT:**  Okay, here's their problem, is --

18             **MS. FORD:**  He doesn't necessarily need to keep

19   backing it up to the Apple computer.

20             **THE COURT:**  But they say you haven't produced it to

21   them.  So if this happens -- hypothetically -- if Mr. Kannan

22   said, "You know what?  These files are cluttering up my system.

23   They relate to the litigation.  I'm not going to destroy them,

24   I'm going to move them onto a CD."  Then Apple is concerned --

25             **MS. FORD:**  Okay.

1    **THE COURT:** -- that you and your client have not

2    reviewed and produced all responsive information.  That's the

3    problem, and it's not really an answer in that situation to

4    say, well, Apple, you have it all anyway.

5    **MS. FORD:**  Okay.  Now, that's a different question.

6    **THE COURT:**  That's the question I'm trying to get at

7    here.

8    **MS. FORD:**  Okay, and that one is pretty easy to

9    answer.  No.  We have withheld documents pursuant to objection,

10   including attorney-client privilege objection, but we haven't

11   certainly destroyed anything, and like I said, counsel has not

12   come to me with anything to discuss any of our objections that

13   we made to their requests for production of documents.

14   So no, are we hiding something?  Absolutely not.  And do

15   I know that?  Yeah, as much as one can ever know that.  I mean,

16   I don't follow my client around 24/7, but yes, I know that as

17   much as one can know that.

18   **THE COURT:**  If we're talking about, just for lack of

19   a better example, the files that relate to this question of

20   on-the-side software development that you think Mr. Kannan

21   engaged in with his wife and that was done on his computer,

22   what evidence do you have of that happening already, besides --

23   that's not these YouTube videos or whatever, but that you found

24   on the computer or on the backup files from the computer?  What

25   is that?

1          **MR. BOYER:**  The specific files that we found?

2          **THE COURT:**  You found some -- what kinds of files

3    are they?

4          **MR. BOYER:**  Yes, your Honor.  So they were all in a

5    development folder, which he had specifically had listed --

6    we're talking about 10,000 files in there -- of various

7    spreadsheets related to -- one of the apps was called something

8    Misheard Word, where it's essentially the individual tried to

9    fill in the word that was misheard, but it's like a

10   conversation app, essentially.  A lot related to that, the

11   various conversations that were uploaded to the app.

12       A lot of small files that would include, like, graphics

13   files that were included in the app, quite a few, and I've

14   tracked it down to about three specific apps, which were in

15   development from about 2012 to 2014, maybe early 2015, around

16   that time frame.

17         **THE COURT:**  Okay.

18         **MR. BOYER:**  So those are just what we know about,

19   but also, he's got personal accounts -- those could be thumb

20   drives and things like that -- which contain -- potentially

21   could contain all of this information.

22       Like, for example, his Gmail account, I have only seen

23   e-mails related to his DFEH application out of his Gmail

24   account and some employer applications that he had, and the

25   problem is that we don't know what else is out there, but we've

1    seen all of this and we're not getting anything back, even

2    though we (inaudible).

3           **THE COURT:**  So it seems to me like it is reasonable

4    for Apple to assume that if there is application development

5    work done on an Apple computer, that -- and since I'm assuming

6    the wife is not an Apple employee, that there's a reasonable

7    basis to think that Mr. Kannan was at least involved in the

8    development of that, and they have an opportunity to discover

9    and inquire about those applications.

10          He may have a perfectly -- well, maybe not perfectly

11   innocent, but an innocent-ish explanation for why his wife was

12   developing applications on his computer, if that's what he says

13   happened.  But it certainly seems that Apple ought to

14   investigate that.

15          So what am I missing?

16          **MS. FORD:**  Well, one thing that you're missing is

17   that I -- we don't know.  We've asked several times for Apple's

18   attorneys to tell -- tell us specifically what's on

19   Mr. Kannan's laptop that you think reflects this kind of

20   activity, and we will easily be able to explain to you what it

21   is, but they haven't ever done that.  They've never given us an

22   explicit, you know, here's the file, here's the file that we

23   think shows this.

