Pages 1-54

```
 1                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
 2                        SAN JOSE DIVISION

 3

 4   RAJA KANNAN,                )   Case No.  17-cv-07305-EJD
                                 )
 5             Plaintiff,        )   San Jose, California
                                 )   Wednesday, November 20, 2019
 6      v.                       )   Courtroom 2, 5th Floor
                                 )
 7   APPLE INC.,                 )
                                 )
 8             Defendant.        )
     _____)
 9

10

11              TRANSCRIPT OF DISCOVERY HEARING
          BEFORE THE HONORABLE VIRGINIA K. DeMARCHI
12              UNITED STATES MAGISTRATE JUDGE

13   APPEARANCES:

14   For Plaintiff:            KAREN E. FORD, ESQ.
                               SW Ocean Avenue and Mission
15                             Suite 208
                               Post Office Box 287
16                             Carmel, California 93921-0287
                               (831) 250-6433
17
     For Defendant:            TODD K. BOYER, ESQ.
18                             Baker & McKenzie LLP
                               600 Hansen Way
19                             Palo Alto, California 94304
                               (650) 856-5572
20
     Transcription Service:    Peggy Schuerger
21                             Ad Hoc Reporting
                               2220 Otay Lakes Road, Suite 502-85
22                             Chula Vista, California 91915
                               (619) 236-9325
23

24

25   Proceedings recorded by electronic sound recording; transcript
     produced by transcription service.
```

1  SAN JOSE, CALIFORNIA  WEDNESDAY, NOVEMBER 20, 2019  10:01 A.M.

2                              --oOo--

3       (Call to order of the Court.)

4            THE CLERK:  Calling the matter of Kannan v. Apple, Case

5  Number 17-cv-07305.

6            THE COURT:  Your appearances, please.

7            MS. FORD:  Karen Ford for Plaintiff Kannan.

8            THE COURT:  Good morning.

9            MR. BOYER:  Good morning, Your Honor.  Todd Boyer for

10 Apple.

11           THE COURT:  Good morning.  All right.  Today I'm going

12 to hear argument about two discovery disputes.  The first is

13 Apple's motion regarding Mr. Kannan's alleged failure to comply

14 with the Court's prior discovery orders regarding evidence of

15 software development work by Mr. Kannan and regarding Mr. Kannan's

16 family's time in India.  That's Docket Number 184.

17      And then I'll also hear argument about the parties' disputes

18 about Apple's "Attorney's Eyes Only" or AEO designations, and

19 that's at Docket Number 198.

20      So first let me begin with Docket Number 184 and that's

21 Apple's motion regarding the application development issue and the

22 time in India.  I have a number of questions for you, Mr. Boyer.

23           MR. BOYER:  Yes.

24           THE COURT:  First of all, can you describe for me

25 comprehensively how the information about Mr. Kannan's software

1    development work is relevant to a claim or defense in the case?

2    MR. BOYER: Yes, Your Honor. So Plaintiff claims in his

3    complaint that Mr. Kotni discriminated against him because of him

4    because of his son's autistic condition. Part of the claim is

5    that Mr. Kotni -- it's alleged that Mr. Kotni believed that Mr.

6    Kannan was not responding to things as quickly and not performing

7    as well because he was taking care of his son. And because of

8    this, this led to -- this is part of the discriminatory conduct

9    that Plaintiff alleges.

10    THE COURT: Uh-huh.

11    MR. BOYER: The fact that his family was in India -- and

12    we found out at his deposition a few weeks ago -- his family was

13    in India for most of the time that he worked for Mr. Kotni. So

14    from 2014, during the school year -- so essentially his family was

15    only in the United States during the summer. And that's really

16    important because --

17    THE COURT: During the summer of which year?

18    MR. BOYER: All -- everything --

19    THE COURT: Just successive years?

20    MR. BOYER: -- 2014, 2015, 2016, and then -- actually,

21    in 2016, they left permanently. So the fact that he has never

22    taken care of his son goes to, one, the discrimination claim, but

23    he also has an FMLA interference claim. And obviously he would

24    not need any sort of leave if his child is not even in the

25    country. So it goes to both claims really.

1          THE COURT:  All right.  I'm asking about the software

2    development issue.

3          MR. BOYER:  Oh, I'm sorry.  Okay.

4          THE COURT:  That doesn't tell me anything about the

5    software development issue.  So how does the -- that work that

6    you're seeking discovery about relate to a claim or defense?

7          MR. BOYER:  Okay.  So the software development part of

8    it goes to really two defenses.  First, I would have to apply that

9    evidence defense in that software development work for third

10   parties is prohibited by Apple's policy and would result in the

11   termination of his employment had they discovered it early on.

12         THE COURT:  Okay.  Even if they're doing it on their own

13   time?

14         MR. BOYER:  Correct.

15         THE COURT:  Okay.  All right.  So basically your

16   argument is the relief that Mr. Kannan says he's entitled to, he's

17   not actually entitled to because had he known, he wouldn't have

18   been entitled to even retaining his employment.  He would have

19   been let go or at least admonished.  He wouldn't be entitled to

20   promotions or additional responsibility or additional stock awards

21   or compensation?

22         MR. BOYER:  That's exactly right.

23         THE COURT:  Is that your thesis?  Okay.  Is that the

24   only reason?  Is that the only -- or is there another?

25         MR. BOYER:  There is one more, Your Honor.

1          THE COURT:  Okay.

2          MR. BOYER:  And, again, this goes to the same issue with

3   regard to the claim that Mr. Kannan was not responsive enough and

4   that Mr. Kotni perceived that Mr. Kannan was not responsive enough

5   because of his son's condition that he was taking care of him and

6   things like that.

7      So why is that relevant?  Because if he was developing and

8   actually working on these third party applications instead of his

9   Apple duties, well, that would explain why he wasn't necessarily

10  responsive.  It would be another reason for Mr. Kotni's alleged

11  perception that he wasn't responsive enough.

12          THE COURT:  Okay.  And I believe that the request for

13  production that you are principally relying on or exclusively

14  relying on is Request for Production 18?

15          MR. BOYER:  Eighteen and 19, yes, Your Honor.

16          THE COURT:  So 19 I've already ruled on.

17          MR. BOYER:  Yes, Your Honor.

18          THE COURT:  You're not entitled to get discovery of Mr.

19  Kannan's wife's software development work.

20      But Request for Production Number 18 is permitted.  You

21  mentioned in your part of the joint submission that Apple had

22  discovered documents on its own.

23          MR. BOYER:  Correct.

24          THE COURT:  Which documents are those and what do they

25  show?

1           MR. BOYER:  Okay.  So they are attached as exhibits.

2           THE COURT:  Are these exclusive?  I've looked at the

3   exhibits.  So were these just examples, or is this sort of

4   comprehensive?

5           MR. BOYER:  These are examples that we felt prove that

6   Mr. Kannan was working in app development at the time he was

7   employed with Apple and that he was not producing -- he certainly

8   didn't produce the documents that we submitted to the Court, but

9   also has not looked in other sources for those productions related

10  to app development.

11          THE COURT:  And when did Apple discover those documents,

12  the documents -- examples of which are attached to your

13  submission?

14          MR. BOYER:  Sure, in late October, when we were looking

15  for documents responsive to Request for Production Numbers 72

16  through 74 from Plaintiff, which are related -- in which Plaintiff

17  seeks documents showing potential policy violations or misconduct.

18          THE COURT:  All right.  And what is the source of the

19  material for these documents?  Is this the mirror image of the

20  laptop computer?

21          MR. BOYER:  That's correct, Your Honor.

22          THE COURT:  Okay.  Why didn't you search for these

23  documents earlier?

24          MR. BOYER:  So we -- so we did.  We just didn't find

25  them.  There are about -- multiple thousands of documents on his

1   computer and when initially we looked -- certainly we listed the

2   entire set and that's in the July 8th letter that we sent to

3   counsel.   There's thousands and thousands of files on his

4   computer.  And when we went and looked again, Plaintiff's counsel

5   specifically asked for -- "I don't want 10,000 documents.  I want

6   essentially the meat of it.  What are you really going to show?"

7   And I said, "Well, we've got, you know, all these documents."

8   "We'll get you, you know, the highlights."

9         THE COURT:  Are we talking now about evidence of the

10   software development work that -- okay.  You're not talking about

11   Document Request 72 -- I mean, I guess they relate.  But when I

12   ask about why didn't you look for -- maybe I should ask it

13   differently.