24          Second of all, yes, his wife, on occasion -- let's put it

25   this way.  I'm not savvy enough with computers to explain

1    exactly how it worked, but some of the activity that they're

2    talking about was his wife doing her -- doing her own work.

3    It's not him.   That's his wife doing work on these

4    applications, not him.

5         But if they could just identify for us what, you know,

6    what folders, what documents that they think reflect all of

7    this information that Todd was just mentioning, which is all

8    news to me, then, you know, we could try to figure out if

9    there's something there, but as it is, I can't do it.

10             **THE COURT:**   I don't think that's really what Apple's

11   asking.   They're not asking for you to explain to them why what

12   they found is innocent.   I mean, they can go and ask Mr. Kotni

13   in a deposition -- talk about that too, maybe they can -- you

14   know, to explain what these file folders are.

15        What they're asking for is, we think there are other

16   application development folders on Mr. Kotni's (sic) Apple

17   computer that reflect work that is non-Apple work.   That's

18   really what they're asking.

19             **MS. FORD:**   You mean Mr. Kannan.

20             **THE COURT:**   Mr. Kannan, I'm sorry.   Who did I say?

21             **MS. FORD:**   Kotni.

22             **THE COURT:**   Excuse me.

23             **MS. FORD:**   Which was wrong.

24             **THE COURT:**   Mr. Kannan, thank you very much.   So

25   I don't think, as phrased, Request For Production number 19 is

1    right.  You're not really interested in what his wife did.

2    What you're interested in is application development work

3    that's reflected on his Apple computer, and that to me seems a

4    totally legitimate thing to ask about, because he's the only

5    one who should be having access to this Apple computer, and if

6    there were any files that were stored on there that reflect

7    application development by anybody, or removed and put

8    someplace else but used to be on that computer, I think you're

9    entitled to get that stuff.

10            And like I said, you can ask him, and he can explain what

11   that is, but inquiring about what the wife did, like, out of

12   the box, doesn't seem like -- that's really beyond the scope.

13   I mean, you don't really care what she did.  You care what he

14   did.  That's what you -- that's what you're going to

15   demonstrate at trial, you hope, is that he spent a lot of his

16   time doing something that wasn't related to his job.

17            **MR. BOYER:**  I think that's accurate, your Honor.

18   The reason that we added the -- drafted them in the way we did

19   is because we kept getting pushback that he didn't do it, he

20   didn't do it and his wife did it, and therefore, we wanted to

21   actually see the files and see who was doing it.

22            It's not just limited to what's on his computer.  There

23   could be another computer where he worked on it, he worked on

24   the files, and the issue is still relevance, right?  It's still

25   relevant to the issues in this case, and that is whether he was

1    doing something else instead of caring for his son, which he

2    claims.

3            **THE COURT:**  That's fine, and you're entitled to ask

4    about other work that he was doing, and I am fully expecting

5    that he will be candid with you, because, you know, he and

6    Ms. Ford will be in a lot of trouble if they don't -- they're

7    not candid about that kind of stuff.  So I have every

8    confidence that Mr. Kannan and Ms. Ford in particular as an

9    officer of the court will make sure that if there is some work

10   that he did stored elsewhere, that that will be disclosed.

11       Okay, but it doesn't seem to me that you're entitled to

12   ask about all of the wife's application development work.

13   That's just -- you can't ask it that way.  If it's on the

14   computer, the Apple computer, that's your hook.

15       So I think number -- Request For Production 19 can't --

16   you can't pursue that one in that scope.  I will only allow a

17   more limited scope, which is -- it's application development

18   work where the file was on the computer at some point.

19           **MS. FORD:**  And I would suggest that it needs to be

20   limited in time.  I don't certainly think that anything he or

21   his wife did in this regard in 2019 has anything to do with why

22   he got the job reviews he got while working for Mr. Kotni prior

23   to 2017.  It would have to be something that he did while

24   reporting to Kotni between 2013 and 2017.  What they're doing

25   today is really not pertinent to this case at all.