14     Did you look for documents that would evidence Mr. Kannan's

15   software development work for others earlier in the case, or did

16   you only look for those in October of 2018?

17         MR. BOYER:  So we did and we listed all the documents.

18   And there are, again, thousands of them.  And so we did not look

19   through every document at that time.  We asked Plaintiff to

20   produce documents related to app development.  And then we wanted

21   to take his deposition to dive into it and find out, you know,

22   what this was and -- but, unfortunately, we weren't able to do

23   that because we had to --

24         THE COURT:  Okay.  But you had all of the documents on

25   this mirror image of the laptop computer since the beginning of

1   the lawsuit.  Yes?

2            MR. BOYER:  Yes, Your Honor.

3            THE COURT:  Okay.  I'm sorry.  You're nodding and we're

4   making an audio recording.

5            MR. BOYER:  Yes, Your Honor.

6            THE COURT:  So forgive me.  I am going to require a

7   response.  All right.  So at this point, what more do you need by

8   way of discovery on this particular issue?

9            MR. BOYER:  Yes, Your Honor.

10           THE COURT:  Document discovery on this particular issue.

11           MR. BOYER:  So a couple of things.  One, initially, when

12  we were here on September 24th, the Court said to Plaintiff's

13  counsel, Please start looking through your client's data.  So that

14  includes the gmail account.  That includes the computer itself.

15  What we believe exists, number one, is emails in his gmail account

16  related to software development.

17      Now, the reason they haven't produced this is because they're

18  saying, Well, this is related to his wife's, and so we don't have

19  to.  But if he's directly involved in it, Request Number 18

20  certainly requests that.

21           THE COURT:  Okay.  Yeah.  So I'm just kind of focusing

22  on what you need.  So gmail?

23           MR. BOYER:  Gmail searches.

24           THE COURT:  Uh-huh.

25           MR. BOYER:  I would also like to subpoena the company

1   that we identified that he worked for and Kickstarter as well

2   because he submitted an application to Kickstarter for development

3   of the application -- I'm sorry -- for funding of that

4   application.

5           THE COURT:  All right.  Let me just -- let me make my

6   question more precise.  What discovery do you need from Mr.

7   Kannan?

8           MR. BOYER:  Okay.

9           THE COURT:  Besides gmail.

10          MR. BOYER:  Okay.  Gmail searches and searches of any

11  other electronic sources that would have data related to his app

12  development.  So he testified at his deposition that he had

13  another laptop.  That wasn't -- I do not believe that was

14  searched.  The gmail account -- any other email accounts that he

15  would have used to communicate regarding app development.

16          THE COURT:  All right.  Is there anything else from Mr.

17  Kannan?

18          MR. BOYER:  And -- well, I'd like to continue asking

19  questions, but I didn't finish his deposition.

20          THE COURT:  So has Apple ever proposed any search terms

21  or search methodology for searching ESI in this case with respect

22  to this software development issue?

23          MR. BOYER:  We have not, Your Honor.

24          THE COURT:  Have the parties ever discussed an ESI

25  protocol for any aspect of the ESI at issue in the case?  You

1  don't have an existing one, in other words?

2       MR. BOYER:  We do not.

3       THE COURT:  Okay.  All right.  One of the things that

4  you asked for by way of relief in this motion is to have a third

5  party review Mr. Kannan's electronic material.  The motion focuses

6  principally on email, maybe exclusively on email.  What is the

7  nature of the search that you expect this third party to do?

8       MR. BOYER:  What we would do is propose specific terms

9  based on the documents that we have found, and that that

10 individual -- I'm sorry, the third party -- will look through any

11 electronic source, whether email or otherwise, for information and

12 responsive documents related to his application development.

13      THE COURT:  All right.  But those terms haven't been

14 proposed at this point?

15      MR. BOYER:  I have not yet.

16      THE COURT:  Okay.  All right.  I have some questions for

17 Ms. Ford.  I'll let you add anything that you wish after I'm done

18 asking her some questions.

19      All right.  So, Ms. Ford, I'm focusing on Request for

20 Production Number 18 which is the request that seeks "All

21 documents concerning, reflecting, or relating to your [meaning Mr.

22 Kannan's] development of any mobile, web, or other software

23 application during your employment with Apple for August 29th,

24 2011 to the present."

25      When you responded to this Request for Production on behalf

1   of Mr. Kannan -- or, rather, when he responded -- there were

2   objections asserted on the basis of privilege and privacy,

3   vagueness and overbreadth, and the fact that Apple had the

4   material in its possession.

5       But then Mr. Kannan represented the following:  "Without

6   waiving said objections, Plaintiff did not develop any mobile,

7   web, or other software application during his employment with

8   Apple from August 29th, 2011 through the present," and then in

9   bold text, "Raja, is this last sentence correct?"  That was the

10  response that was presented to the Court in a prior submission.

11      And Mr. Kannan has represented on subsequent occasions that

12  he has produced responsive documents and those concern only the

13  application -- applications that Mr. Kannan developed for Apple

14  and that he hasn't developed any other applications, so there are

15  no other responsive records.

16      And that representation was made very explicitly in the

17  declaration that was filed at Docket Number 160.  So did Mr.

18  Kannan do any software application development work for anyone

19  other than Apple?

20          MS. FORD:  Well, I guess that depends on whether you buy

21  Apple's characterization of what he did as being development, as

22  being app development.

23          THE COURT:  Did he work on any software applications?

24          MS. FORD:  He did not write any code or work on any

25  software applications is my understanding from him.

1          THE COURT:  He did no work for Tringio?

2          MS. FORD:  I'm sorry?

3          THE COURT:  Tringio.

4          MS. FORD:  No.  That's his wife's company.  No.

5          THE COURT:  He did no software application work for Kno?

6          MS. FORD:  No.  He did not.

7          THE COURT:  He did no software application work for any

8   other company besides Apple?

9          MS. FORD:  He testified to these issues during his

10  deposition (indiscernible).

11         THE COURT:  I have to say I can't -- I can't resolve the

12  inconsistency between that representation that you just made and

13  the representation that he made and what I see in the papers.  It

14  seems inconsistent.

15      Just a moment.  Let me just ask you a question about the

16  search.  So Mr. Boyer is saying -- maybe you do have a dispute

17  about the characterization of these things.  Let's just put a pin

18  in that.  Did you search or have a vendor search Mr. Kannan's

19  gmail and his electronic documents for information responsive to

20  Request for Production 18?

21         MS. FORD:  The answer to that is yes.  He did look

22  through his gmail.

23         THE COURT:  No, not him.  You personally --

24         MS. FORD:  No.

25         THE COURT:  -- or a third party vendor?

1          MS. FORD:  I did not do that and, no, we did not request

2     a third party vendor to do that.

3          THE COURT:  Have you ever looked at his gmail --

4          MS. FORD:  Yes.

5          THE COURT:  -- for responsive documents?

6          MS. FORD:  Yes, I have.

7          THE COURT:  And how -- how -- I understand.  How did you

8     do that?

9          MS. FORD:  We were on the telephone and he had the

10    ability to reflect the screen of his computer on my computer so

11    that I could watch --

12         THE COURT:  So he shared the screen with you?

13         MS. FORD:  Yeah, and then I could watch him do searches.

14         THE COURT:  And I take it Mr. Kannan has preserved all

15    of his electronic -- his gmail and any other email accounts that

16    would be connected to this lawsuit?

17         MS. FORD:  Well, I would say that he would have done so

18    with anything connected to this lawsuit.  Remember, this whole

19    question of app development was raised quite late in the game --

20    three and a half years after the case was filed or three years

21    after the case was brought -- so that he would have no way of

22    knowing in 2016 or '17, you know, '18 for that matter, that in

23    July of 2019, all of a sudden this issue would be raised about him

24    supposedly engaging in app development.  There's nothing about it

25    in the answer.  There was nothing about it in response to our

1    interrogatories.  There was no -- there was no hint that that was

2    the case.

3        So could it be that he has deleted -- one thing you have to

4    understand about these apps, a couple things you should

5    understand.  Number one, we're not talking about Minecraft or any

6    (indiscernible) here.  He spends his life work on very small

7    rudimentary apps.

8        When I took Mr. Carr's deposition, the 30(b)(6) witness for

9    Apple, he testified that he couldn't find any indication that any

10   money was ever made on any of these.  And I think these are --

11           THE COURT:  You know, I appreciate that you may think

12   this is an insignificant thing.  But I'm really just trying to

13   focus on documents responsive to the request.