1          **THE COURT:**  Yeah, so long as you're not going to

2     claim that it relates to damages.  So anyway, there's a sort of

3     end -- since he's still unemployed, there's this weird,

4     ambiguous portion.  You're arguing for broader when it suits

5     your purposes and, you know, obviously, Apple would argue for a

6     broader scope on the tail end when it suits their purposes.  So

7     hard for me to know about that.

8          Let me look at the text of the -- is it --

9          **MS. FORD:**  The request itself is --

10          **THE COURT:**  Is it time-limited?

11          **MS. FORD:**  No, it's totally open-ended.  It doesn't

12     talk about, could have been before he went to work and....

13          **THE COURT:**  Okay.

14          **MS. FORD:**  Certainly could be.

15          **THE COURT:**  At a minimum, it has to encompass the

16     dates when he worked for Mr. Kotni, okay?  At a minimum.  And

17     if there is reason for you to believe that it continued on, we

18     can revisit that question, or continued application development

19     work continued on.  If he testifies in deposition that, yeah,

20     he continued to work on this, and is still working on it or

21     whatever, then maybe we'll see, because maybe it does impact

22     damages.

23          **MR. BOYER:**  The only caveat I have to that, your

24     Honor, is that some of the work began in 2012, it looks like,

25     and so I'd like to include that.  So I put that, I'm okay with

1    not going back to January 1st, 2011, but, er -- January 1st,

2    2012 through the end of the time he worked with Joe Kotni is a,

3    I think, a reasonable limitation.

4              THE COURT:  Okay, let's do that, January 1st, 2012

5    through the end date of his time with Mr. Kotni.  That's just

6    number 19.  That's the one that caught my attention.  You all

7    haven't crystallized your dispute as to the scope of production

8    for all these other things, unfortunately, so I'll give you

9    some guidance on how to deal with that going forward.

10        But as to the privilege log, my decision on this one is

11   that there needs to be a showing in support of the privilege

12   log, and that privilege log needs to be provided on October 8th

13   to Apple, and then I will entertain any further briefing that

14   we need to -- on those particular claims at that time.

15        It sounds like there are still documents to be produced

16   here and there on the second -- the second set of requests for

17   production of documents that were enumerated, 14, 15, 16, 18 --

18   I'm going to skip 19 -- and 21.  Based on what you said, there

19   are some things you're looking for about the travel?

20              MS. FORD:  Like I said, the only thing would be --

21              THE COURT:  How quickly can that be provided?

22              MS. FORD:  I don't know.  I'll talk to my client

23   about it.  Maybe, again, we'll give it that same two-week limit

24   there?

25              THE COURT:  Okay, it sounds like it's very limited,

1    so I'd ask you to do it as soon as possible.

2              **MS. FORD:**  Okay.

3              **THE COURT:**  Because we're now going to turn to the

4    question of further deposition of Mr. Kannan.

5        So Mr. Boyer, how long -- for how many hours did

6    Mr. Kannan testify during his deposition on May 1st?

7              **MR. BOYER:**  Seven hours.

8              **THE COURT:**  It was a full seven hours?

9              **MR. BOYER:**  Yes, your Honor.

10             **THE COURT:**  Okay, and what documents had you asked

11   for as of that date that you did not receive until afterwards?

12             **MR. BOYER:**  So there were certainly some files from

13   the DFEH that we still haven't received in terms of the

14   attachments.  I had actually not completed the deposition.

15   There were a number of e-mails that I still needed to get

16   through.  It was a pretty significant amount of data that we

17   had to get through.

18       Also, we did not get an audio record that we had requested

19   as part of our first request for production.  It's about 18

20   minutes.  It seems like it's him and another employee at Apple

21   discussing compensation.  It would have been nice to have it to

22   go through at his deposition as well.

23             **THE COURT:**  So this is Request For Production 13,

24   which encompassed whatever was listed in the initial

25   disclosures?