14           MS. FORD:  Yes.

15           THE COURT:  You all can slog this out on the merits

16   later.  I'm not going to decide the merits of whether it is or is

17   not something that would justify termination.

18           MS. FORD:  Well, I just needed to get one more thing

19   which is that to the extent that there was any development

20   activity that took place in the company, that happened in 2012 and

21   2013.  So this is fairly old stuff.

22           THE COURT:  But it's within the scope for the Request

23   for Production which goes back to August 29th of 2011.

24           MS. FORD:  I'm sorry?

25           THE COURT:  The Request for Production goes back to

1   August 29th of 2011.

2           MS. FORD:  Yes, but the request itself was not served,

3   and we had no notice that Apple --

4           THE COURT:  I see.

5           MS. FORD:  -- considers this part of the case until I

6   believe it was June or July of 2019.

7           THE COURT:  Okay.  I take your point that you wouldn't

8   have necessarily known to search for this material until you

9   received the request.  However -- however, having received the

10  request, --

11          MS. FORD:  Uh-huh.

12          THE COURT:  -- whenever it was served, your client had

13  an obligation to search for responsive documents.  That obligation

14  doesn't fall on him personally, as you know.  It's an obligation

15  that extends to counsel.

16      So I take that very seriously, and I am concerned about the

17  representations that have been made to the Court and that have

18  been made to Apple about documents responsive to this request.

19      I'd like to ask you one more question about that.  I have

20  Exhibits  B,  C,  and  E  that  were  submitted  with  the  joint

21  submission, and I'm wondering -- it's been represented to me that

22  these were not produced by Mr. Kannan.  They were discovered on

23  the mirror image of his laptop computer.  So my question for you

24  is:  Why were these documents not produced by Mr. Kannan?  You've

25  now had an opportunity to investigate that.

1          MS. FORD:  Well, the first answer is they would not have

2     been responsive documents, in our view.  They would not be

3     responsive to the request that was asked.

4          THE COURT:  Why not?

5          MS. FORD:  Because the request that was asked is narrow.

6     It talks about "your development of applications with software."

7     He didn't develop.  He didn't write code.  And none of those

8     documents say that he did.

9          THE COURT:  The request says, "All documents concerning,

10    reflecting, or relating to the development of ..."

11         MS. FORD:  Right.

12         THE COURT:  All right.  It doesn't say "You were writing

13    a code."

14         MS. FORD:  Yes.

15         THE COURT:  Software development is a complex process

16    that I think we can all agree.  It's not just coding.

17         MS. FORD:  No.

18         THE COURT:  So are you representing that you construed

19    this response as related only to actual coding?

20         MS. FORD:  Yes.

21         THE COURT:  That's an unreasonable interpretation of

22    this request.

23         MR. BOYER:  Your Honor, if I might?

24         THE COURT:  No.  Not yet.  So that's my question.  If

25    you have more to say about my question about now having -- you say

1   you didn't think they were responsive.  Did you encounter them and

2   choose not to produce them in your initial review?

3          MS. FORD:  I did not review those documents and choose

4   not to produce them.  But they would not have been, given what my

5   client and I discussed -- if you could -- if you could please just

6   hear me one more second.  The issue of was what he had to do with

7   his wife's company, whatever it was, did that constitute app

8   development within the meaning of the company's policy, had he in

9   fact produced any of these documents, Apple would be using the

10  fact that he produced them as an admission on his part that he

11  violated their company policy by engaging in app development.

12         THE COURT:  Yes.

13         MS.  FORD:   And,  yes,  with  his  firm  belief  and

14  understanding  that  the  image  prohibited  is  app  development,

15  writing code and using your skills as a software code writer on

16  behalf of some other entity, and even that isn't even absolute,

17  but the --

18         THE COURT:  And you might be absolutely right about

19  that.

20         MS. FORD:  Uh-huh.

21         THE COURT:  However, that's not a justification for not

22  producing the documents.

23         MS. FORD:  Well, it's -- it is if producing them would

24  be construed as an admission that this constituted app development

25  because that's exactly what the question asked.

1    THE COURT:  You could have phrased your response to make

2  clear your understanding, which is actually a requirement under

3  Rule 34, if you have a way of parsing this request, that you think

4  means that the documents that you are aware of fall outside the

5  scope of production -- you can also confer with Mr. Boyer about

6  it.  But the Request for Production is not limited to coding.

7  It's broadly worded.

8    MS. FORD:  Uh-huh.

9    THE COURT:  "... concerning, reflecting, or relating to

10  your development of ..."  That's not just coding.  So maybe

11  reasonable people could quibble about that.  Maybe not.  The

12  merits are a totally different thing about whether it's a

13  violation of policy.  You may be absolutely right that it is not

14  in violation of the policy.  But I'm trying to deal with a

15  discovery dispute, and I'm rather concerned about what seems to me

16  to be an unfair parsing of this request.

17    So back to what we're going to do about it, I take it that

18  the current state of play, even now at this stage, is that no one

19  has searched Mr. Kannan's gmail account for documents that would

20  relate to the activity that is reflected, for example, in Exhibits

21  B, C, and E; is that correct?

22    MS. FORD:  No.  That's not correct.  I haven't asked my

23  client to -- now that this issue arose, I asked my client to

24  search his gmail account and see if there were any emails in there

25  that would have related to anything having to do with his wife's

1    company, and he said that absolutely that they were not.

2        And he also testified in his deposition, because Mr. Boyer

3    asked him about it -- he said, "Did you have any email

4    communications?"  And he said, "If I did, they would have been on

5    domains at this time, in '12 or '13, but don't exist anymore."

6        THE COURT:  What does that mean?

7        MS. FORD:  It means that they had -- his wife had a

8    domain, a web page, I guess, on the computer for her little

9    company.  I think it was called Tringio.  Anyway, it no longer

10   exists.  And they used to communicate through that device, so

11   that's what he testified to at his deposition, was that if he had

12   any email communications back in '12 or '13, that they would

13   likely have been on this domain that no longer exists.

14       THE COURT:  The email would have been on the domain, but

15   it was an email at --

16       MS. FORD:  I'm not sure whether it was email or online

17   communication, but it may have been an email.  But, anyway, if

18   there was any electronic communications there, it would have been

19   on this domain that no longer exists.

20       THE COURT:  Okay.

21       MS. FORD:  He testified to that at his deposition.

22       THE COURT:  All right.  But just to be clear, he has or

23   has not searched his gmail account?

24       MS. FORD:  He has, and he did not find anything.

25       THE COURT:  Okay.  But you didn't conduct that search

1    with him?

2            MS. FORD:  No.

3            THE COURT:  Do you know what terms he used or how he

4    conducted the search?

5            MS. FORD:  I asked him to look for the names of the

6    applications and for the company that (indiscernible) software.

7        By the way, one thing that has not come out here is that we

8    did produce other software -- another software agreement that his

9    wife had signed as part of the documents that we did produce.  We

10   produced a number of things that had to do with his wife's use of

11   his laptop and we were aware of the software things that she

12   signed and (indiscernible).

13       But, in any event, yes, he said that he searched it and he

14   did not find anything in response to it.  Now, if a third party

15   went in and searched it, one of the things that would happen is

16   that it would pop up emails between Mr. Kannan and myself, among

17   other things, because we communicated about it.

18           THE COURT:  So the other thing that Mr. Boyer mentioned

19   is that there were -- there are other computers besides the Apple-

20   issued laptop that Mr. Kannan had.  And I guess my question is how

21   many such other electronic devices, computers and other devices,

22   does he have?

23           MS. FORD:  The only one that I know of is one that he

24   bought long after all of this was over, that he bought -- as a

25   matter of fact, that was acquired back in May when this whole

1    issue arose over whether he should be keeping personal information

2    on his Apple laptop.

3         THE COURT:  May of 2019?

4         MS. FORD:  Yes.  So it's not going to happen again.

5         THE COURT:  All right.

6         MS.  FORD:    (Indiscernible.)    I  know  that  he  had

7    predecessor computers.  If he still has some of them floating

8    around, I don't know, but I believe they were all Apple laptops

9    and  so  they  probably  went  back  to  Apple  when  he  switched

10   (indiscernible).

11        THE COURT:  Are you speculating or do you know?

12        MS.  FORD:   I'm speculating.   I didn't ask him that

13   specific question.