1          **MR. BOYER:**  Correct, your Honor.

2          **THE COURT:**  So those are the two categories of

3     information.

4          **MR. BOYER:**  Those are the main categories, yes, your

5     Honor.  I don't think there's anything else that we listed

6     there.

7          **THE COURT:**  Okay.  So those are pretty -- it sounds

8     like that's pretty limited.  I mean, I don't know how extensive

9     this audio recording is, but it sounds like you had the bulk --

10    did you have the response to the FOIA request from DFEH by the

11    time you took Mr. Kannan's deposition?

12         **MR. BOYER:**  I did, your Honor, yes.

13         **THE COURT:**  Okay.  So it sounds like, apart from a

14    few things that may still not be produced, it's pretty limited

15    what you did not have before you took Mr. Kannan's deposition.

16         **MR. BOYER:**  In terms of the documents, at least at

17    this point, based on RFP and initial disclosures, that's

18    correct.

19         **THE COURT:**  Okay.  So you haven't made a motion for

20    more time, in the sense that -- you have asked for further

21    deposition, but what I'm trying to articulate is, sometimes in

22    a situation where there is just kind of too much to get through

23    with a particular witness, we get a request, either I get a

24    request or Judge Davila will get a request for, you know, an

25    opportunity to exceed the seven-hour limit.

1       And Ms. Ford, I noticed that you've put in your papers

2    Apple had every opportunity to continue questioning Mr. Kannan

3    on May 1st but chose not to do so.  I wasn't really sure what

4    you meant by that.

5            **MS. FORD:**  Because he had already traveled there

6    from India, and even though he had finished his seven hours, we

7    were not jumping up, pounding the table and saying, "Your seven

8    hours are up."  I certainly would have let him ask additional

9    questions for another hour --

10           **THE COURT:**  I see.

11           **MS. FORD:**  -- or so, without kicking up much of a

12   fuss.  I mean, I just normally do that, to be collegial.

13           **THE COURT:**  All right, I just wanted to understand

14   what that was about.

15           **MS. FORD:**  And also, they had the opportunity at the

16   time to ask for more than one day of deposition, which they

17   didn't.

18           **THE COURT:**  I understand that, and so this is the

19   problem I'm trying to solve right now, because it sounds like

20   Apple is seeking -- Apple is clearly seeking more time with

21   Mr. Kannan.  I'm not convinced that you have a lot of -- a lot

22   left to do based on just the information that you sought before

23   his deposition not being produced on time.  So it seems like a

24   pretty limited set of information.

25           So let me just ask a question.  How long do you think you

1    need with Mr. Kannan for a further deposition?

2              **MR. BOYER:**  Assuming I can get through the remaining

3    documents, probably three hours.

4              **THE COURT:**  Okay, and Ms. Ford, does Mr. Kannan have

5    any plans to be in the United States for business or personal

6    reasons in the near future?

7              **MS. FORD:**  No.  He would make -- he would need to

8    make a special trip, thousands of dollars, two weeks of time --

9              **THE COURT:**  Okay, okay, I just need the answer to

10   the question.  Okay.

11        All right, what I'm contemplating is, I'm contemplating

12   allowing the further deposition of Mr. Kannan, and I actually

13   had in my notes that I thought three hours would be reasonable,

14   and I wasn't going to limit you to just the stuff -- three

15   hours is your limit, in other words.  Three hours, whatever

16   you're going to do, three hours, that's it.  Okay?  You would

17   have to use your time wisely.

18        But I was going to see if we could arrange for Mr. Kannan

19   to appear by video; so videoconference the deposition.  I know

20   nobody likes that.  It's not in Mr. Kannan's interest to do it

21   that way either, because you won't be sitting with him, unless

22   you're planning to fly to India.  So it's not a desirable thing

23   all around, but I'm trying to be mindful of the fact that this

24   is his second deposition, he would have to travel a long time,

25   he is the plaintiff in the court, but he's already been here

1   for one deposition.