14        THE  COURT:   Was  he  asked  in  deposition  what  other

15   computers he had -- has or had?

16        MS.  FORD:   He  was  asked  what  other  computers  he

17   currently has as far as my recollection.

18        THE COURT:  Okay.

19        MS.  FORD:   I don't believe he was asked historically

20   when he acquired the (indiscernible) at any given point in time.

21        THE COURT:  All right.  Mr. Boyer, is there something

22   you wanted to add?

23        MR.  BOYER:   Yes,  Your  Honor.   So  actually  these

24   documents would have also been responsive to RFP 19 which this

25   Court did order him to produce in a limited fashion, and I'll read

1   the Court's order.

2           THE COURT:  You're referring to B, C, and E -- the

3   Exhibits B, C, and E to the joint submission?

4           MR. BOYER:  Correct, Your Honor.

5           THE COURT:  Uh-huh.

6           MR. BOYER:  And the Court's order said, "Produce

7   responsive documents reflecting software applications developed by

8   any person using Mr. Kannan's Apple-issued computer equipment,

9   whether those responsive documents are currently stored on Mr.

10  Kannan's Apple-issued computer equipment or elsewhere."

11      So even if it was his wife's development, it was on his

12  computer and it was required to be produced regardless.

13          THE COURT:  Uh-huh.

14          MS. FORD:  Your Honor, --

15          THE COURT:  All right.  Just a moment.  I'm going to let

16  you respond as well.  With respect to the other computers -- so

17  Ms. Ford has just represented that the only other computers -- the

18  only other computers that he has currently are a computer that he

19  purchased in May of 2019 that he's using only for personal stuff,

20  not Apple stuff.

21      Do you have any contrary information?

22          MR. BOYER:  That would be surprising because I did ask

23  him about that during his deposition and he said he couldn't

24  recall when he purchased it.  And I would think that if he

25  purchased it just a few months ago, he would recall that.

1          THE COURT:  Do you have any -- any evidence about these

2    predecessor computers that you obtained during the deposition?

3          MR. BOYER:  I don't believe he mentioned other than we

4    know specifically that he had Apple computers, that when he

5    changed jobs he would recycle those.  I don't know about any other

6    personal ones because I did ask him about that during his

7    deposition and he said there was this other one, but he couldn't

8    recall when he purchased it.

9          THE COURT:  Okay.  And as to the prior Apple computers,

10   does Apple have -- have those computers, or have mirror images of

11   those computers?

12         MR. BOYER:  We do not.

13         THE COURT:  So the one that you have a mirror image of

14   is the most recent Apple-issued laptop?

15         MR. BOYER:  Yes.

16         THE COURT:  Okay.  And could you remind me when the

17   mirror image was taken.

18         MR. BOYER:  It would have been in April of 2019.

19         THE COURT:  Okay.  All right.  Ms. Ford, you wanted to

20   respond.

21         MS. FORD:  Yeah, on a couple of -- on a couple of

22   issues.  One is that when my client was asked to produce documents

23   that related to the use of his computer by (indiscernible), we

24   produced a bunch of (indiscernible), which included other things,

25   some contacts and stuff that were -- his wife's contracts and we

1   produced those (indiscernible) at that time.

2        And then another thing that we were asked to do was send in

3   a list of files -- send a list of the files, which we did on 4/25.

4        He also -- and the Court didn't even ask us to do this -- he

5   uploaded 16 gigabytes of copies of files from his laptop, the one

6   that his wife had saved and shared on his computer, and he did

7   that on October 26th.  He uploaded those to Dropbox and sent them

8   in to Apple.  So they have copies of everything that related to

9   his wife's company that was on that laptop.  He has produced and

10  I don't know why Apple keeps saying over and over that he never

11  produced the things that reflected his wife's file sharing use of

12  his computer.

13       He also testified about this at great length in his

14  deposition (indiscernible).

15       THE COURT:  I think the principal concern at this point

16  is Mr. Kannan's gmail.

17       MS. FORD:  Yes.

18       THE COURT:  So I don't think there's been the kind of

19  search of his gmail, at least not timely, that Mr. Boyer said he

20  expected to be done.  So I don't think the production that you're

21  referring to had anything to do with gmail, if I'm not mistaken,

22  this voluminous production in the file.

23       MS. FORD:  No, because what we were asked to produce was

24  documents related to someone else using his computer, and the use

25  of his computer was for saving files on it, so he just kept all

1 the files which he had saved and we uploaded them to Apple.  And

2 they already had them from the mirror, so they already had them,

3 but we did it -- we did that.

4      MR. BOYER:  And I would say for the record, Your Honor,

5 I have all that here.

6      THE COURT:  You have what all right here?

7      MR. BOYER:  The files that have been produced, and these

8 documents that we specifically pointed out to the Court are not in

9 there.

10      THE COURT:  Uh-huh.  All right.  I want to turn to the

11 other issue that's raised, albeit it in an abbreviated fashion in

12 the joint submission.  That's Docket 184, and that's this issue

13 about Mr. Kannan and his family's time in India.

14      And I think principally the dispute is about responsive

15 information for Request 16, "Periods of time your spouse and son

16 were in India."  I think you already explained to me why you think

17 this information is relevant to a claim or defense.

18      But what I -- what I'm wondering is you again say that Apple

19 found documents showing Mr. Kannan's wife was in India -- you say

20 "until April of 2015."  I'm not sure I quite understand what that

21 means because you explained here that Mr. Kannan's wife and son

22 were in India during the school year but not in the summers on all

23 of the years that are relevant to this dispute.

24      So I'm not entirely sure -- not entirely sure what

25 information you still need if you've got that documentation

1    already.

2            MR. BOYER:  Yes, Your Honor.  So it's -- I'm not sure

3    that there's anything else out there at this point, but the

4    problem is I don't have any confidence that there isn't.  And we

5    produced a document I believe at the end of October that we found

6    on his computer showing an email that he had sent to a school

7    district saying, My son will be essentially in India for the

8    school year, for the 2014-2015 school year.  That was not a

9    document that was produced.  It was a gmail.  It was on his --

10   saved on his laptop but also should have been in his email account

11   and was not produced.  So it gives me no confidence that these

12   searches are done inappropriately.

13       And one other document that I didn't raise, but again goes to

14   the veracity of the searches that are being done, is that we

15   received employment records from Adobe that we subpoenaed that he

16   had brought over, and that we had never received any emails from

17   Plaintiff confirming that he had applied there or any response.

18   But we got them from Adobe.  And after we got them from Adobe, we

19   got them Plaintiff.

20           THE COURT:  Have you asked an interrogatory about -- for

21   the information about what periods of time Mr. Kannan's wife and

22   son were in India?

23           MR.  BOYER:   I did not, but I did ask him in his

24   deposition and I confirmed the times now.

25           THE COURT:  All right.  So he testified consistent with

1    the documentation that you have?

2          MR. BOYER:  Yes, Your Honor.

3          THE COURT:  Okay.  And have you also asked an

4    interrogatory about the question of, "Which companies did you

5    apply to and at what times?"

6          MR. BOYER:  We did ask -- we sent a Request for

7    Production for that.

8          THE COURT:  Have you asked an interrogatory?

9          MR. BOYER:  We have not, Your Honor.

10          THE COURT:  Okay.  All right.  It seems to me that you

11    have the information that you need.  I'm not sure it's really

12    proportional to the needs of the case for me to order anything

13    further on this point.  It sounds like you've got your documents,

14    you've got your deposition testimony.  They're both consistent.

15        Explain to me why requiring a third party to search for

16    emails about the time that Mr. Kannan's family was in India is

17    really useful at this point.

18          MR. BOYER:  Well, I mean, the only -- the only thing

19    that would be useful would be the specific dates and so we could

20    have a specific timeline.  Of course, his memory is not perfect.

21    I don't think anyone's would be with regard to specific dates when

22    somebody was here, when they came back.  The document obviously

23    show when the family was gone and when they were back because the

24    airline tickets would show when somebody left and when somebody

25    came back.

1          THE COURT:  And you have those documents now.

2          MR. BOYER:  I have some airline tickets.  I can't piece

3   together everything.  And I'm not sure if there is anything else

4   out there.  But I am not -- I am confident that it was -- the

5   search was not done properly because I produced the documents.

6          THE COURT:  All right.  Ms. Ford, with respect to the

7   question of the precise periods of time that Mr. Kannan's wife and

8   son -- I'm assuming his son is not in India by himself, so that's

9   why I use the term "wife and son" -- were in India, does your

10  client have information specific to what those times were?