2      So what I was wondering about is whether -- I think a big

3   concern here is whether you have good quality facilities for

4   having a good quality videoconference.  So somebody just

5   sitting on their laptop doing Skype, you know, via India, may

6   not be great.

7      So my question is, does Apple India have videoconferencing

8   facilities that might be suitable for this purpose?  Because if

9   it does, we could just require Mr. Kannan to go there and do it

10  via -- and, you know, make it sort of easy for Apple to

11  communicate with him.  It would be an Apple system and, you

12  know, no IT problems, hopefully.

13     So that's my question.  I'm happy to -- I don't want to

14  dictate the terms of this, but I want to ensure that it's good

15  quality videoconferencing.

16     So Mr. Boyer, your thoughts on that.

17        **MR. BOYER:**  So I don't necessarily have an objection

18  to it.  The problem is, it's a legal issue, and I've looked at

19  taking a deposition in India --

20        **THE COURT:**  Yeah.

21        **MR. BOYER:**  -- before, and it's a jurisdictional

22  issue.  You've got to get a -- in order to really bind somebody

23  through deposition in India, although I know he's subject to

24  the jurisdiction of the court, the problem is he's in India.

25  You have to actually get a commission.  It's a big process in

order to --

            **THE COURT:**  Even if the deponent consents?

            **MR. BOYER:**  That I don't know.

            **THE COURT:**  See, that's the thing here, is --

            **MS. FORD:**  You have a court reporter here.

            **THE COURT:**  -- Mr. Kannan -- no, no, I totally get
Mr. Boyer's point, but -- and I know it's jurisdiction-
specific.  I don't know for India at all, but whether if the
deponent consents, whether you avoid those kinds of objections,
because I'm trying to find -- trying to find a way how to
accommodate the interests.

    I do think that Apple is entitled to further deposition
and, you know, I do think that videoconference, while it's not
great, it's acceptable, if we can do it without having anybody
violate any laws.

    So I'm going to ask you to go figure that out.  I'm going
to put the onus on the both of you to do that jointly, because
it's in your interest, Ms. Ford, I think, to ensure that
Mr. Kannan doesn't have to travel here, but -- so I would like
for you to work on this together.

    So if you find law that you think says it's possible and
you find law that you think says it's not, then maybe you can
exchange thoughts about that and then report to the Court, as
soon as you can, about it.

            **MR. BOYER:**  Yes, your Honor.

1    **THE COURT:** And I'm open to other possibilities. It

2    doesn't have to be this way, but I'm open to other

3    possibilities, but I do think that Apple should get an

4    additional three hours with Mr. Kannan. Okay.

5    **MS. FORD:** Will they be limited in scope to what

6    they can ask about?

7    **THE COURT:** No, he can ask whatever he wants in the

8    three hours, because there was -- and this includes whatever

9    else is out there, okay? So it's -- I'm taking -- I'm not

10   going to parse the subject matter. It's limited in time.

11   Three hours, that's it. Okay? And no more than three hours,

12   okay?

13   All right. I think I've gone through all of the disputes

14   that you all have that have been teed up for me. Is there

15   anything that I missed, that someone thinks I need to address

16   specifically?

17   And I will issue a written order with the outcomes, based

18   on this -- what we've gone through so far, but I've indicated

19   as we've gone along what I think the relevant scope of various

20   topics are and who should do what when.

21   There's some follow-up that will trigger other orders when

22   you report back to me, there will probably be some other

23   decisions that I have to make, but I think I've addressed all

24   of the disputes that you all have, save for what we do about

25   your discovery deadline and the remaining depositions.

1          **MS. FORD:**  And the expert.

2          **THE COURT:**  Do you all agree?  So let's just go to

3     that issue.  So as you know, I can't relieve you from any of

4     your case management deadlines.  Only Judge Davila can do that.

5     You have five depositions collectively that remain to be taken,

6     and some of those may be half-day depositions.  Certainly

7     Mr. Kannan's would be a half-day.  I don't know if some of the

8     30(b)(6) witnesses can be combined, you know, but five, five

9     people, who will need to be deposed.