11         MS. FORD:  First of all, Mr. Boyer is overstating what

12  the testimony on the documents show because my client reported to

13  Mr. Kotni in 2013 through part of 2017, and the time he's talking

14  about was likely '15 and '16.  So it doesn't cover the entire time

15  he worked for Mr. Kotni.

16         THE COURT:  Fine.

17         MS.  FORD:   We  have  produced  documents  and  he  has

18  testified about it and he was fairly specific about the dates and

19  the why, the reasons and -- that would justify --

20         THE COURT:  Let me just be a little bit more specific.

21  If Mr. Kannan had an opportunity to sit and reflect -- not in a

22  deposition, but to figure out precisely when his wife and son were

23  in India, using whatever sources of material he has to do that,

24  whether it's his own recollection or whatever -- can he give

25  precise dates?

1          MS. FORD:  Probably not precise dates except for the

2    ones that are shown by the airline tickets and itineraries that we

3    have, but pretty close, within a month or so.  And that's what he

4    testified to in his deposition.  They (indiscernible) were

5    planning to go in November.  They went in November and they came

6    back in January.  When he talks about the school year, the

7    academics (indiscernible) what the evidence shows, but, yeah, he

8    can say roughly when they went and when they came back with some

9    precision to the extent that we still have the airline tickets.

10         But this was another one Mr. Kannan couldn't have known back

11   in the day, 2014, '15, '16, or just whatever would be relevant to

12   anything or even during the pendency of this case.

13         THE COURT:  Are you telling me that he wouldn't have

14   thought it would be relevant to his claims that there were periods

15   of time when his wife and son were not even there that could

16   justify, you know, any kind of need for a flexible schedule?  That

17   sounds -- strikes me as a little bit --

18         MS. FORD:  Well, --

19         THE COURT:  -- suspect.

20         MS. FORD:  That's because Mr. Boyer has really misstated

21   the claim.

22         THE COURT:  Okay.  So you're not claiming that he

23   required a flexible schedule and was denied that by Mr. Kotni?

24         MS. FORD:  We claim that he requested a flexible

25   schedule in 2013 when he first joined Mr. Kotni's team.  In 2013

1    and 2014 and to a certain extent thereafter, he did use that

2    flexible schedule to care for his son.  We do not claim that Mr.

3    Kotni ever forbad him from doing that. As a matter of fact, he was

4    able to do that quite nicely because he keeps very irregular hours

5    anyway because a lot of the people that Mr. Kannan supervised

6    worked in other parts of the world.

7            THE COURT:  Uh-huh.

8            MS. FORD:  Some in India, some from Asia, people all

9    over the world.  So he often has to work in the middle of the

10   night but then has some time off during the day, and they all have

11   very irregular schedules that work in that (indiscernible) for

12   that reason.

13       So, no, we're not claiming at all that he was forbidden from

14   taking the time he needed.  We say that he was retaliated against

15   because his son has autism and because of the requests that he

16   made for -- that he be allowed that flexibility.

17           THE COURT:  Sounds relevant.

18           MS. FORD:  So we're claiming retaliation, not that he

19   was prevented from doing it.  And, you know, were there times when

20   he required less time to be caring for his son as his employment

21   rolled forward?  Absolutely that's probably true.

22           THE COURT:  Uh-huh.

23           MS. FORD:  But that doesn't change the fact of the

24   retaliatory and discriminatory intent that we maintain was that

25   Mr. Kotni just didn't want to have someone (indiscernible) that

1   had an autistic child and (indiscernible).

2          THE COURT:  Uh-huh.

3          MS. FORD:  By the way, Mr. Boyer says that our complaint

4   is all about that there were complaints that Mr. Kannan was not

5   responsive.  That's not in our complaint anywhere.  Mr. Kannan was

6   asked by Mr. Boyer in his first deposition, "Did Mr. Kotni ever

7   say anything to you that indicated directly that he didn't want

8   you to take time to care for your son?"  And he said something to

9   the effect that, "The closest thing would be that he complained

10  once or twice about response time."  That was the only thing.

11         THE COURT:  Okay.  So what I'm toying with here is --

12         MS. FORD:  So the claims are slightly different.

13         THE COURT:  I understand, and you have a different view

14  of what's relevant and what's not relevant to your claims.  And of

15  course Mr. Boyer has a whole defense on behalf of Apple that he

16  plans to put on.  And I'm not going to resolve who gets to put on

17  what evidence or how it's going to turn out.

18     But what I -- what I am concerned with is the discovery

19  request, which was not objected to in any way by the time we got

20  to the hearing and seems to have an incomplete response.

21     Now, I don't think that a request for production of documents

22  is necessarily the most effective tool here in the first place,

23  but it seems that there -- there was documentation that sort of

24  trickled out later that then got asked about in deposition and the

25  answer is probably fine but maybe not as precise as it could be.

1      So what I'm toying with -- and I want to get your responses

2   for this -- is I am playing with giving Apple leave to serve a

3   specific interrogatory or maybe I will just craft a specific

4   interrogatory about this issue that Mr. Kannan will be required to

5   answer.   This is not new discovery.   This is a remedy for a

6   failure to produce complete documents.

7      So I'd like to hear Ms. Ford's response to that -- that

8   proposed resolution of this issue.

9         MS. FORD:  Well, if that is a resolution which can avoid

10   further deposition questioning or something really cumbersome

11   while they sort of have a person searching for I don't know what,

12   then I would say that it's probably something that is not terribly

13   burdensome to do.

14      On the other hand, I'm not hearing any limits whatsoever on

15   Apple's side on the scope of further discovery that they're going

16   to do in this case.

17         THE COURT:   I'm going to just nip this in the bud.

18   There is no more discovery.   We are done.   I already issued an

19   order on it about what's allowed to be done in this case.  Motions

20   to compel to enforce the prior discovery order, okay.   No new

21   discovery.   So I'm not -- I will get to your -- the pile of

22   additional motions that were filed.   But right now, I'm really

23   just trying to focus on the discovery dispute that was briefed in

24   a timely way and is before me right now which is 184.

25      Mr. Boyer, your views on the proposed remedy?

1        MR. BOYER:  I think that's fine, Your Honor.  And just

2   for the record, I do want to state from the complaint, this is

3   paragraph 60, "Mr. Kotni evaluated Plaintiff's performance lower

4   than was appropriate and denied him RSU awards, increases in job

5   level, bonuses, and compensation increases based on the fact that

6   Plaintiff had asked for a flexible schedule and sometimes worked

7   a flexible schedule and Kotni's perception that Plaintiff was

8   spending time taking care of his son's needs rather than working

9   and/or that he would be inattentive at work due to his son's

10  disability."

11       So it's right on point in defense of that claim.

12       THE COURT:  All right.  I will consider -- I will

13  consider requiring an interrogatory to be answered.

14       I do not have all I need on this issue, and let me tell you

15  what my thoughts are about a resolution on both.

16       So starting -- going back to the Request for Production 18,

17  I am not sympathetic to Mr. Kannan's excuses that because he's in

18  India, it makes working with U.S. counsel difficult.  That may be

19  a fact, but he is the Plaintiff in this matter and he has certain

20  obligations in prosecuting his case.  And among those obligations

21  are complying with discovery and discovery orders.

22       So I am also not sympathetic, Ms. Ford, to your explanation

23  that you don't have the technical tools or ability to do the kind

24  of searches that would be necessary.  That is no longer the

25  standard for dealing with discovery of electronically-stored

1    information in this day and age.  You just can't rely on counsel's

2    inability or lack of resources or lack of, you know, technical

3    resources.

4         Both parties failed to comply with Rule 26 with respect to a

5    discovery plan for electronically-stored information.  Given that

6    there was electronically-stored information that was relevant in

7    this case, Rule 26 requires you to discuss and confer about a

8    plan, and nobody did that.  So now here we are after the close of

9    discovery with this problem.

10        I consider Mr. Kannan's declaration at Docket 160 to be, at

11   best, misleading and, at worst, a misrepresentation to the Court.

12   And that declaration and the failure to do an adequate search for

13   documents responsive to Request for Production 18 I do think

14   violates my order.

15        As a remedy, what I plan to do is to order Ms. Ford to

16   personally review the gmail that Mr. Kannan has and that will be

17   based on a prior conference with counsel for Apple about the

18   search terms to be used.  And you're not just reviewing the gmail.