10         **MS. FORD:**  Plus the 30(b)(6), yeah.

11         **THE COURT:**  There's no way you're going to get that

12    done by Monday.  So what is the plan, before you got here, what

13    is the plan for dealing with that issue?  Have you all talked

14    about it?

15         **MR. BOYER:**  We're going to need to sit down and come

16    up with a schedule, I think, your Honor.  That's the only way

17    to hammer this out.

18         **THE COURT:**  Okay.  And you know you're going to need

19    to address -- I assume that you're proposing that you all can

20    agree on a schedule.  That's what you're suggesting?

21         **MS. FORD:**  Do you think that, like, 30 days will do

22    it?

23         **THE COURT:**  You know, part of it is, you all have --

24    you know, there's a whole pile of things that are being --

25    maybe it's a small pile, but at least it's somewhat of a pile

1    of things that you claim are privileged and Mr. Boyer saying

2    are not privileged, and that would need to be produced.

3        So once I resolve that, there's yet more production

4    coming, potentially.  Okay?  So your schedule is going to need

5    to anticipate some of those things.

6        There's some documents that Apple is producing as a result

7    of this discussion, and you have people who I assume don't have

8    unlimited time in their schedules who also need to be deposed.

9        So what I am suggesting is, since I have you here captive,

10   one of the things you should do when you talk about when

11   different witnesses are going to be available for deposition,

12   which I'm going to require you to do, is you can also talk

13   about how much time you need for schedule, and if you disagree,

14   that's fine.  You can propose different things to Judge Davila,

15   but you're going to need his permission, and he might not say

16   yes.

17       So what I'm trying to do is kind of help you get to a

18   point where you can actually make the ask you need to make of

19   Judge Davila, because you're going to need to ask for more time

20   if you both want to get your discovery done, it sounds like.

21           **MS. FORD:**  Yeah, and --

22           **THE COURT:**  Yes?

23           **MS. FORD:**  I was just going to say that my guess is

24   that it's going to be pretty hard to sit here today and come up

25   with a schedule for the depositions, but --

1     **THE COURT:**  Well, you're going to have to -- you all

2   don't talk to each other otherwise.  So you're here, so you

3   should at least make a first step.  Maybe there will be some

4   follow-up, but I think you -- you're going to need to talk to

5   each other about it, and you have access to your phones and

6   your e-mail.  You can work on it.  Okay?  I mean, you should

7   have done that before we got to this point.  You should have

8   figured out when your witnesses were available for deposition

9   by now, mainly an Apple issue, but, you know, if Mr. Kannan has

10  constraints, you should know about those, so that we can

11  schedule it.

12      Because you all have been having this issue fester for

13  months, and nobody's, like, put any dates down, as far as I can

14  tell.  So no time like the present.  You should start working

15  on it.

16      Let me -- so let me do two things.  It's -- I have a 1:30

17  calendar, so here is what I'm going to do.  I'm going to tell

18  you how I plan to handle your discovery disputes going forward,

19  and then I'm going to let you go eat, and then I invite you to

20  come back, and you can hang out in my jury room and you can

21  talk about these things, and then if you've reached something

22  that's an agreement that you want to talk to me about and you

23  want it to be a record of the court, we can talk about it, and

24  we can come back in here and go on the record and you can put

25  whatever stipulation you agree to on the record.

1          **MS. FORD:**  And this would be concerning what?

2          **THE COURT:**  Depositions, the remaining document --

3    this document issue that you all are going to talk about from

4    the very first issue that we -- there was some document that

5    you said showed X, you said no, it doesn't show X, this is a

6    question of when people got their RSUs.  I think you should

7    talk about that, but mainly I want you to focus on deposition

8    scheduling and I want you to focus on your case schedule, what

9    you can agree on or not, in front of Judge Davila.