19   You're also reviewing the attachments to any email.  And you are

20   looking for Mr. Kannan's work relating to any software that is not

21   for his employer Apple.

22        So, Mr. Boyer, I'm going to require you to provide search

23   terms within seven days.  You can provide them earlier.  And

24   within seven days of provision of search terms, I'm going to

25   require the search to be done, this review to be done by Ms. Ford.

1   You cannot delegate this to your client Mr. Kannan.  If you want

2   to use a third party vendor, you are welcome to do that and you

3   can review the results.  But I'm going to require that to happen.

4       I don't think using a third party vendor -- I'm not going to

5   require that because I think it's overkill.  I think it's not

6   proportional to the needs of the case.  You already have

7   substantial information that you've obtained from review of the

8   material on the mirror image of Mr. Kannan's laptop.  I don't

9   think the gmail was reviewed appropriately, and so I'm going to

10  order that to be done.  But I will leave it to Ms. Ford whether

11  she does it personally or uses the services of a third party

12  vendor to assist her in doing that.  I will allow you to propose

13  search terms.

14      Don't be greedy.  If we get search terms that hit like every

15  single email, that will not be acceptable.  So that's the

16  resolution that I propose, and I will consider on the other issue

17  the interrogatory that I suggested as a way to resolve that

18  dispute as well.

19      I'm prepared to move on to the next discovery dispute unless

20  the parties have any -- and I will issue a written order.  You

21  won't have to just take notes or order the transcript.  I will

22  issue a written order on these issues.  But before I move on to

23  the next dispute, are there any questions about what I've just

24  described as my proposed -- or my expected resolution?

25          MS. FORD:  My only question would be what if we are

1   provided with search terms and we disagree with or dispute --

2            THE COURT:  All right.  I've told them not to be greedy.

3   Don't be took picky.  I mean, this is the third time that I've had

4   to address this issue of this Request for Production, so I'm just

5   going to say I expect the parties to be reasonable about this.

6        If the search terms result in, you know, outrageous number of

7   hits, that's going to be a problem.  So I'm not going to pre-judge

8   that issue.  If you have to come back to me, you can.  But as you

9   can tell, I'm rather aggravated about the way the discovery has

10  been conducted in this case and the way the parties have conducted

11  themselves.

12       I looked back at my notes from our first meeting where I gave

13  you all the lecture about how you're supposed to cooperate in

14  discovery.  Clearly hasn't happened and there's enough blame to go

15  around -- to go around -- all around here, but I really encourage

16  you, Ms. Ford, to be cooperative in this process because I am not

17  awarding Apple the relief that it seeks and I'm giving you an

18  opportunity to make sure that your client's production in response

19  to this Request for Production is in fact complete.  So I think

20  you should approach it in that spirit.

21            MS. FORD:  I was asking you a more procedural question

22  of how we would try to resolve it or call it to the attention of

23  the Court because --

24            THE COURT:  Send me a short, short note saying the

25  parties need the Court's assistance.  I don't want briefing.  I

1    don't want people telling me what the other guy did badly.  Just

2    say, "We think we need a call with the Court."  I will set you up

3    for a telephonic call and we will do it as soon as I can.  But I

4    would encourage you to not have to do that.

5        Okay.  Docket Number 198, this is the AEO designations.  All

6    right.  So Mr. Kannan seeks relief in the form of I think de-

7    designation.  Let me just say I am not going to entertain re-

8    litigation of the parties I've already ruled on in Docket Number

9    105.

10       It's very difficult for me to understand from the submissions

11   that I have what the problem is.  For example, at the bottom of

12   page 2 of Mr. Kannan's half of the joint submission, there's a

13   description about what is -- what remedy is being sought with

14   respect to this Exhibit B.

15       I look at Exhibit B.  It has no confidentiality designations,

16   and I can't tell if Mr. Kannan is complaining about AEO

17   designations, redactions, or both.  Same thing at the top of page

18   3, Exhibit C.  I can't tell what portion is or is not designated

19   AEO.

20       And then Mr. Kannan writes that Apple has designated all

21   pages AEO of some documents when only certain pages should be.

22       Exhibit D is the example.  That shows the opposite.  It shows

23   that there are AEO designations only on certain pages.

24       And I have Exhibit E, again, a job application example.  Has

25   redactions and no AEO designations.

1    So I get this submission and I can't tell what the basis is

2    for the complaint.  So I am very reluctant to grant any -- I don't

3    see how I can grant any relief when I have that kind of a showing.

4        So, Ms. Ford, you've heard my concern.  I'm going to give you

5    an opportunity to explain what the problem is and how you want --

6    how you are not arguing for a re-visitation of my prior order.

7            MS. FORD:  I'm not sure, first of all, why what you just

8    described -- you began talking about Exhibit B as in "Boy."

9            THE COURT:  The -- yes, the first example that I'm

10   looking at is Exhibit B.  It's at Docket 199 -- this is the sealed

11   version -- and it has a bunch of redactions in it.  It has no AEO

12   designations on it.

13           MS. FORD:  May I just explain something, Your Honor?

14           THE COURT:  Sure.

15           MS. FORD:  The way that Apple attached its Bates numbers

16   and AEO designations is something that sometimes when you print it

17   out on certain computers, those don't carry over and they don't

18   get printed.

19       May I bring it to you to the bench and show you a copy of

20   Exhibit B?

21           THE COURT:  Are you just going to tell me that it has

22   AEO designations on it?

23           MS. FORD:  Yes, and that got filed with the court.  This

24   is just a printout of what I filed with the court.

25           THE COURT:  Okay.  So I'm looking at --

1          MS. FORD:  What you're looking at doesn't show that on

2   there.

3          THE COURT:  No, it doesn't.  It does not.

4          MS. FORD:  Because of a technical problem that I don't

5   understand.

6          THE COURT:  All right.  Okay.  So let's assume that

7   every single page has an AEO designation in Exhibit B, and I'll

8   approach it that way.  Is there a problem that there are AEO

9   designations and redactions in the same document?  Or are some

10  versions   AEO   and   then   other   versions   "Confidential   With

11  Redactions"?

12         MS. FORD:  First of all, all the pages that we have

13  presented to you as exhibits are all marked "Attorney's Eyes

14  Only," okay?  The redactions that you see there -- for example, on

15  Exhibit B, you see these redactions?

16         THE COURT:  Yes.

17         MS. FORD:  Those are mostly just email addresses.

18  That's not what the problem is.

19         THE COURT:  Okay.

20         MS. FORD:  That's not what the concern is at all.  But

21  on Exhibit B, what they did was they -- the first three pages the

22  first time they produced it was with AEO and it has people's names

23  on the second page.

24         THE COURT:  Uh-huh.

25         MS. FORD:  Okay.  This is a listing.  And then they put

1  it down to "Confidential."   But when they put it down to

2  "Confidential," then they redacted all of those names.

3          THE COURT:  I see.  So this would be at page 8 of 185 in

4  Document 199-2, which is the sealed --

5          MS. FORD:  That's what I was trying to illustrate for

6  you there.  So it's the fact -- just the fact that there are

7  redactions of people's phone numbers and emails is absolutely no

8  problem for us.

9          THE COURT:  All right.  So that was extremely confusing

10  when you're describing redactions and AEO in a two-line argument

11  about this category.

12          MS. FORD:  It was really hard for me to pare all those

13  down so we could show -- yes, but that is one technique that they

14  used.

15      Another thing that we have here is that some of these emails

16  go on for many pages and particularly the ones with all those

17  compensation planning emails.

18          THE COURT:  Yeah.

19          MS. FORD:  And I think there are several examples and

20  (indiscernible).  But they will have five or six pages of detailed

21  description of what the guidelines and rules are for granting

22  compensation and bonuses and RSUs and other things.  No mention of

23  any specific employee information.  Then at the end, they will

24  have attached a spreadsheet that has individual employee names and

25  what they individually are going to receive.

1          And what Apple did was to mark all of the entire document,

2     including all of the guidelines and rules for controlling how

3     compensation was to be computed.   And they made that "All

4     Attorney's Eyes Only," and that is really crippling because Apple

5     has a number of witnesses who can testify about these things.   I

6     have one and it's the Plaintiff.   And if it's going to be him

7     trying to compare his compensation to others and the reasons why,

8     he needs to have access to that information.   There's actually

9     nobody else on our side who can testify to that.