10          If you can't agree, that's fine, but I want you to take

11   the time to talk about it, and I'm going to make my jury room

12   available for you to do that.  And then if you need me to come

13   back out and help you memorialize something, I'm happy to do

14   it, okay?  Or if you decide that some discovery dispute

15   that I still have to decide here is no longer an issue because

16   you all have reached agreement on it, great, we can take that

17   off my list.  Okay?

18          So I'm inviting you to talk to each other while you're

19   here.  Actually, I'm requiring you to talk to each other while

20   you're here.

21          But let me tell you about how we're going to go through

22   with discovery management.  I will put this in my order as

23   well.

24          I am concerned about the lack of cooperation.  I talked to

25   you all about this last time; didn't have much of an impact, so

I'm going to talk to you about it again.

So my standing order provides that a conference of lead counsel has to take place within five court days of someone saying, "I want a conference of lead counsel on X dispute," unless you mutually agree to not -- to do it some other time, and then the joint submission is supposed to take place within five court days of the lead conference of counsel.

It is rare that I am confronted with parties who can't manage to do that.  It's 10 court days to get a dispute to me.  So I don't....

So special rules, just for you.  Here there are.  The conference of lead counsel must take place within three court days of the demand for a call.  After the call, the party who wants the Court to act has to provide its portion of the joint submission by 5:00 p.m. on the second day after the conference of lead counsel.  So you have the call on day one, you have day two, you have day three.  That's the second day after.  That's when you provide your portion of the joint submission.

The opposing party provides its portion of the joint submission on the fourth day following the call, so two days after, okay?

The first party then gets to revise its portion of the joint submission by 11:00 a.m. on the fifth day after the call of counsel, and the opposing party can revise its portion of the joint submission by 4:00 p.m.  The first party makes no

1  further revisions to its submission except to correct typos or

2  something like that, and files the joint submission on the

3  fifth court day after the call of lead counsel.  That's how it

4  works.

5      So I've micromanaged how you exchange your portions of the

6  joint submission.  I will put this in writing.

7      If any party fails to comply in any material way with this

8  guidance, that party or its counsel will be subject to

9  sanctions, including an adverse determination on the matter in

10 dispute.

11     Again, I will put that in writing, and hopefully, there

12 will be no ambiguity, but that's how we'll manage discovery

13 disputes going forward, if you have any.

14     Okay.  Any questions?

15         **MR. BOYER:**  No, your Honor.  Thank you.

16         **THE COURT:**  All right.  So when you come back -- I'm

17 going to let you go off to lunch.  When you come back, please

18 just check in at the clerk's office, let Ms. Cromwell know that

19 you're here and that you'd like to come into my jury room, and

20 we can let you in there, and the subject matter is what I said

21 before.  You're mainly talking about deposition scheduling and

22 case management scheduling, but feel free to use the time to

23 resolve anything else while you're there.  Okay?

24     I know it's been a long morning.  I appreciate your

25 participation and your good faith in trying to get through all

1    this.

2              **MS. FORD:**  I really appreciate the amount of time

3    you've spent on this stuff, your Honor.

4              **THE COURT:**  Okay, you're very welcome.

5              **MS. FORD:**  You're terrific.  Thank you, your Honor.

6              **THE COURT:**  All right, thank you.

7              **MR. BOYER:**  Thank you, your Honor.

8              **THE CLERK:**  Court's in recess.

9                                                    1:23 p.m.

10                         ---o0o---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    **CERTIFICATE OF TRANSCRIBER**

4

5        I, Leo Mankiewicz, certify that the foregoing is a true

6   and correct transcript, to the best of my ability, of the above

7   pages of the official electronic sound recording provided to me

8   by the U.S. District Court, Northern District of California, of

9   the proceedings taken on the date and time previously stated in

10  the above matter.

11       I further certify that I am neither counsel for, related

12  to, nor employed by any of the parties to the action in which

13  this hearing was taken; and, further, that I am not financially

14  nor otherwise interested in the outcome of the action.

15

16                                           09/27/2019

17             Signature of Transcriber        Date

18

19

20

21

22

23

24

25