10          THE COURT:  All right.  Two things.  Two things.  I've

11     already ruled that Mr. Kannan cannot see confidential employee-

12     specific information.  So are you arguing about that again?

13          MS. FORD:  I am -- not with respect to what I just said.

14     The pages of the -- that show just the guidelines are not

15     employee-specific.

16          THE COURT:  Right.

17          MS. FORD:  I believe that the Court should, in light of

18     the things that we discovered in deposition after your prior

19     ruling, which is that Mr. Kotni, in explaining why other people

20     got paid a lot more, they were paid three, four times as much as

21     Mr. Kannan, he relies exclusively on those performance reviews.

22     There's nothing negative in there.   We're not looking for

23     complaints or dirt on any of these other people.  To the contrary,

24     we're looking for the reasons that Apple relies on for paying them

25     a lot more money.

1        And when I asked Mr. Kotni those questions in his deposition,
2    he simply started to read the performance reviews and he testified
3    that he really wouldn't be able to remember why he gave them more
4    money  than  he  gave  him  without  looking  at  the  performance
5    tabulations.   And yet I don't have any witness other than Mr.
6    Kannan  who  can  say,  "Well,  he  accomplished  that,  but  I
7    accomplished this over here."

8            THE COURT:   Well, of course you do.   Mr. Kannan can
9    testify to all of his accomplishments.   You have access to both
10   and you're --

11           MS. FORD:   The comparison between himself and --

12           THE COURT:   I'm not going to tell you how to litigate
13   your case, but I don't think that's a justification for getting
14   access for your client to someone else's performance reviews.   And
15   I've already ruled on that issue.

16       So the fact that Mr. Kotni testified about that in deposition
17   doesn't  change  my  mind  on  that  issue,  so  I  don't  want  to  re-
18   litigate and I won't permit you to re-litigate that issue.

19       It may very well be that when you all get to trial, your
20   presiding judge will make entirely different calls on what gets to
21   be testified to in public, what documents are shown in public.   I
22   mean, he's not going to be clearing the courtroom every single
23   time a witness is going to talk about another employee.   So that
24   would be a very impractical way to conduct a trial.

25       But for discovery purposes, I've already issued a decision on

1    that and I don't want to -- I don't want to revisit that and spend

2    time revisiting that.

3         I am concerned with over-designation.  I am concerned about

4    that issue.  So, Ms. Ford, I would like for you to focus on what

5    you view as the over-designation beyond what I have already

6    ordered can be designated AEO.  So I hear you when you say there

7    are portions of documents that have been designated AEO in their

8    entirety and only some portions of those ought to be treated AEO.

9    I got that point.  That's one I have in my list to ask Mr. Boyer.

10        Are there other examples of the kinds of things?

11            MS. FORD:  Exhibit C, which is the documents that have

12   to do with the internal investigation by Mr. Kannan's complaint

13   that he wasn't being treated fairly compared to other people,

14   okay?  And Apple produced some notes concerning the interviews

15   that were done.

16        Now, initially Apple designated all of those notes in their

17   entirety,  even  the  questioning  of  his  manager,  as  being

18   "Attorney's Eyes Only."

19        Then  in  response  to  us  raising  the  issue,  they  sent  us

20   another copy which was then marked "Confidential," which is fine

21   if it says "Confidential," but what it did was it redacted -- when

22   Mr.  Kotni  gave  testimony  to  the  investigator  and  when  the

23   investigator wrote his report, he said, Mr. Kannan was paid fairly

24   and I can tell that because here's these two other named employees

25   who got paid similarly to him.

1      The thing is those people are not comparable employees.  But

2  if my client can't know who those people are or what -- what that

3  -- and Apple has redacted all of that information from the

4  investigative report that relates to the investigation of Mr.

5  Kannan's claim and, again, he needs to be the one to testify about

6  that.  It's a denial of due process if he can't testify about

7  these comparisons to Apple's --

8          THE COURT:  Why can't you ask him, "Who are the

9  employees who are comparable to you and who are the employees who

10  are not?"  Why can't you just ask him those questions?  I've

11  already ruled precisely on how you may advise your client, gather

12  information from your client, get help from your client in

13  analyzing the documents that you have.  These problems that you're

14  describing are problems I have already heard and taken into

15  consideration in ruling on the prior motion.

16      So if there's something else.

17          MS. FORD:  I think that the notes of that investigation

18  are entirely a different issue than the performance reviews of the

19  people.  I really do.  I think what Mr. Kotni testified to the

20  internal investigator to justify his decision-making is something

21  that doesn't belong in the AEO category, even though it does

22  mention other people's names.

23          THE COURT:  All right.  Is there anything else?

24          MS. FORD:  That's it.

25          THE COURT:  All right.  I'm going to ask Mr. Boyer some

1    questions.

2          MR. BOYER:  Yes, Your Honor.

3          THE COURT:  The main thing that struck me about your

4    response here was the designation as AEO of the compensation

5    guidelines.  Your argument is that these are confidential to Apple

6    and highly sensitive.  I take that point.  You can designate them

7    "Confidential."  And I think it's entirely appropriate when you

8    have documents that can be easily segregated.  If you've got a

9    chart at the end that has employee-specific information that gets

10   AEO treatment, the rest of it doesn't need to.  You can designate

11   that "Confidential."

12        So I'm going to order that you do that and make those

13   changes.

14        What I have some concern about -- and maybe this is a

15   question that I can ask -- I'll pose to both counsel -- is what is

16   the volume of documents where the document is designated AEO and

17   the reason is is because strewn throughout that document in

18   different places are references to other employees' names and

19   compensation or personnel information, performance reviews?  Are

20   we talking about thousands of documents like that, 50 documents

21   like that?  What is the universe?

22        Let me ask Mr. Boyer since you did -- you did the AEO

23   designations in the first place.

24          MR. BOYER:  I would think it's significant.  However --

25   well, I take that back.  If it's just the performance -- I think

1    anything related to specific employees, we've already covered and

2    it doesn't sound like the Court's going to want to see some

3    (indiscernible) designation.  That looks like a big chunk of the

4    documents are kind of off the table.

5         With regard to the comp guidelines, if we need to re-

6    designate those, but keep the charts confidential, it's a few

7    hundred.

8              THE COURT:  That's not what I'm asking about.

9              MR. BOYER:  Okay.

10             THE COURT:  So, here, let me give you an example.  So

11   let's take Exhibit B, which is the example I was discussing with

12   Ms. Ford and it was the third page of Exhibit B.  It doesn't have

13   any Bates numbers, so I don't know what it's actually called.  It

14   probably does have Bates numbers but not my copy.  But this is

15   page 8 of 185 in Docket 199-2, the sealed version, where there's

16   a list of four employee names.

17        So what Ms. Ford said is that a copy of this document was

18   produced.  It was de-designated down to "Confidential."  But those

19   four names were redacted so that Mr. Kannan could see them.  The

20   rest of the document doesn't need to be designated AEO is what I

21   -- at least the preceding pages.

22        So what I'm asking is how many documents in the production

23   that's marked AEO are like this, where but for a few names or a

24   few names associated with salary information or performance review

25   information, the remainder of the document could be shared?  Same

1  thing for this internal investigation summary, which I understand

2  has received the same treatment.  There have been redactions so

3  that Mr. Kannan could see it.  The redaction is specific to the

4  employee information, but most of the document doesn't need to be

5  designated AEO.

6       How big is that problem?

7            MR. BOYER:  I don't think that's the majority of it.  I

8  would say maybe there's 50 documents like that.

9            THE COURT:  All right.  Ms. Ford, do you agree there are

10  about 50 documents that fall into that category?

11            MS. FORD:  I would think there's more.  I would think

12  it's probably between 50 and a hundred at least that fall into

13  that category.

14            THE COURT:  Okay.  Because here's what I'm prepared to

15  do.  I think that it's appropriate -- for documents that are

16  meaningful to the case -- you know, you don't want to waste your

17  time on things you don't want to waste your time on, but ones that

18  are meaningful to the case, I think it's appropriate to do the

19  redaction treatment of them so that Mr. Kannan can see everything

20  else and those can be designated "Confidential With Redactions."

21  Ms. Ford, of course, can see everything.  So that requires there

22  to be two versions of such documents -- the AEO version and a

23  "Confidential With Redactions" version.  And maybe it does not

24  even need to be "Confidential."  I'm not proposing they have to be

25  "Confidential" -- but it sounds like that might be the mode -- so

1    that Mr. Kannan can see everything he's entitled to and there

2    aren't these few bits and pieces of the document holding up his

3    access to the remainder.

4            MR. BOYER:  We've actually done that with quite a few of

5    these.

6            THE COURT:  Okay.

7            MR. BOYER:  I can give you examples of that.

8            THE COURT:  Yeah, so that's why I wanted to understand

9    the scope of the problem 'cause I think that's -- that would be --

10   that would be important.  If Ms. Ford can provide you a list or --

11   I don't know how you want to do it -- maybe you guys have already

12   provided a list, but whatever it is that you want to see, you can

13   share that with Mr. Boyer.  And if it really is just 50 to a

14   hundred, maybe it's just easier to do them all.

15       So whatever -- I want to try the easiest path here, but I

16   think that that would be an appropriate thing to do.  How long do

17   you think that you would need, assuming there are, say, a hundred

18   documents?  How long do you think you'd need to --

19           MR. BOYER:  Once they -- you know, if it's a hundred

20   documents, five days.

21           THE COURT:  Let's say there's no list given.  It's just

22   whatever documents there are.  They estimate that there's a

23   hundred.

24           MR. BOYER:  Well, if we're going to have to go through

25   and look through them and make that determination, at least a

1   week.

2          THE COURT:  I don't want to micro-manage this.  I want

3   you all to figure out how many documents there are that you need,

4   Ms. Ford.  If you want them all done because there's a -- there's

5   a hundred or less, fine.  If there's way more than a hundred,

6   you're going to have to tell Mr. Boyer which ones you want done

7   because that would be unreasonable.

8          So that's kind of the dividing line there.

9          MS. FORD:  I'm sorry.  I'm not following you.

10          THE COURT:  I'm prepared to order him to do the

11   redaction and confidentiality designation for all the documents

12   that I described where there's employee-specific information

13   embedded in an AEO document that otherwise Mr. Kannan could see

14   but for that employee-specific information.  If there are a

15   hundred such documents, I'll just order him to do them all.  If

16   there are more than a hundred documents, I'm going to require you

17   to provide a list of the ones that you really want your client to

18   have access to with the redactions.

19          So I suggest you confer about that.

20          That's separate from the question of -- with respect to the

21   compensation guidelines, I'm going to order that those be done

22   without any kind of listing.  The compensation guidelines that are

23   not employee-specific, results of compensation process, that

24   portion of the document has to be de-designated.

25          MR. BOYER:  Okay, Your Honor.

1          THE COURT:  That's important to disclose.  I'm trying to

2     figure out if there are any other categories of documents I can

3     deal with in a categorical fashion, but I couldn't tell from this

4     submission if there were.  And I realize, Mr. Boyer, I haven't

5     really given you an opportunity to respond to what Ms. Ford said,

6     but -- except with respect to the compensation issue.

7        Is there anything that you'd like to add?

8          MR. BOYER:  Counsel will go ahead and re-designate the

9     compensation documents --

10          THE COURT:  Yeah.

11          MR. BOYER:  -- according to the Court's order today?

12     That's not a problem, Your Honor.

13        The only thing I would note is that we've done this

14     "Attorney's Eyes Only" to redacted to confidential with at least

15     -- looking at -- it's about 200 pages' worth of documents.  So

16     with these departments, I don't really know other than the comp

17     guidelines once those get re-designated what's left.

18          THE COURT:  You don't know how many remain.

19          MR. BOYER:  Yes.

20          THE COURT:  Okay.  All right.  Well, that's a point that

21     you should confer about.

22          MR. BOYER:  All right.

23          THE COURT:  I will again give you a written order on

24     this question.  And, you know, I would encourage you if there are

25     specific documents for which there can -- you know, there is some

1   request, that you confer about it.   Again, if it's something

2   that's really meaningful, Ms. Ford really needs, see if you can

3   accommodate it given the concerns and the prior order that I've

4   already issued on this point.

5        All right.   I think -- I think that that's -- that's all I

6   had for 198.   I will issue a written order.

7        So let me address some of the other things that remain.   I'm

8   not taking argument on this, but I'm going to share with you how

9   I intend to handle these remaining matters.

10       I am going to decide Mr. Kannan's multiple motions for leave

11   and for protective orders and for reconsideration of my prior

12   orders as follows:

13       Docket No. 186, which was filed on November 11th, that's an

14   administrative motion asking for leave to file a motion for a

15   protective order barring Apple from making discovery demands after

16   the close of discovery and generally complaining about Apple's

17   discovery conduct, I have already issued an order, as I reminded

18   you all at the outset of this hearing, about how the deadline for

19   fact discovery works, how the motion to compel deadline works, and

20   about what motions the Court will entertain going forward.   That's

21   Docket No. 190.   In all other respects, I am denying this

22   administrative motion.

23       For Docket No. 187, filed on November 11th, this is mostly an

24   improper request for reconsideration of my prior order regarding

25   the employee designations "high growth" and "key talent."   And

1   there's no basis for seeking reconsideration recited in that

2   request.

3       I do, however, have one question for Apple.  Are the records

4   in the Merlin system records that would show which of Mr. Kotni's

5   employees were designated "high growth" or "key talent"?

6           MR. BOYER:  I asked my client and we believe, yes, there

7   would be information on that.

8           THE COURT:  Have you produced those records?

9           MR. BOYER:  We have produced them on the spreadsheets.

10  But that designation is contained on the spreadsheets that we

11  submitted in our opposition.  It was submitted today with the

12  motion for every year.

13          THE COURT:  Okay.  Have you produced those records

14  before Mr. Kotni's deposition or only after the fact?

15          MR. BOYER:  Those were all produced before.

16          THE COURT:  Okay.  So let me just make sure I understand

17  because I know there's reference to calibration sheets, but what

18  I'm asking about is the records in the Merlin system that Mr.

19  Kotni referred to in his deposition, have those records that would

20  reflect which of his employees got "high growth" and "key talent"

21  designations for the relevant years, have those records been

22  produced?

23          MR. BOYER:  Not from the Merlin system.  No, Your Honor.

24          THE COURT:  Okay.  I'm going to order you to do that --

25  create a database, produce those records.  Give those to Ms. Ford

1   and that's it.  No more deposition.  No more anything about it.

2   Just produce those records.  Okay?

3       All right.  Docket No. 196, filed on November 16th, I view as

4   just more argument about the matters raised in Docket Number 184,

5   186, and 187.  I view it as an effort to circumvent my discovery

6   dispute resolution process and my standing order, and that is

7   denied as well.

8       There are a number of pending administrative motions to seal.

9   Some of them involve motions to seal by one party because the

10  other party has designated material confidential and that's mostly

11  Apple's designation.  One example is Docket Number 180, which is

12  an administrative motion to seal by Mr. Kannan.  That was filed on

13  November 5th.  Mr. Kannan says, I'm only marking this under seal

14  because Apple says it's supposed to be designated that way.  I

15  don't think it's necessary.

16      In that situation, our Local Rule 795.E(1)(ph) requires the

17  designating party to file a declaration supporting the claim that

18  the document needs under seal treatment.  And so some of these

19  motions -- and this is just an example -- some of these motions,

20  I don't have the supporting declaration in this case of Apple.

21      I'm going to decide these administrative motions by the end

22  of the week.  I will give you an opportunity to file your

23  declarations.  You need to review your administrative motions.

24  I'm not giving you an exhaustive list.  But if someone has failed

25  to file a declaration, you need to remedy that right away because,

1  otherwise, that's a sort of automatic, you know, failure to
2  support the administrative motion to seal.

3      So I just noted that and wanted to give you a head's-up about
4  that.  That needs to be fixed.

5      All right.  I think that's it.  I will issue a written order
6  on these two motions and I will also issue a written order on the
7  more miscellaneous matters that I've just reviewed with you.

8      All right.  Anything further at this time?

9          MR. BOYER:  No, Your Honor.

10         THE COURT:  Okay.  Thank you very much.

11     (Proceedings adjourned at 11:13 a.m.)

12

13         I, Peggy Schuerger, certify that the foregoing is a
14  correct transcript from the official electronic sound recording
15  provided to me of the proceedings in the above-entitled matter.

16

17  _____          November 21, 2019
    Signature of Approved Transcriber        Date

18
    Peggy Schuerger
19  Typed or Printed Name
    **Ad Hoc Reporting**
20  Approved Transcription Provider
    for the U.S. District Court,
21  Northern District of California

22

23

24

25